UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | |
| | : | VIOLATION: |
| FOKKER SERVICES B.V. | : | 18 U.S.C. § 371 |
| | : | (Conspiracy to Violate |
| | : | International Emergency |
| | : | Economic Powers Act) |
| | : | |
| | : | 50 U.S.C. § 1705 |
| | : | (International Emergency |
| | : | Economic Powers Act) |
| | : | |
| | : | 31 C.F.R. § 560 |
| | : | (Iranian Transactions |
| | : | Regulation) |
| | : | |
| | : | FORFEITURE: 18 U.S.C. § 981; |
| | : | 28 U.S.C. § 2461; and |
| | : | 21 U.S.C. § 853 |

## INFORMATION

The United States Attorney informs the Court that:

### COUNT ONE
(Conspiracy to Unlawfully Export U.S.-Origin Goods and Services to Iran, Sudan, and Burma)

At all times material to this Information:

#### The Defendant

1. Defendant Fokker Services B.V. ("FSBV") was a Dutch aerospace services provider and was a subsidiary of Fokker Technologies Holding B.V., a Netherlands-based manufacturing and technical services company. Both FSBV and Fokker Technologies Holding B.V. were registered under the laws of The Netherlands.

1

2. FSBV had three subsidiaries: (1) Fokker Aircraft Services, B.V. ("FAS"), which was based in The Netherlands; (2) Fokker Services Asia Pte. Ltd., which was based in Singapore; and (3) Fokker Services, Inc. ("FSI"), which was based in Atlanta, Georgia. FSI had one wholly-owned subsidiary: Aerotron AirPower Inc., which was located in LaGrange, Georgia.

3. FSBV's primary charge was safeguarding the continued airworthiness of Fokker aircraft, manufactured by FSBV's predecessor, Fokker Aircraft B.V. In this capacity, FSBV provided the following services to aircraft operators and owners throughout the world: logistical support, component maintenance, repair and overhaul, technical services, and aircraft maintenance and modification. To achieve this mission, FSBV used individual aircraft parts that have been manufactured in a number of jurisdictions throughout the world, including the United States.

4. Defendant FSBV's activities in the United States were subject to oversight and regulation by the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") and the United States Department of Commerce's Bureau of Industry and Security ("BIS"). OFAC, which is located in the District of Columbia, and among other things, administers and enforces economic and trade sanctions against certain foreign countries and entities associated with those countries.

General Allegations

5. Over the years, the United States has employed sanctions and embargos with regard to countries, such as Iran, Burma, and Sudan. Those restrictions arose in

response to repeated support by those nations for international terror against the United States and its allies, and with regard to Iran, the proliferation of weapons of mass destruction.

6. Since its formation in or about 1996, FSBV has historically worked with 11 Iranian customers: Iran Aseman Airlines, Iran Air Transport Company, Iran Air, Iran Aircraft Industries, ANA Trading, Iran Air Force, Iran Navy, Iran Army, Kish Airlines, Taftan Air, and Aria Air—five of these customers were military customers.

7. Since its formation in or about 1996, FSBV has historically worked with four Sudanese customers: Sudan Airways, Nova Airlines, Mid Airlines, and Feeder Airlines.

8. Since its formation in or about 1996, FSBV has historically worked with four Burmese customers: Myanma Airways, Air Mandalay, Yangon Airways, and Air Bagan.

9. From in or around late 2005 until 2010, FSBV violated U.S. export laws by engaging in illegal transactions involving the export and re-export of aircraft parts, technology, and services to U.S.-sanctioned countries, specifically, Iran, Burma, and Sudan (collectively, "U.S.-sanctioned countries"), without first obtaining a license from OFAC.

10. FSBV's criminal conduct included knowingly initiating, either directly or indirectly, 1,153 shipments of aircraft spare, repaired, or exchanged parts, or a combination thereof, which had a U.S. nexus, to FSBV customers who FSBV knew were located in U.S.-sanctioned countries. The shipments in violation of

U.S. export laws had the following U.S. nexus: (1) FSBV sent shipments to U.S. repair shops for repair knowing that the shipments consisted of parts and technology derived from aircraft controlled by FSBV customers located in U.S.-sanctioned countries; or (2) the shipments contained U.S.-origin parts or technology that were subject to export license requirements under U.S. law at the time of shipment. From late 2005 and lasting until 2010, FSBV generated approximately $21 million in revenue attributed to shipments in violation of U.S. export laws.

### The International Emergency Economic Powers Act & Iran, Burmese, and Sudanese Sanctions

11. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat. Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

*The Iranian Sanctions*

12. On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, et seq., finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national

security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat."

13. President Clinton followed this with Executive Order No. 12959, issued on May 6, 1995, which substantially tightened sanctions against Iran by imposing comprehensive trade and financial sanctions on Iran. The Iran sanctions prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran. The Iran sanctions also include a prohibition on the re-exportation from a third country, directly or indirectly, to Iran or the Government of Iran, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States. On August 19, 1997, President Clinton issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. Effective October 22, 2012, the Department of the Treasury renamed and reissued the ITR as the Iranian Transactions and Sanctions Regulations ("ITSR").

14. With the exception of certain exempt transactions, the ITR prohibited any transaction by any U.S. person, or within the United States, that evades or avoids,


security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat."

13. President Clinton followed this with Executive Order No. 12959, issued on May 6, 1995, which substantially tightened sanctions against Iran by imposing comprehensive trade and financial sanctions on Iran. The Iran sanctions prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran. The Iran sanctions also include a prohibition on the re-exportation from a third country, directly or indirectly, to Iran or the Government of Iran, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States. On August 19, 1997, President Clinton issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. Effective October 22, 2012, the Department of the Treasury renamed and reissued the ITR as the Iranian Transactions and Sanctions Regulations ("ITSR").

14. With the exception of certain exempt transactions, the ITR prohibited any transaction by any U.S. person, or within the United States, that evades or avoids,

or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained within the ITR. The ITR were in effect at all times relevant to the conduct described below.

*The Burmese Sanctions*

15. On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.

16. On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta. That same day, President Bush issued Executive Order No. 13310, which blocked all property and interests in property of individuals and entities meeting the criteria set forth in that order. Executive Order No. 13310 also prohibited the exportation or re-exportation to Burma of financial services from the United States, or by U.S. persons, wherever located. President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property is blocked.

17. The Burmese Sanctions Regulations, 31 C.F.R. part 537, implement Executive Order Nos. 13047 and 13310 and the BFDA.

*The Sudanese Sanctions*

18. On November 3, 1997, President Clinton issued Executive Order No. 13067, which imposed a trade embargo against the entire territory of Sudan and a comprehensive blocking of the Government of Sudan. Effective July 1, 1998, OFAC issued the Sudanese Sanctions Regulations ("SSR"), 31 C.F.R. part 538, to

implement Executive Order No. 13067. On October 13, 2006, President George W. Bush issued Executive Order No. 13412 (collectively with Executive Order No. 13067, the "Sudanese Executive Orders"), which continued the comprehensive blocking of the Government of Sudan imposed by Executive Order No. 13067, but exempted the then-regional Government of South Sudan from the definition of the Government of Sudan. Effective October 31, 2007, the SSR was amended to implement Executive Order No. 13412. The Sudanese Executive Orders prohibit, with certain exceptions among other things, the exportation or re-exportation, directly or indirectly, to Sudan of any goods, technology, or services from the United States or by a United States person, wherever located, or requiring the issuance of a license by a Federal agency. The SSR further prohibited any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the SSR.

<u>The Conspiracy</u>

19. Beginning in and around 2005 until in and around 2010, the exact dates being unknown, in the District of Columbia and elsewhere, Defendant FSBV, did willfully and knowingly conspire, confederate and agree with persons, both known and unknown, to commit offenses against the United States, that is, to export and cause the exportation of goods from the United States, and to provide and cause others to provide services, to Iran, Sudan, and Burma, in violation of the prohibitions imposed upon those countries by the United States Government, without having first obtained the required licenses from OFAC, located in the

District of Columbia, in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Part 560.

## The Object of the Conspiracy

20. The objects of the conspiracy were:

   a. to acquire U.S.-origin goods from the United States on behalf of FSBV customers located in U.S.-sanctioned counties;

   b. to service FSBV customers located in U.S.-sanctioned countries,

   c. to conceal from United States companies and the United States Government that the U.S.-origin goods and services were destined for FSBV customers located in U.S.-sanctioned countries;

   d. to make a financial profit for defendant; and

   e. to evade the regulations, prohibitions, and licensing requirements of the ITR, Burmese sanctions, and SSRs.

## Manner and Means of the Conspiracy

21. The manner and means by which the defendant sought to accomplish the objects of the conspiracy, included, among others, the following:

   a. FSBV employees deliberately withheld aircraft tail numbers, or provided false tail numbers to U.S. and U.K. companies, or FSBV stated to U.S. and U.K. companies that the parts were to be used as "stock" parts, as an intentional means to conceal the customers' actual affiliations with U.S.-sanctioned countries.

   b. FSBV employees constructed and constantly updated a chart that tracked which U.S. companies were more vigilant about export controls (the chart

was called "the black list") and directed FSBV business to those U.S. companies which were not vigilant about export compliance.

c. FSBV employees intentionally deleted references to Iran in materials sent to FSBV's U.S. subsidiaries and U.S. repair shops and elsewhere.

d. FSBV deliberately changed the internal FSBV database that tracked parts to delete fields related to ultimate end-user information.

e. FSBV employees were directed to hide activities and documents related to Iranian transactions when U.S. Federal Aviation Administration inspectors audited the FSBV Dutch warehouse.

Overt Acts

22. In furtherance of the above-described conspiracy, and in order to carry out the object thereof, the defendant committed or caused to be committed at least one of the following overt acts, among others:

a. Since its formation in or about 1996 and lasting through 2010, FSBV provided services to 11 Iranian customers, five of which were military customers, four Sudanese customers, and four Burmese customers.

b. In or around late 2007, a manager in the FSBV Logistics department published internally a "work instruction," which detailed steps FSBV employees were to take to evade U.S. sanctions and avoid detection by U.S. authorities; the work instruction informed employees, *inter alia*, that they were to choose only U.S. repair shops that did not request end-user statements or other indicia related to where the parts were ultimately destined, employees were to repackage parts to remove

indications that the part had come from a customer located in a U.S.-sanctioned country.

c. In or around November 2007, FSBV instructed employees not to refer to aircraft tail numbers for parts from customers located in U.S.-sanctioned countries.

d. In or around March 2008, after FSBV's then president decided to temporarily suspend all of FSBV's business with Iran, after the Dutch customs had seized two FSBV packages intended for ANA Trading in Iran, FSBV's CMS group concluded that if FSBV did not use U.S. or U.K.-origin parts, or parts containing U.S. or U.K.-content, the "Iran region will come to a stop completely."

e. On or about April 28, 2008, FSBV officially resumed business with Iranian commercial customers, deciding to comply only with local Dutch law, the applicable U.N. rules, and the terms of any end-user statements that it had signed with U.S. companies.

f. In or around August 2009, after FSBV's newly appointed export compliance manager and FSBV's in-house counsel recommended to FSBV senior management that no U.S.-origin parts could be shipped to Iran, FSBV's president at the time responded, "don't think you can stop everything from going to Iran now that you have this position or I will take you out of the position."

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

1. Upon conviction of the offense alleged in Count One, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The United States will seek entry of a forfeiture money judgment in the amount of at least $21,000,000.

2. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28 United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p)

6/4/14
DATE

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

Maia Luckner-Miller
Assistant United States Attorney
National Security Section