EXHIBIT A

RECEIVED

JUN - 5 2014

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA )
)
v. )
)
FOKKER SERVICES B.V., )
)
Defendant. )
)
)
)

Case: 1:14-cr-00121
Assigned To : Leon, Richard J.
Assign. Date : 6/5/2014
Description: INFORMATION (A)

Defendant Fokker Services B.V. ("FSBV"), a Dutch aerospace services provider, headquartered in Hoofddorp, The Netherlands, by and through its attorneys, Clifford Chance US LLP, hereby enters into this Deferred Prosecution Agreement (the "Agreement") with the United States Attorney's Office for the District of Columbia (the "United States").

**Criminal Charges**

1.     FSBV agrees that it shall waive indictment and agrees to the filing of a one-count Criminal Information in the United States District Court for the District of Columbia, charging it with knowingly and willfully conspiring, in violation of Title 18, Section 371, to engage in transactions with entities associated with sanctioned countries, including Iran, Sudan, and Burma, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701-06, and regulations issued thereunder, and to defraud the United States of America.

**Acceptance of Responsibility**

2.     FSBV accepts and acknowledges responsibility for its conduct and that of its employees as set forth in the Factual Statement attached hereto as Exhibit A and

incorporated herein by reference (the "Factual Statement"). If the United States, pursuant to Paragraph 9 of this Agreement, initiates a prosecution against FSBV that is deferred by this Agreement, FSBV agrees that it will neither contest the admissibility of the Factual Statement or any other documents provided by FSBV to the United States, nor contradict in any such proceeding the facts contained within the Factual Statement. Except as provided in Paragraph 4(i) below, FSBV waives and forgoes any right under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other rule, that any plea, plea discussions, and any related statements made by or on behalf of FSBV prior or subsequent to this Agreement, or any leads derived therefrom, shall be inadmissible, suppressed, or otherwise excluded from evidence at any judicial proceeding arising from this Agreement.

**Forfeiture Amount**

3.    As a result of FSBV's conduct, including the conduct set forth in the Factual Statement, the parties agree that the United States could institute a civil and/or criminal forfeiture action against certain funds held by FSBV and that such funds would be forfeitable pursuant to Title 18, United States Code, Sections 981 and 982. FSBV hereby acknowledges that at least $21,000,000 was involved in transactions described in the Factual Statement, and that such conduct violated Title 50, United States Code, Sections 1701-06, and the regulations issued thereunder. In lieu of a criminal prosecution and related forfeiture, FSBV hereby agrees to pay to the United States the sum of $10,500,000 (the "Forfeiture Amount"). FSBV hereby agrees that the funds paid by FSBV pursuant to this Agreement shall be considered substitute *res* for the purpose of forfeiture to the United States pursuant to Title 18, United States Code, Sections 981 and

2

982, and FSBV releases any and all claims it may have to such funds. FSBV shall pay the Forfeiture Amount plus any associated transfer fees within five (5) business days of the date on which this Agreement is approved by the Court, pursuant to payment instructions as directed by the United States in its sole discretion.

**Deferral of Prosecution**

4.    In consideration of FSBV's remedial actions to date and its willingness to: (a) acknowledge and accept responsibility for its actions; (b) voluntarily self-report its conduct and cooperate in this investigation; (c) voluntarily terminate the conduct set forth in the Factual Statement; (d) continue its cooperation with the United States as stated in Paragraphs 5 and 6; and (e) settle any and all civil and criminal claims currently held by the United States for any act within the scope of or related to the Factual Statement or this investigation, the United States agrees as follows:

(i)    This Agreement is effective for a period beginning on the date on which the Information is filed, and ending 18 months from that date (the "Term"). FSBV expressly waives any and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution for the Term of this Agreement. Moreover, if necessary, FSBV agrees: (1) to join the Government in seeking to exclude, pursuant to Title 18, United States Code, Section 3161(h)(2), the Term of this Agreement from the time within which trial of the offense charged in the Information must commence, for the purpose of allowing FSBV to demonstrate its good conduct; and (2) to waive any rights to a speedy trial under Federal Rule of Criminal Procedure 48(b) and Local Criminal Rule 45.1 of the United States District Court for the District of Columbia.

3

(ii)     the United States shall, if FSBV is in full compliance with all of its obligations under this Agreement, within thirty (30) days of the expiration of the Term of this Agreement set forth above in Paragraph 4(i), or less at the discretion of the United States, seek dismissal with prejudice of the Information filed against FSBV pursuant to Paragraph 1 and this Agreement shall expire and be of no further force or effect.

**Cooperation:**

5.     FSBV agrees that it shall:

(i)     Continue to cooperate during the Term with the United States and with any other governmental department or agency regarding any matters related to this agreement;

(ii)     FSBV agrees that with respect to this Agreement, FSBV's cooperation shall include, but is not limited to the following: truthfully disclosing information within FSBV's possession, custody, or control with respect to activities of FSBV, its affiliates and its present and former officers, agents, and employees, concerning the subject matters inquired into by the United States regarding possible violations of the laws, regulations, and programs listed in this Agreement. This obligation of truthful disclosure includes an obligation to provide the United States reasonable access to FSBV's documents and employees, whether or not located in the United States, and reasonable access to FSBV's facilities for that purpose; assembling, organizing, and providing on request from the United States, documents, records or

4

other tangible evidence in FSBV's possession, custody, or control in such format as the United States reasonably requests, and where appropriate, FSBV will continue to use the services of expert technical consultants to assist in the identification and retrieval of relevant information and data;

(iii) Use its reasonable best efforts to make available its present or former officers, directors and employees, whether or not located in the United States, to provide information and/or testimony as requested by the United States, including sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal authorities. Cooperation under this paragraph will include identification of witnesses who, to FSBV's knowledge, may have relevant information regarding possible violations of the laws, regulations and programs listed in this Agreement;

(iv) Providing testimony and other information deemed necessary by the United States or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents or other exhibits in any criminal or other proceeding as requested by the United States;

(v) FSBV agrees that the United States, in its sole discretion, may disclose to any government department or agency any information, testimony, document, record, or other tangible evidence provided to the United States pursuant to this Agreement. If any

5

information, documents, records or other materials provided by FSBV to the United States contain confidential or proprietary business or financial information, FSBV may identify the relevant information or materials at the time of production. The United States agrees that it will maintain the confidentiality of, and will not disclose or disseminate, any confidential or proprietary business or financial information identified and provided by FSBV without the consent of FSBV, except that the United States may share such information with another government department or agency, as required by law or to the extent necessary to fulfil its law enforcement obligations or duties;

(vi)   Continue to apply and implement FSBV's new Export Compliance Program designed to comply with all United States sanctions with embargoed countries, which includes a provision that prohibits FSBV compliance staff from working in any of FSBV's sales division or deriving any financial benefit or bonus from FSBV sales, and which also requires periodic compliance training of all FSBV employees;

(vii)  Continue to apply and implement FSBV's new compliance statement policy, which reads, "FSBV shall not export or re-export aircraft parts, technology, or provide any services to persons or countries that are embargoed with the United States, The Netherlands, or the United Nations . . . ."

(viii) Include in all FSBV contracts with all customers language which explicitly states that FSBV will not export or re-export any items contrary to United States laws, United Nations laws, and laws of The Netherlands;

(ix) Except as otherwise permitted by United States law, not knowingly engage in any export or re-export of aircraft parts, technology, or provide any services to persons or companies that are sanctioned by the United States, the United Nations, and The Netherlands;

(x) Require that all FSBV customers sign end-user statements;

(xi) Notify the United States of any criminal, civil, administrative, or regulatory investigation or action of FSBV or its current directors, officers, employees, consultants, representatives, and agents related to FSBV's compliance with U.S. sanctions laws, to the extent permitted by the agency conducting the investigation or action and applicable law;

**Additional Cooperation**

6.     FSBV agrees that for the term of this Agreement, in accordance with applicable laws, it shall supply and/or make available upon request by the United States any additional relevant documents, electronic data, or other objects in FSBV's possession, custody, or control as of the date of this Agreement relating to any transaction within the scope of or relating to the Factual Statement. Nothing in this Agreement shall be construed to require FSBV to produce any documents, records or tangible evidence that are protected by the attorney-client privilege or work product doctrine or Dutch or

7

other applicable confidentiality, criminal, or data protection laws. To the extent that a United States request requires transmittal through formal government channels, FSBV agrees to use its best efforts to facilitate such a transfer and agrees not to oppose any request made in accordance with applicable law either publicly or privately.

**Government Commitments**

7.     In return for the full and truthful cooperation of FSBV and compliance with the terms and conditions of this Agreement, the United States agrees that it shall not seek to prosecute FSBV, its corporate parents, subsidiaries, affiliates, successors, or assigns for any act within the scope of or related to the Factual Statement or this investigation from 2005 through the date of this Agreement unless: (a) other than the transactions, exports, or re-exports that have already been disclosed and documented to the United States, FSBV knowingly and willfully exported or re-exported aircraft parts, technology, or provided any services involving a U.S. person in violation of U.S. law that went to or came from persons or entities designated at the time of the transaction by the United States Department of Treasury, Office of Foreign Asset Controls as a Specially Designated National, a Specially Designated Global Terrorist, a Foreign Terrorist Organization, or a proliferator of Weapons of Mass Destruction (an "Undisclosed Special SDN Transaction"); or (b) in the sole discretion of the United States, there is a willful and material breach of this Agreement. In the event of a breach resulting in a prosecution of FSBV or a prosecution related to an Undisclosed Special SDN Transaction, the United States may use any information provided by or on behalf of FSBV to the United States or any investigative agency, whether prior to or subsequent to this Agreement, and/or any leads derived from such information, including the attached Factual Statement.

**Waiver of Rights**

8.     FSBV hereby further expressly agrees that within six (6) months of a willful and material breach of this Agreement by FSBV, any violations of federal law that were not time-barred by the applicable statute of limitations as of the date of this Agreement, including any claims covered by the tolling agreement signed by the parties, and that: (a) relate to the Factual Statement; or (b) were hereinafter discovered by the United States, may in the sole discretion of the United States be charged against FSBV, notwithstanding the provisions or expiration of any applicable statute of limitations.   In the event of a willful and material breach, FSBV expressly waives:  any challenges to the venue or jurisdiction of the United States District Court for the District of Columbia; any right to be charged by an Indictment returned by a grand jury, and agrees to be prosecuted on the Information filed in this matter or a superseding Information arising from the facts presented in the Factual Statement.

**Breach of the Agreement**

9.     If the United States determines that FSBV has committed a willful and material breach of any provision of this Agreement, the United States shall provide written notice to FSBV's counsel of the alleged breach and provide FSBV with a two-week period from the date of receipt of said notice, or longer at the discretion of the United States, in which to make a presentation to the United States to demonstrate that no breach has occurred or, to the extent applicable, that the breach is not willful or material, or has been cured.  The parties expressly understand and agree that if FSBV fails to make the above-noted presentation within such time period, it shall be presumed that FSBV is in willful and material breach of this Agreement.  The parties further understand and

agree that the United States' exercise of discretion under this paragraph is not subject to review in any court or tribunal outside the Department of Justice and the United States Attorney's Office for the District of Columbia. In the event of a breach of this Agreement that results in a prosecution, such prosecution may be premised upon any information provided by or on behalf of FSBV to the United States or any investigative agencies, whether prior to or subsequent to this Agreement, and/or any leads derived from such information, including the attached Factual Statement, unless otherwise agreed to by the United States and FSBV in writing at the time the information was provided to the United States.

**Requirement to Obey the Law**

10.     If the United States determines during the term of this Agreement that FSBV has committed any federal crime after the date of the signing of this Agreement, FSBV shall, in the sole discretion of the United States, thereafter be subject to prosecution for any federal crimes of which the United States has knowledge, including but not limited to the conduct described in the Factual Statement. The discovery by the United States of any purely historical criminal conduct that did not take place during the term of the Agreement will not constitute a breach of this provision.

**Parties Bound by the Agreement**

11.     This Agreement and all provisions set forth herein bind FSBV, which agrees to ensure that its wholly-owned subsidiaries, and any successors and assigns, comply with the requirements and obligations set forth in this Agreement. It is further understood that this Agreement and all provisions set forth herein are binding on the United States. It is further understood that this Agreement does not bind any federal

agencies, or any state or local authorities, although the United States will bring FSBV's cooperation and its compliance with its other obligations under this Agreement to the attention of federal, state, or local prosecuting offices or regulatory agencies, if requested by FSBV or its attorneys. Nothing in this Agreement restricts in any way the ability of the United States, any other federal department or agency, or any state or local government from proceeding criminally, civilly, or administratively, against any current or former directors, officers, employees, or agents of FSBV or against any other entities or individuals. The parties to this Agreement intend that the Agreement does not confer or provide any benefits, privileges, immunities, or rights to any other individual or entity other than the parties hereto.

### Public Statements

12.    FSBV expressly agrees that it shall not cause to be made, through its attorneys, board of directors, agents, officers, employees, consultants or authorized agents (including, contractors, subcontractors, or representatives), including any person or entity controlled by any of them, any public statement contradicting the acceptance of responsibility by FSBV set forth above or the facts described in the Factual Statement. Any such public statement by FSBV, its attorneys, board of directors, agents, officers, employees, consultants, contractors, subcontractors, or representatives, including any person or entity controlled by any of them, shall, subject to the cure rights of FSBV set forth below, constitute a wilful and material breach of this Agreement as governed by Paragraph 9 of this Agreement, and FSBV would thereafter be subject to prosecution pursuant to the terms of this Agreement. The decision of whether any public statement by any such person contradicting the acceptance of responsibility by FSBV set forth

above or the facts described in, the Factual Statement will be imputed to FSBV, for the purpose of determining whether FSBV has breached this Agreement, shall be in the sole discretion of the United States. Upon the United States' notification to FSBV of a public statement by any such person that in whole or in part contradicts the acceptance of responsibility by FSBV set forth above or the facts described in the Factual Statement, FSBV may avoid breach of this Agreement by publicly repudiating such statement within five (5) business days after notification by the United States. FSBV shall be permitted to raise defences and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defences and claims do not contradict, in whole or in part, a statement contained in the Factual Statement. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of FSBV in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of FSBV. Subject to this paragraph, FSBV retains the ability to provide information or take legal positions in litigation or other regulatory proceedings in which the United States is not a party.

13.    FSBV agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, FSBV shall first consult the United States to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the United States and FSBV; and (b) whether the United States has no objection to the release.

12

**Sales or Mergers**

14.     FSBV agrees that if it sells, merges, or transfers all or substantially all of its business operations or assets as they exist as of the date of this Agreement to a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include. in any contract for sale, merger, or transfer a provision binding the purchaser/successor/transferee to the obligations described in this Agreement. Any such provision in a contract of sale, merger, or transfer shall not expand or impose additional obligations on FSBV or the purchaser, successor or transferee as they relate to Paragraphs 5 and 6 of this Agreement.

**Conduct Covered by Agreement**

15.     It is further understood that this Agreement does not relate to or cover any conduct by FSBV other than for any act within the scope of the Factual Statement or this investigation.

**Public Filing**

16.     FSBV and the United States agree that this Agreement (and its attachments) and an Order deferring prosecution shall be publicly filed in the United States District Court for the District of Columbia.

**Complete Agreement**

17.     This Agreement sets forth all the terms of the Agreement between FSBV and the United States. There are no promises, agreements, or conditions that have been entered into other than those expressly set forth in this Agreement, and none shall be entered into and/or be binding upon FSBV or the United States unless signed by the United States, FSBV's attorneys, and a duly authorized representative of FSBV. This

Agreement supersedes any prior promises, agreements, or conditions between FSBV and the United States. FSBV agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement and it agrees to abide by all terms and obligations of this Agreement as described herein.

**Acknowledgment on behalf of Fokker Services B.V.**

I, ~~Peter~~ , ~~Somas~~ , the duly authorized representative of Fokker Services B.V., hereby expressly acknowledge the following: (1) that I have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Information and Statement of Facts; (2) that I have had an opportunity to discuss this Agreement fully and freely with Fokker Services B.V.'s counsel, Clifford Chance US LLP; (3) that Fokker Services B.V. fully and completely understands each and every one of the terms of this Agreement; (4) that Fokker Services B.V. is fully satisfied with the advice and representation provided to it by its counsel, Clifford Chance US LLP; (5) that I am authorized, on behalf of Fokker Service B.V., to enter into this Agreement; and (6) that Fokker Services B.V. has signed this Agreement knowingly and voluntarily.


Fokker Services B.V.

_____          _____
28 May 2014
DATE                                            Fokker Services B.V.


15

**Acknowledgment by Defense Counsel for Fokker Services B.V.**

We, David D. DiBari, and Edward O'Callaghan, the attorneys representing Fokker Services B.V., hereby expressly acknowledge the following: (1) that we have reviewed and discussed this Agreement with our client; (2) that we have explained fully each one of the terms of the Agreement to our client; (3) that we have answered fully each and every question put to us by our client regarding the Agreement; and (4) that we believe our client fully and completely understands all of the Agreement's terms.

6/3/14
DATE

David D. DiBari, Esquire
Clifford Chance US LLP

6/3/14
DATE

Edward O'Callaghan, Esquire
Clifford Chance US LLP

16

*__On Behalf of the Government__*

Date: 5|22|14

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

Date: 5|22|14

Maia Luckner Miller
Assistant United States Attorney
National Security Section

### *Exhibit A*

Factual Statement

## EXHIBIT A -- FACTUAL STATEMENT

### Introduction

1.      This Factual Statement is made pursuant to, and is part of, the Deferred Prosecution Agreement dated 6/3/14, between the United States Attorney's Office for the District of Columbia ( "USAO-DC") and Fokker Services B.V. ("FSBV"), a Dutch aerospace services provider, headquartered in Hoofddorp, The Netherlands.

2.      Starting in late 2005 and ending in late 2010, FSBV violated U.S. laws by engaging in illegal transactions involving the export and re-export of aircraft parts, technology, and services to customers located in U.S.-sanctioned countries, specifically, Iran, Burma, and Sudan (collectively, "U.S.-sanctioned countries").[1]   Throughout this time period, FSBV knowingly and willfully engaged in this criminal conduct, aware of the application of U.S. export laws to FSBV, an issue which was repeatedly raised internally with FSBV management. Moreover, during this time period, FSBV's conduct in violation of U.S. export control laws occurred in various business units within FSBV and certain policies and practices in furtherance of FSBV's criminal conduct were carried out with the knowledge and approval of FSBV's senior corporate managers, as well as with the knowledge of FSBV's Legal and Export Compliance departments.

3.      FSBV's criminal conduct included knowingly initiating, either directly or indirectly, 1,153 shipments of aircraft spare, repaired, or exchanged parts, or a combination thereof, which had a U.S. nexus[2] to FSBV customers whom FSBV knew were located in U.S.-

---

[1] The majority of FSBV's conduct in violation of U.S. export laws concerned shipments of aircraft parts, technology, and services to FSBV customers located in Iran.  FSBV, however, engaged in similar conduct with customers located in other embargoed locations, including Sudan and Burma.

[2] The shipments in violation of U.S. export laws had the following U.S. nexus: (1) they consisted of parts and technology that FSBV provided from U.S. suppliers or were sent by FSBV to be repaired by U.S. shops; or (2) the

sanctioned countries (collectively, "shipments in violation of U.S. export laws"). Neither FSBV nor its corporate subsidiaries obtained U.S. export licenses to provide its customers located in U.S.-sanctioned countries with the aircraft parts, technology, and services. Among these unlawful transactions were 99 transactions involving Iran Air, which, during the relevant time period, was subject to a temporary denial order issued by the United States Department of Commerce under the Export Administration Regulations. The temporary denial order further prohibited Fokker and any other third party from exporting or reexporting U.S. origin commodities to Iran Air or providing services to Iran Air.

4. FSBV's gross revenue for the shipments in violation of U.S. export control laws amounted to approximately $21 million.

### FSBV's Business Organization and Assets

5. FSBV is a Dutch aerospace services provider and is a subsidiary of Fokker Technologies Holding B.V., a Netherlands-based manufacturing and technical services company. FSBV was founded in 1996 after its predecessor, Fokker Aircraft B.V., which manufactured Fokker aircraft, went bankrupt. Presently, FSBV's primary charge is safeguarding the continued airworthiness of Fokker aircraft in operation.

6. FSBV has three subsidiaries: (1) Fokker Aircraft Services, B.V. ("FAS"), which is based in The Netherlands; (2) Fokker Services Asia Pte. Ltd., which is based in Singapore; and (3) Fokker Services, Inc. ("FSI"), which is based in Atlanta, Georgia. FSI has one wholly-owned subsidiary: Aerotron AirPower Inc.("Aerotron"), which is located in LaGrange, Georgia.

---

shipments contained U.S.-origin parts or technology that were subject to export license requirements under U.S. law at the time of shipment.

## Applicable Law

### *The Iranian Sanctions*

7.     On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq.*, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat."

8.     President Clinton followed this with Executive Order No. 12959, issued on May 6, 1995, which substantially tightened sanctions against Iran by imposing comprehensive trade and financial sanctions on Iran. The Iran sanctions prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran. The Iran sanctions also include a prohibition on the re-exportation from a third country, directly or indirectly, to Iran or the Government of Iran, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States. On August 19, 1997, President Clinton issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.[3]

---

[3] Effective October 22, 2012, the Department of the Treasury renamed and reissued the ITR as the Iranian Transactions and Sanctions Regulations (ITSR).

9.     With the exception of certain exempt transactions, the ITR prohibited any transaction by any U.S. person, or within the United States, that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained within the ITR. The ITR were in effect at all times relevant to the conduct described below.

### The Burmese Sanctions

10.     On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.

11.     On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta. That same day, President Bush issued Executive Order No. 13310, which blocked all property and interests in property of individuals and entities meeting the criteria set forth in that order. Executive Order No. 13310 also prohibited the exportation or re-exportation to Burma of financial services from the United States, or by U.S. persons, wherever located. President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property is blocked.

12.     The Burmese Sanctions Regulations, 31 C.F.R. part 537, implement Executive Order Nos. 13047 and 13310 and the BFDA.

### The Sudanese Sanctions

13.     On November 3, 1997, President Clinton issued Executive Order No. 13067, which imposed a trade embargo against the entire territory of Sudan and a comprehensive blocking of the Government of Sudan. Effective July 1, 1998, the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") issued the Sudanese Sanctions

Regulations ("SSR"), 31 C.F.R. part 538, to implement Executive Order No. 13067. On October 13, 2006, President George W. Bush issued Executive Order No. 13412 (collectively with Executive Order No. 13067, the "Sudanese Executive Orders"), which continued the comprehensive blocking of the Government of Sudan imposed by Executive Order No. 13067, but exempted the then-regional Government of South Sudan from the definition of the Government of Sudan. Effective October 31, 2007, the SSR was amended to implement Executive Order No. 13412. The Sudanese Executive Orders prohibit, with certain exceptions among other things, the exportation or re-exportation, directly or indirectly, to Sudan of any goods, technology, or services from the United States or by a United States person, wherever located, or require the issuance of a license by a Federal agency. The SSR further prohibited any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the SSR.

### Violation of 18 U.S.C. § 371

16. By information, the USAO-DC has charged, and FSBV agrees, that its conduct, as described herein, violated Title 18, United States Code, Section 371; specifically, the USAO-DC has charged, and FSBV agrees that during the time period, FSBV conspired to violate IEEPA which criminalizes the willful violation or attempted violation of regulations prohibiting: (1) the direct or indirect export of goods, services, or technology from the United States to U.S.-sanctioned countries, and (2) the re-export of U.S.-origin controlled goods to Iran, Burma, and Sudan, as well as conspired to defraud the United States.

## FSBV's Customers Affiliated with Embargoed Locations

17.     Since its formation in 1996, FSBV had historically worked with 11 Iranian customers: Iran Aseman Airlines, Iran Air Transport Company, Iran Air, Iran Aircraft Industries, ANA Trading, Iran Air Force, Iran Navy, Iran Army, Kish Airlines, Taftan Air, and Aria Air. Five of these customers were military customers: Iran Aircraft Industries, ANA Trading, Iran Air Force, Iran Navy, and Iran Army.

18.     FSBV also historically worked with four Sudanese customers: Sudan Airways,[4] Nova Airlines, Mid Airlines, and Feeder Airlines.  FSBV also historically worked with four Burmese customers: Myanma Airways, Air Mandalay, Yangon Airways, and Air Bagan.

## FSBV's Management's Awareness of Violations of U.S. Export Control Laws

19.     On February 8, 2002, FSBV applied to OFAC for a license to re-export six U.S.-manufactured aircraft traffic collision avoidance systems ("TCAS") to be acquired from two U.S. suppliers to Iran Air.  In its application, FSBV stated, "It is our understanding [] that the TCAS II system is produced only in the United States. [] Failure by [FSBV] [] to obtain a license to [] re-export to Iran the TCAS II [] will prevent the installation of a traffic avoidance system on the Fokker 100s owned by Iran Air since there are no non-U.S. suppliers of the TCAS II." Thus, by no later than the 2002 application to OFAC, FSBV had specific and actual knowledge of U.S. export laws prohibiting the export and re-export of U.S.-origin goods to Iran.

20.     While waiting for a response from OFAC, FSBV internally evaluated its practice of supplying Iranian customers with parts supplied by U.S. repair shops.  For example, on August 4, 2003, FSBV's in-house counsel raised this issue with FSBV's president, among other

---

[4] During the relevant time period, Sudan Airways was an entity identified on OFAC's List of Specially Designated Nationals and Blocked Persons (the "SDN list").  The assets of entities identified on the SDN List are blocked and U.S. persons are generally prohibited from conducting business with them.

FSBV senior management, and specifically discussed the tension between FSBV's growing Iranian customer base and the potential risk that U.S. authorities would deem FSBV to be in violation of U.S. export control laws.

21.     On January 22, 2004, OFAC denied FSBV's license application.

22.     Subsequently, in September 2005, FSBV's senior management learned that U.S. export control laws also prohibited U.S. repair shops from repairing aircraft parts for Iranian customers when a U.S. repair shop refused to return an aircraft part to FSBV because the U.S. repair shop had learned that the aircraft part was intended for a FSBV customer on the "U.S. boycott list." On October 3, 2005, a FSBVDirector advised FSBV management that a growing number of U.S. and U.K. suppliers were requesting signed end-user statements.

23.     Although FSBV was generally aware of the reality that it was engaging in transactions that were in violation of U.S. export control laws, it was not until late 2007, when FSBV's management assembled a formal working group ("export compliance working group"), comprised of members of FSBV senior management as well as FSBV's in-house counsel, and tasked with reviewing FSBV's export compliance policies and its business with Iran. Among the questions that initially were discussed by the export compliance working group were the following: (1) "What is permissible within the framework of current Dutch, European, and American law," (2) "How can we ensure that our process with regards to trade with Iran is entirely under control," and (3) "What are the consequences for the stream of outsourced requests." Shortly thereafter, the export compliance working group specifically considered the issue of the application of U.S. export control laws to FSBV's transactions involving Iranian customers and came to the following conclusion: "America[,] for example[,] tracks her parts over the entire world where it legally has jurisdiction to do so. You can thus comply with all

Dutch legislation, but that does not imply that you are at the same time also 'compliant' with American legislation," and that "the central question that now arises is whether Fokker wishes to be 100% compliant with American regulations. At this very moment a risk for Fokker already exists, because a lot of business is being conducted with companies in America." Subsequently, the export compliance working group discussed at a meeting the following possibility: "Taking the future into account – America will become increasingly important for FS[BV] for the generating of turnover – the question is whether one wishes to expose himself [sic.] to risks of possible sanctions. One is thus confronted with the decision of sacrificing turnover in Iran in order to be entirely compliant with American regulations."

24.     Shortly after the creation of the management working group, a manager in FSBV's Logistics department published internally a "work instruction," which detailed steps FSBV employees were to take to evade U.S. sanctions and avoid detection by U.S. authorities. The "work instruction" told FSBV employees how to handle parts that came from Iranian customers or that were intended for Iranian customers and which FSBV wanted to send to the U.S. for repair. The "work instruction" informed employees to choose only U.S. repair shops that did not request end-user statements or other indicia related to where the parts were ultimately going. Additionally, the "work instruction" informed employees how to repackage parts to remove indications that the part had come from a customer identified in a U.S.-sanctioned country. The purpose of this "work instruction" was to prevent U.S. authorities from discovering activities that violated U.S. export controls relating to U.S.-sanctioned countries.

25.     In February 2008, Dutch authorities stopped two FSBV shipments intended for ANA Trading, a FSBV Iranian customer, as part of a new Dutch program to require licenses for commercial shipments to Iranian military customers. After the shipments were stopped, a FSBV

senior representative spoke to the Dutch authorities regarding the two detained packages; Dutch authorities told the company representative that all shipments to Iran needed an export license and asked FSBV to compile a list of all Iranian customers and provide it to them.   This information was relayed to FSBV senior management.

26.   The next day, on February 29, 2008, three members of FSBV's management working group jointly sent FSBV senior management, including FSBV's president, a memorandum noting that FSBV management needed to address "how to deal with the two deliveries by FS[BV] to ANA Trading in Iran that were blocked by the Dutch customs[,] and [] how to deal with future deliveries to military customers from the same region."   The memorandum continued, "[i]n addition to this military shipment, we engage in many times as many shipments to commercial customers in Iran. [] [I]n the end, [] a possible discontinuation will have a major impact on our turnover."   On March 3, 2008, FSBV's president decided to temporarily suspend all of FSBV's business with Iranian customers.

27.   On March 18, 2008, FSBV's Component and Material Services ("CMS") management team member and in-house counsel went to The Hague, The Netherlands, to meet with Dutch customs authorities.   The Dutch authorities warned FSBV that the Dutch authorities would not be able to defend FSBV if it encountered problems with the United States authorities concerning FSBV's possible non-compliance with U.S. export laws.   Following this meeting, FSBV's management team decided to resume its business with Iranian commercial customers, while ceasing business with Iranian military customers.[5]

---

[5]  Before resuming business with Iranian commercial customers, however, FSBV management tasked FSBV's CMS group with finding alternatives for the parts that could not be used with FSBV's Iranian customers because of the parts' U.S. content or origin.  The CMS group concluded that if FSBV did not use U.S.- or U.K.-origin parts, or parts containing U.S.- or U.K.-content, that the "Iran region will come to a stop completely."  Ultimately, FSBV management's directive to CMS was not implemented.

28.     On or about April 28, 2008, FSBV resumed business with Iranian civilian customers and decided it would comply with U.S. export laws only to the extent it was bound by the terms of any end-user statements FSBV had signed with U.S. companies.

29.     On May 19, 2008, FSBV's then president, as well as FSBV's recently replaced former president, attended a management team meeting wherein the decision to terminate FSBV's business with Iranian military customers, while continuing operations with Iranian civilian customers, was discussed.

30.     On September 8, 2008, FSBV in-house counsel wrote a memorandum to the General Counsel at FSBV's parent company, in which the in-house counsel explained that FSBV would continue serving its civilian customers in Iran, which constituted the majority of its business with Iran, but noted that "it might be unwise to do business with certain (military) customers because of our expansion plans in the U.S." The memorandum additionally stated that FSBV "estimates a decline in revenue of about EUR 5 million as a result of loss of business with … (military customers). … No estimate has been made as of yet regarding revenue decline in case certain American and English suppliers become more strict and refuse to deliver any parts for our customers in Iran." (sic.)

31.     In November 2009, FSBV in-house counsel explicitly advised the FSBV president that FSBV could not ask FSI to ship parts to The Netherlands if FSBV intended to then ship those parts to customers in Iran.  FSBV internal policies and practices did not change as a result of in-house counsel's warning.

### Steps Taken by FSBV to Avoid Detection of Violations of U.S. Export Laws

32.     From on or about 2005 through 2010, FSBV used a number of schemes to evade U.S. sanctions and export laws while continuing its business with customers located in U.S.-

sanctioned countries. FSBV described these schemes to continue its business in U.S.-sanctioned counties by evading U.S. law and detection by U.S. authorities as "work-arounds."

33.     For example, FSBV employees engaged in the following conduct designed to conceal FSBV's involvement with customers located in U.S.-sanctioned countries:

    i.   FSBV deliberately withheld aircraft tail numbers, or provided false tail numbers to U.S. and U.K. companies, or FSBV stated that the parts were to be used as "stock" parts, as an intentional means to conceal the customers' locations in U.S.-sanctioned countries.  For example, FSBV provided a U.S. aerospace company with a work order that falsely represented that the aircraft part belonged to an airplane owned by a Portuguese airline when in reality, the part belonged to an Iran Air aircraft. In this instance, FSBV falsified the tail number on the paperwork that was provided to the U.S. aerospace company, who fixed the part and returned it to FSBV in The Netherlands, where the part was shipped to Iran. Furthermore, FSBV automated this practice of providing misleading or intentionally incorrect information to its suppliers in February 2008 when FSBV added an alert notice to its internal account management database which told FSBV employees that they should "[s]upply TAIL-NRS except for customers like Iran and other countries that are boycotted;"

    ii.   FSBV constructed and constantly updated a chart they called "the black list" that tracked which U.S. companies were more vigilant about export controls, and FSBV directed its business to those U.S. companies which were not on "the black list;"

iii.   FSBV deleted references to Iran in materials sent to FSBV's U.S. subsidiaries and U.S. repair shops and elsewhere. This policy was pursued with U.S. companies on the black list, as well as other U.S. companies;

iv.   FSBV changed the internal FSBV database that tracked parts to delete fields related to ultimate end user information; and

v.   FSBV employees were directed to hide activities and documents related to Iranian transactions when U.S. Federal Aviation Administration inspectors audited the FSBV Dutch warehouse.

34.   For those U.S. repair shops who did not ask for identity of the end-user, or if the U.S. repair shop did not request an end-user statement, FSBV withheld that information; FSBV followed a "what they don't know won't hurt them" policy. An August 19, 2004, email explicitly articulated this position, in which an FSBV employee wrote to the Manager of Operations and Resources and to the Account Support Manager for Technical Services, "[I]t is indeed up to the vendor whether they supply products/services to Iranian [] customers or not. [] This is because the U.S. government explicitly prohibits them from supplying these countries. [] [W]e apply the 'what they don't know, won't hurt them,' principle which means we don't provide more information to suppliers than they need." This practice was rearticulated and cited again in a November 9, 2007, internal memorandum to the management team for FSBV's Component and Material Services Division discussing the then-current state of affairs with FSBV's vendors and vendors' delivery requirements concerning exports to Iran. The November 9, 2007, memorandum expressly states, "it may be common knowledge that especially USA suppliers are bound by Government Acts, so if you were to ask them directly they would not

agree to the export [of] parts to the 'axis of evil.' Generally speaking, we will then implement the FS[BV] policy with regard to this matter, meaning: what one doesn't know won't hurt anyone."

35.   All of the evasive schemes were instituted and employed by FSBV employees as a way in which to allow FSBV to continue its transactions with customers located in U.S.-sanctioned countries despite FSBV's awareness that these transactions were in violation of U.S. export laws.

### FSBV's Disclosure and Cooperation

36.   On June 23, 2010, FSBV provided the United States Department of Commerce's Bureau of Industry and Security ("BIS") and OFAC with an initial notice of disclosure of certain historic FSBV transactions that potentially implicated various U.S. regulations.  In this initial disclosure, FSBV acknowledged and accepted responsibility for its unlawful conduct.  Moreover, during this time period, FSBV hired outside counsel, Clifford Chance US LLP ("Clifford Chance") to investigate the extent of FSBV's U.S. export control law violations and to assist FSBV in developing a new corporate export compliance program.

37.   Since its engagement, Clifford Chance has completed the following, *inter alia*: (1) reviewed 584,046 documents, (2) interviewed 51 current FSBV employees and 4 former FSBV employees, (3) collected data on 20,614 transactions possibly related to transactions involving U.S.-sanctioned countries, and (4) reviewed data associated with approximately 200,000 parts.

38.   On December 23, 2010, FSBV submitted to BIS and OFAC a narrative submission, articulating the results of its vast internal investigation led by Clifford Chance.  Over the next two years, FSBV supplemented this report through additional submissions to BIS and OFAC, including the following: (1) a May 9, 2011, disclosure of additional violations of U.S. export laws identified as a result of FSBV's comprehensive review of the Export Control

13

Classification Numbers ("ECCNs") used in its business, and (2) a June 6, 2011, disclosure of additional violations of U.S. export laws identified as a result of research undertaken by FSBV to determine which foreign suppliers and repairers were the branch offices of U.S. companies.

39.     Throughout the course of this investigation, FSBV's cooperation with the USAO-DC, BIS, and OFAC has also included the following:

    i.    FSBV provided unredacted documents after having assisted in expediting the USAO-DC's Mutual Legal Assistance Treaty request made to Dutch authorities;

    ii.    FSBV answered USAO-DC questions and document requests in a timely manner; the majority of the documents FSBV provided were originally written in Dutch, but FSBV provided English translations;

    iii.    FSBV facilitated   interviews by federal investigators and USAO-DC prosecutors of 12 FSBV employees and former employees; FSBV paid for the individuals' personal U.S. legal counsel, and provided a translator and working space to conduct the interviews in The Netherlands; and

    iv.    FSBV agreed to toll the expiration of the relevant statute of limitations several times during the course of the investigation.

## FSBV's Remediation

40.     Since the submission of its 2010 disclosure to U.S. authorities, FSBV has also taken voluntary steps to enhance and optimize its sanctions compliance programs, including the following:

    i.    In September 2010, FSBV stopped all new business with customers located in U.S.-sanctioned countries, regardless of whether that business had a U.S.

nexus, and determined that it would fulfill pre-existing contractual commitments with these customers only to the extent that the transactions complied with U.S. law;[6]

ii.   FSBV launched an employee disciplinary review to investigate the conduct of all employees, including senior management, who were involved in the apparent violations.  Following this review, FSBV hired a new President. Depending on their level of individual responsibility for the apparent violations, other FSBV employees received training in U.S. export controls and economic sanctions, were removed from decision-making positions or demoted, or had some of their duties reassigned;

iii.  FSBV adopted a new Export Compliance Program ("ECP"), which is based on OFAC and BIS regulations, as well as the United States Sentencing Guidelines, and the laws of The Netherlands and Singapore.  Under the new ECP:

a.   There is a Chief Compliance Risk Officer, who reports to FSBV's parent's company CEO; a Divisional Compliance Manager, who reports to the Chief Compliance Risk Officer and the President of FSBV, and an Export Compliance Manager, who reports to the Divisional Compliance Manager.

iv.   FSBV's written compliance materials were revised to incorporate guidelines provided by BIS, OFAC, and the United States Department of State's Directorate of Defense Trade Controls;

---

[6] FSBV completed its pre-existing obligations and commitments in early 2011.

15

v.   FSBV's electronic systems include a "track and trace" feature that allows FSBV employees to determine if a part has previously been used in an embargoed country, to prevent the part's shipment to the U.S., as well as to identify and terminate relationships with third party brokers who are dealing in Iranian parts;

vi.   FSBV's contracts include language that FSBV will not export or re-export any items in violation of U.S., U.N., or European Union export control laws;

vii.   FSBV requires all customers to sign end-user statements specifying that parts will "not be supplied in any way, directly or indirectly, via third-party organizations to an entity/person in or from Cuba, Iran, North Korea, Sudan, and Syria;

viii.   FSBV has posted on its company intranet a link for employees to anonymously report violations;

ix.   FSBV's compliance program is subject to regular internal and external audits;

x.   All FSBV employees must complete basic compliance training, and in addition to initial basic training, all employees must receive updated training.

xi.   Terminating relationships with sanctioned banks and closing its Iranian representative office and branch.

16