UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.  14-CR-121 (RJL) |
| | : | |
| v. | : | |
| | : | |
| FOKKER SERVICES B.V., | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF DEFERRED PROSECUTION AGREEMENT REACHED WITH FOKKER SERVICES B.V.

For almost five years, Fokker Services B.V. ("Fokker Services") violated U.S. sanctions against Iran, Sudan, and Burma on more than 1,100 occasions.  Under ordinary circumstances, such conduct would warrant the harshest of punishments.  However, there are several mitigating factors that explain and support the resolution reached here, which involves a deferred prosecution agreement ("DPA") for an 18-month period and immediate forfeiture of $10.5 million, one half of the revenues the illegal conduct generated.  First, the government did not initiate the investigation of Fokker Services.  Rather, the company made a voluntary self-disclosure after a lengthy and thorough internal investigation.  Under prevailing Department of Justice policy, a voluntary self-disclosure alone can be a significant factor in the decision to offer a corporation a DPA.  But Fokker Services did more.  It gave complete and fulsome cooperation during the government's investigation.  Among other things, the company prevailed upon a Dutch court to permit the production of unredacted documents to the government and then provided translated copies, significantly expediting the course of the investigation.  Fokker Services also punished employees responsible for the violations and instituted a comprehensive remediation and compliance program.  Finally, the $10.5 million Fokker Services is paying as part of its resolution here is not the only penalty it will pay.  It also is paying the two civil

regulators – the Bureau of Industry and Security ("BIS") of the Department of Commerce and the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury – an additional $10.5 million in administrative fines, thereby resulting in complete disgorgement of all the revenue from the illegal activities.  Moreover, Fokker Services is a company in poor financial straits, and the sums it is paying represent the outer limit of its ability to pay, which has been independently verified.  In light of the company's strong compliance program and the costs associated with it, the company's poor financial health is a reason for the government's decision to forgo the imposition of a monitor.

In sum, the proposed resolution with Fokker Services is fair and is an appropriate exercise of the government's discretion.

## I.      INTRODUCTION

### A.  Procedural Background

On June 23, 2010, Fokker Services voluntarily disclosed to the government that the company had violated U.S. export control laws by engaging in transactions with U.S.-sanctioned countries, specifically, Iran, Sudan, and Burma, dating back to 2005.  Subsequently, with the assistance of outside counsel, Fokker Services submitted to BIS and OFAC a supplemental disclosure in December 2010 that articulated the results of an extensive internal investigation; the internal investigation cost the company more than $8 million in 2010.

Upon receipt of the company's voluntary disclosures, the United States began an investigation focused on the company's conduct.

After extensive negotiations between the parties, including counsel from BIS and OFAC, in early June 2014, Fokker Services and the government reached a global settlement resolving the criminal and administrative investigations.  See Exhibit A (settlement documents with BIS

and OFAC).  To that end, on June 5, 2014, the government filed an Information, DPA with an accompanying Statement of Offense, and Joint Consent Motion for Exclusion of Time Under the Speedy Trial Act.  The parties subsequently provided the Court a proposed Consent Forfeiture Order.

At the June 25, 2014, initial status conference, the Court requested that the government submit a pleading setting forth why the DPA reached in this case adequately reflects the seriousness of the company's conduct and why this resolution serves the interests of justice.

### B.  Fokker Services' Corporate Background

Fokker Services is a non-public Dutch aerospace services provider, headquartered in The Netherlands; it was founded in 1996 when its predecessor, Fokker Aircraft N.V. went bankrupt.[1] Fokker Services' primary charge is safeguarding the continued airworthiness of the Fokker Aircraft planes still in operation.  In particular, the services provided by Fokker Services to its customers include the following: (1) spare parts sales, (2) repairs of parts, (3) exchanges of parts, (4) maintenance repair and overhaul projects ("MRO"), and (5) technical services.

### C.  Fokker Services' Customer Base in Sanctioned Countries and Customer Services Provided in Violation of U.S. Export Control Laws

#### 1.  *Fokker Services' Customers in U.S.-Sanctioned Countries*

Since its formation in 1996, the company has worked with 11 Iranian customers: Iran Aseman Airlines, Iran Air Transport Company, Iran Air, Iran Aircraft Industries, ANA Trading, Iran Air Force, Iran Navy, Iran Army, Kish Airlines, Taftan Air, and Aria Air.  Five of these were military customers: Iran Aircraft Industries, ANA Trading, Iran Air Force, Iran Navy, and Iran Army.  Fokker Services also historically worked with four Sudanese customers: Sudan

---

[1] Fokker Aircraft N.V. manufactured Fokker airplanes; when that company went bankrupt in 1996, it ceased manufacturing Fokker planes.  Fokker airplanes continue to fly in countries throughout the world, including in the United States as well as in countries subject to United States sanctions.

Airways, Nova Airlines, Mid Airlines, and Feeder Airlines.   In addition, Fokker Services historically worked with four Burmese customers: Myanma Airways, Air Mandalay, Yangon Airways, and Air Bagan.[2]

2.   *Fokker Services' Conduct in Violation of IEEPA*

As described in more detail in the Statement of Offense to which the company has stipulated, starting in or around late 2005 and ending in or around late 2010, Fokker Services violated the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, and its implementing sanctions regulations by engaging in illegal transactions involving the export and re-export of aircraft parts, technology, and services to customers located in U.S.-sanctioned countries.   DPA, Attachment A, ¶ 2.  As a means to continue its business with customers located in U.S.-sanctioned countries, the company used a number of self-described "work arounds," designed to evade U.S. export control laws.  Id. at ¶¶ 32-35.  For example, Fokker Services and its employees deliberately withheld aircraft tail numbers to U.S.-based repair shops, provided false tail numbers to U.S. and U.K. companies and repair shops, stated that parts actually intended for customers located in U.S.-sanctioned countries were intended for "stock," created and maintained a "black list" tracking which U.S.-based repair shops requested certified, signed, end-user statements, and directed employees not to use repair shops on the black list.  Id.

Throughout this period, Fokker Services knowingly and willfully engaged in this criminal conduct, fully aware of the application of U.S. export control laws, an issue that was repeatedly raised internally with the company's most senior management.   DPA, Attachment A, ¶ 2.  In fact, the issue of the application of U.S. export control laws to Fokker Services and the

---

[2] As a result of the company's internal investigation, Fokker Services no longer provides services to customers located in U.S.-sanctioned countries, even when there would be no nexus with the United States.

company's possible exposure to U.S. laws was raised to the company's senior management by in-house counsel frequently, albeit at times in an ambiguous way.  Id. at ¶¶20-31.

### D.  Fokker Services' 2010 Voluntary Self-Disclosures

On June 23, 2010, Fokker Services voluntarily disclosed to the government that the company had violated U.S. export control laws by engaging in transactions with U.S.-sanctioned countries dating back to 2005.  Subsequently, with the assistance of outside counsel whom Fokker Services retained to investigate the extent of its violations of U.S. export control laws and provide guidance on developing a new corporate export compliance program, Fokker Services submitted to BIS and OFAC a supplemental disclosure in December 2010 that articulated the results of the extensive internal investigation. The investigation concluded that from 2005 until 2010, Fokker Services engaged in 1,147 transactions in violation of U.S. export control laws, conduct that earned Fokker Services $21 million in gross revenue and $5.9 million in gross pretax profit.

### E.  Fokker Services' Financial Status

In June 2010, Fokker Services employed approximately 1075 employees; currently Fokker Services employs approximately 910 employees worldwide, of which 105 are employed by its operations in the US (Fokker Services Inc. and Fokker Aerotron).  Fokker Services currently is undertaking a restructuring process in the Netherlands that will reduce the number of employees to 840 worldwide by the end of 2014.

In recent years, the company has experienced significant financial distress, which is discussed in the attached declaration from a Financial Analyst in the Antitrust Division, United States Department of Justice, included as Exhibit B to this Memorandum.[3]  As outlined in the

---

[3]  The declaration contains an error in paragraph 5.  Fokker Service's cash position at the end of 2012 was $7,528,000.  The government will be substituting a corrected declaration.

attached declaration in Exhibit B, Fokker Services has faced a steady decrease in revenue, gross profit, and net profit.  Similarly, the company's cash balances have been reduced each year since 2009.  Additionally, since 2009, the company has not seen a reduction in its long-term debt. Finally, Fokker Services has not made dividend payments for the last two to three years.

A summary of Fokker Services' financial data for the past four years supports the conclusion that the current financial performance of Fokker Services is insufficient to guarantee the long-term financial stability of the company.  Based on the company's financial status, the government carefully weighed Fokker Services' ability to pay when fashioning the DPA with the company, especially given the government's desire to avoid the collateral consequence of causing Fokker Services to go out of business and the consequent loss of jobs in the United States and elsewhere.[4]

## II.   THE DPA SERVES THE ENDS OF JUSTCE

### A.  United States Government's Investigation

The parties' proposed DPA concludes the government's investigation.  Over the course of the investigation, which began in mid-2010 after the government received the company's self-disclosures, Fokker Services has produced, at the government's request, several revised versions of an Initial Reporting Spreadsheet, which highlighted transactions in violation of U.S. export control laws and which the government determined to be accurate.  Additionally, the government issued to Fokker Services requests for information on March 4, 2011, and September 19, 2011. The company responded over the next year, but with individuals' identifying information

---

[4]  Fokker Services was at the time of the disclosure owned by Stork B.V., a large Dutch manufacturing and services firm.  In a corporate restructuring, the aerospace activities of the group were separated from the other activities of Stork and Fokker Services is now owned by Fokker Technologies Holding B.V.  Neither the management of Stork nor Fokker Technologies was involved in the illegal activities, and the government has no criminal recourse against the former or current parent.  Fokker Technologies Holding B.V. is nevertheless providing financial support to Fokker Services to meet the costs associated with both its current restructuring program and the global settlement with U.S. authorities.

redacted from many of the documents pursuant to Dutch law.  The government subsequently made a request to the Dutch Public Prosecutor for the unredacted copies of these materials pursuant to a Mutual Legal Assistance Treaty ("MLAT") between The Netherlands and the United States.  Subsequently, with the company's significant assistance in expediting the government's request – which included Fokker Services' appearance before a Dutch court through counsel – the government received information in response to the MLAT.  Through Fokker Service's cooperation, the government conducted interviews of 12 individuals who were the key Fokker Services employees in this case.

### B.  Application of Principles of Corporate Liability

The proposed DPA is the result of the government's careful and thorough review and analysis of the principles guiding corporate liability, which are set forth in the United States Attorneys' Office Manual ("USAM") §9-28.000—principles that require that the government review the following factors when considering a resolution in a corporate investigation: (1) the nature and seriousness of the offense, (2) the pervasiveness of the wrongdoing, and whether corporate management was complicit in the wrongdoing, (3) the company's history of similar misconduct, (4) the company's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation, (5) the existence and effectiveness of the company's pre-existing compliance program, (6) the company's remedial actions, (7) collateral consequences, (8) the adequacy of the prosecution of individuals responsible for the company's malfeasance, and (9) the adequacy of remedies such as civil or regulatory enforcement actions.

Although the government carefully considered all of the aforementioned factors before concluding that the most appropriate resolution in this investigation was to enter into a DPA, the

most salient principles[5] of corporate liability relevant here include: (1) the extent of the wrongdoing at issue and upper management's knowledge of and role in the wrongdoing, (2) the Department of Justice's statements and policy regarding voluntary self-disclosures,[6] (3) the remediation efforts undertaken by the company as a result of the instant investigation, (4) the company's extensive cooperation with law enforcement since initially disclosing its criminal conduct, (5) the adequacy of remedies such as civil or regulatory enforcement actions, and (6) collateral consequences to the company.[7]  A more detailed description of these factors follows.

1.  *Extent of Wrongdoing at Issue*

It is uncontroverted that Fokker Services knowingly violated U.S. export control laws for years all the while being aware of the extraterritorial application of U.S. laws to Fokker Services' conduct.  This conduct was willful and reckless and pursued despite repeated warnings to senior management that U.S. export control laws applied to the company.  For example, in an email from Fokker Services' in-house counsel to Fokker Services senior management sent on February 28, 2008, in-house counsel explained that, "the American laws and policies related to the subject at hand have a so-called exterritorial function.  If in the eyes of the U.S., a Dutch company is in

---

[5] See USAM § 9-28.300B Comment to Factors to Be Considered ("[i]n most cases, however, no single factor will be dispositive") and id. at § 9-28.400B Comment to Special Policy Concerns ("it is entirely proper in many investigations for a prosecutor to consider the corporation's pre-indictment conduct, e.g., voluntary disclosure, cooperation, remediation, and restitution, in determining whether to seek an indictment").

[6] On a panel sponsored by Practicing Law Institute titled Coping With U.S. Export Controls, held on December 11, 2012, Steven Pelak, the former Deputy Chief of the Counterespionage Section, National Security Division, Department of Justice, and former National Coordinator for Export Enforcement, stated that the Department of Justice will not prosecute a company that comes forward with a voluntary self-disclosure, as long as the voluntary self-disclosure is "truthful, complete, and voluntary." Former Deputy Chief Pelak made similar comments at the same panel held in 2010 and 2011. Under current Department of Justice, National Security Division, policy, a voluntary self-disclosure, consistent with the USAM, can be a significant factor in the decision to enter into a DPA, but it is not a controlling factor.

[7] Although this factor did not substantially affect the government's analysis, the government considered that Fokker Services did not have a history of charged violations of U.S. export control laws, although it goes without saying that the company's prior compliance program was far from adequate.  We address the prosecution of individuals below.  Moreover, while not an independent USAM §§9-28.000 factor, the government viewed Fokker Services' current financial health and the company's compromised ability to pay a monetary penalty as significant.

breach of the American export laws and policies, then the U.S. will prosecute the Dutch company."  Simply put, the issues of the application of U.S. export control laws to Fokker Services and the possible consequences of such violations were repeatedly raised and discussed with senior management from at least late 2007.

Despite senior management's awareness of the application of U.S. export control laws to Fokker Services, Fokker Services did not submit its voluntary self-disclosure until 2010—demonstrating that the company continued to violate U.S. export control laws for several years after senior management became aware of the application of those laws to the company. Furthermore, the impact of Fokker Services' conduct in violation of U.S. export control laws amounted to significant economic benefit to Fokker Services' customers located in U.S.-sanctioned countries, in addition to the obvious benefits conferred to Fokker Services.

The number and the total transaction value of the violations, the length of time over which they occurred, the particular customers (including Iranian military customers from 2005 through March 2008), and the resulting economic benefit to Iran, Sudan, and Burma, taken together, constitute a substantial evasion of the United States' sanctions programs.  The government duly recognizes the egregious nature of Fokker Services' conduct. The government is mindful nonetheless of a number of other USAM § 9-28.300 factors present in this case that favor significant mitigation and support the DPA before the Court.  The complexity of this investigation and the company's noteworthy dedication to remediation and cooperation with the government dictated that the government consider a number of additional factors apart from the gravity of the company's conduct.

## 2.   *The Company's Voluntary Self-Disclosure*

Fokker Services' decision to voluntarily disclose its violations, followed by the company's decision to conduct an internal investigation, the results of which were fully disclosed to the government, is another factor that <u>heavily</u> weighs in favor of mitigation.  The Department "has and will continue to provide meaningful credit for companies that provide voluntary disclosures."[8]  <u>See</u> USAM § 9-28.750 ("[i]n conjunction with regulatory agencies and other executive branch departments, the [Department] encourages corporations, as part of their compliance programs, to conduct internal investigations and to disclose the relevant facts to the appropriate agencies . . . . [P]rosecutors may consider a corporation's timely and voluntary disclosure in evaluating the adequacy of the corporation's compliance program and its management's commitment to the compliance program").  <u>See also</u> Prepared Remarks of Alice S. Fisher, Assistant Attorney General, Criminal Division, at the ABA National Institute on the Foreign Corrupt Practices Act (October 16, 2006), stating, "although nothing is off the table when you voluntarily disclose, I can tell you in unequivocal terms that you will get a real benefit," <u>and</u> Prepared Remarks of Assistant Attorney General Lanny A. Breuer, at the Compliance Week 2010 – 5th Annual Conference for Corporate Financial, Legal, Risk, Audit & Compliance Officers (May 26, 2010), stating "if you come forward and if you fully cooperate with our investigation, you will receive meaningful credit for having done so."[9]

---

[8] Remarks by Charles Duross, the Deputy Chief of the Department of Justice's Criminal Division Fraud Section, at the World Bribery & Corruption Compliance Forum in September 2010.

[9] The government also highlights for the Court that both OFAC and BIS similarly provide benefits to companies that voluntarily disclose violations.  <u>See</u>, <u>e.g.</u>, 31 CFR Part 501 Appendix A (discussing benefits conferred by OFAC on voluntary self-disclosures) <u>and</u> Part 764.5 of the Export Administration Regulations (outlining benefits conferred by BIS on voluntary self-disclosures).  In this instance, OFAC made an express finding that Fokker Services had voluntarily self-disclosed its violations to the agency.

In this case, there is no evidence to suggest that the company's voluntary self-disclosure was anything other than self-initiated or voluntary—no part of the United States government was investigating Fokker Services at the time the company submitted its voluntary self-disclosure. Moreover, the company's disclosures were "truthful, complete, and voluntary," and therefore, under the previously articulated positions, the Department was disposed not to prosecute Fokker Services.[10]   Simply put, the resolution here is consistent with the widely stated policy of providing a benefit to companies that voluntarily self-disclose wrongdoing so as to encourage similar voluntary disclosures.

### 3.   *The Company's Remediation Efforts*

USAM § 9-28.900 directs that, "a prosecutor may [] consider other remedial actions, such as improving an existing compliance program or disciplining wrongdoers, in determining whether to charge the corporation and how to resolve corporate criminal cases . . . . [because] a corporation's response to misconduct says much about its willingness to ensure that such misconduct does not recur."   Remediation efforts undertaken by a company that voluntarily disclosed its violations to the government, which was not in the process of investigating the company's wrongdoing, amount to a significant factor weighing in favor of mitigation because such efforts demonstrate a continued commitment by the company to become and remain compliant going forward.   See USAM § 9-28.900B ("although the inadequacy of a corporate compliance program is a factor to consider when deciding whether to charge a corporation, that corporation's quick recognition of the flaws in the program and its efforts to improve the program are also factors to consider as to appropriate disposition of a case").

---

[10] While it is true that it appears that other provisions of USAM §§9-28.000 direct that this factor alone should not independently inform a prosecutor's charging decision, in a case such as this one, this factor heavily weighs in favor of mitigation.

Fokker Services' remediation efforts undertaken since disclosing its violations have been extraordinary, especially given the costs associated with undertaking such efforts as compared with the company's gross revenue earned as a result of the conduct supporting the violations.  Of additional significance, in September 2010, the company's management decided to stop shipments of goods to all U.S.-sanctioned countries.  The company also launched an employee disciplinary review program and additionally reorganized its management.   The company reviewed the conduct of the individuals associated with the company's violations and has sanctioned all of the senior employees associated with the criminal transactions.   Based on the information Fokker Services provided to DOJ and as a result of the DOJ's independent interviews with several of the affected employees in Amsterdam, it was demonstrated that following the employee review, the former President of Fokker Services resigned and was replaced, and several other senior managers were moved into positions with less responsibility and different reporting lines.  In addition several individuals had to undergo further training.[11]

In addition, the company adopted a new Export Compliance Program that is based on BIS and OFAC regulations, the United States Sentencing Guidelines, and the laws of The Netherlands and Singapore.  The newly adopted Fokker Services Export Compliance Program is discussed in the attached declaration from André Hermsen, currently Chief Compliance and Risk Officer of Fokker Services' parent, Fokker Technology Holding B.V, which is included as Exhibit C.  The government notes that for much of the relevant time period, Fokker Services did not have a formal U.S. sanctions compliance program and appeared to have an export compliance program in name only.  Since launching its internal investigation, Fokker Services has adopted new and more effective internal controls and procedures, including robust enhancements to its current compliance program to prevent a recurrence of the criminal conduct

---

[11]   In all, Fokker Services reprimanded 15 employees.

at issue.  Fokker Services has also incorporated safeguards into its electronic data management systems to prevent future violations of U.S. sanctions laws.  In addition, the company now scrutinizes all of its vendor relationships and advises vendors that Fokker Services will not export or re-export items in violation of U.S., U.N., or E.U. export control laws.  The company further ensures compliance through explicit provisions in its purchase contracts and by requiring that customers provide signed end-user statements that certify that parts will not be supplied, either directly or indirectly, to U.S.-sanctioned countries.[12]

The company's inadequate compliance program during the period 2005-2010 is not an excuse for the company's violations or in any way minimizes the company's willfulness; rather, the government asserts that the vast improvement in the company's export compliance program underscores Fokker Services' commitment to remediation and ensuring compliance with U.S. export control laws going forward.  Fokker Services has also implemented internal auditing of its compliance program, facilitated by external auditors.  Finally, Fokker Services now requires all employees to complete basic compliance training, and the training is frequently refreshed for employees.

It is true that the proposed DPA does not require the imposition of an independent monitor.  However, neither BIS nor OFAC, which are charged with implementing and enforcing the very regulations that Fokker Services violated, required the imposition of an independent monitor as part of their respective settlements with the company.  The point is that both BIS and OFAC decided that Fokker Services' current compliance program was sufficiently robust that

---

[12]   Fokker Service's contracts now contain language such as the following:  "Fokker Services B.V.  shall comply with all export control laws and regulations (including, but not limited to, the US Export Administration Regulations and the U.S. International Traffic in Arms Regulations) to the extent applicable to Fokker Services' purchase under the terms and conditions of this Agreement or any Order resulting thereof," and "We, Fokker Services B.V., herewith declare that we will not re-export these items contrary to applicable US, UN or EU export control regulations."

neither required Fokker Services to engage an independent monitor.  See Exhibit A.  We agree with that assessment.

4.  *The Company's Cooperation*

As USAM § 9-28.700 instructs, "[c]ooperation is a potential mitigating factor, by which a corporation—just like any other subject of a criminal investigation—can gain credit in a case that otherwise is appropriate for indictment and prosecution . . . . [C]ritically, cooperation may benefit the corporation by presenting it with the opportunity to earn credit for its efforts." Fokker Services' cooperation has been extensive.  Apart from the self-initiated step of voluntarily disclosing its violations of U.S. export control laws, Fokker Services' actual voluntary disclosures were based on the company's vast internal investigation.  The internal investigation led by outside counsel was thorough and complete and included the following undertakings, *inter alia*: (1) reviewing 586,046 documents, (2) interviewing 51 current Fokker Services employees and four former Fokker Services employees, (3) collecting data on 20,614 transactions possibly related to the U.S.-sanctioned countries, and (4) reviewing data associated with approximately 200,000 shipments.

During the government's investigation, the company promptly responded to all requests. The company went before a Dutch court and obtained authorization to provide unredacted documents in response to the government's MLAT request.  Absent the company's cooperation, the investigation could have been stalled for a period of years.  The company then provided translations of the requested documents.  The company later facilitated the government's interviews of 12 individuals.  The company also provided translators for the government's witness interviews.  The company has executed multiple tolling agreements with the government extending the statute of limitations for these violations.  Additionally, Fokker Services has

provided law enforcement with detailed and specific information related to other conduct by other companies that may be indicative of similar violations of U.S. export control laws.  For example, since Fokker Services instituted its new compliance program in 2010, on at least five separate instances, the company has provided law enforcement with information related to other possible U.S. export control violations by other companies.  In short, the government views the company's cooperation as a model that similarly situated corporations should adopt if they intend to argue that mitigation is warranted based on cooperation. See, e.g., Alice S. Fisher, Assistant Attorney General, Department of Justice, Prepared Remarks at the American Bar Association National Institute on Foreign Corrupt Practices Act (Oct. 16, 2006) ("if [companies] are doing the things [they] should be doing—whether it is self-policing, self-reporting, conducting proactive risk assessments, improving [] controls and procedures, training [], or cooperating with an investigation after it starts—[companies] will get a benefit").

### 5.   *Collateral Consequences Facing Fokker Services*

USAM § 9-28.1000A directs that "prosecutors may consider the collateral consequences of a corporate criminal conviction or indictment in determining whether to charge the corporation with a criminal offense and how to resolve corporate criminal cases."  "A deferred prosecution [] agreement can help restore the integrity of a company's operations and preserve the financial viability of a corporation that has engaged in criminal conduct."  Id.  Fokker Services' present financial situation is precarious; however, the company still employs over 900 employees world-wide.  Requiring Fokker Services to pay $10.5 million to resolve the criminal investigation and an additional $10.5 million to resolve BIS and OFAC's investigations justly punishes the company while also avoiding the adverse collateral consequences associated with putting Fokker Services out of business and causing the loss of jobs, including American jobs.

Additionally, the decision not to impose an independent monitor was also based on the company's present financial health; the expenses associated with an independent monitor would have been born by the company.  The government prioritized recovery of the $10.5 million forfeiture and the $10.5 million in civil penalties over monitor-related expenses.

6. *Synthesis of Pertinent USAM § 9-28.000 Factors Support the DPA*

Against this backdrop, the DPA reached with the company is appropriate and serves the ends of justice.[13]   To put the government's proposed resolution with Fokker Services in perspective, it is important to note that the DPA between the Department of Justice and Fokker Services is one component of the global settlement reached with three different agencies of the United States Government that requires Fokker Services to pay the United States government collectively $21 million dollars—the precise amount of Fokker Services' gross <u>revenue</u>[14] associated with its U.S. export control violations.[15]   Fokker Services has reached separate settlements with BIS and OFAC that require it to pay the two regulators a joint sum of an additional $10.5 million.  Further, the decision not to impose an independent monitor in this case was appropriate.  <u>See</u>, <u>e.g.</u>, March 7, 2008, Memorandum, "Selection and Use of Monitors in Deferred Prosecution Agreements and Non-Prosecution Agreements with Corporations," from Acting Deputy Attorney General, Craig S. Morford ("A monitor should only be used where appropriate given the facts and circumstances of a particular matter . . . . [I]n negotiating agreements with corporations, prosecutors should be mindful of both, (1) the potential benefits that employing a monitor may have for the corporation and the public, and (2) the cost of a

---

[13] This is particularly true given that the company is also required to pay an additional $10.5 million to settle with BIS and OFAC.

[14] Fokker Services earned $5.9 million in gross pretax profit.

[15] The company's current financial status and the reality that Fokker Services' current financial performance is uncertain is another factor that demonstrates that the proposed resolution is appropriate.

monitor and its impact on the operations of the corporation"). Finally, the 18-month period of deferred prosecution in this case should be viewed as an extension of the company's previous four years of cooperation with the United States Government.

### III.   <u>CONCLUSION</u>

In sum, in light of the company's two voluntary self-disclosures, which were accurate, complete, and fulsome, and the fruits of its cooperation and remediation efforts, the appropriate resolution of Fokker Services' criminal liability is the pending DPA, which requires the company to forfeit $10.5 million (or half) of its gross revenue earned as a result of the conduct in violation of U.S. export control laws.[16] This resolution appropriately calculates and considers a number of factors that weigh in favor of mitigation.  Given that the primary goals of criminal law are deterrence, punishment, and rehabilitation, the proposed DPA squarely achieves each of these goals.  The company voluntarily disclosed its violations to the government at a time when the government was not investigating such conduct. The company fully cooperated throughout the government's investigation.  The company's remediation efforts are comprehensive.  The company's compliance program is robust.  In light of the resolutions with the civil regulators, the company has agreed to disgorge to the United States Government all of the ill-gotten gross revenue it earned as a result of the sanctions violations. The company is suffering financial decline.  The instant resolution thus aligns itself with the Department of Justice's goals and policy, as stated in the USAM § 9-28.1000B, "Under appropriate circumstances, a deferred prosecution agreement [] can help restore the integrity of a company's operations and preserve the financial viability of a corporation that has engaged in criminal conduct, while preserving the government's ability to prosecute a recalcitrant corporation that materially breaches the

---

[16] The DPA also requires that Fokker Services successfully resolve the company's civil matters—the resolution of which now requires Fokker Services pay an additional $10.5 million in civil penalties.

agreement."   Furthermore, the instant resolution aligns itself with other similarly situated investigations.   For example, based on a review of investigations involving OFAC between 2005-2013, none of the 78 OFAC cases involving a voluntary self-disclosure resulted in a criminal conviction.

Finally, this is not the Department's first DPA that does not include an independent monitor.   See, e.g., United States v. ING Bank, N.V., 12-CR-00136 (PLF) (D.D.C. 2012) (IEEPA violation resolved with a DPA with the following terms: 18-month period of deferred prosecution and no monitor imposed); United States v. Falconstor Software, Inc., 12-MJ-00615 (E.D.N.Y. 2012) (Foreign Corrupt Practices Act violation resolved with a DPA with the following terms: 18-month period of deferred prosecution and no monitor imposed); United States v. ABN Amro Bank N.V. (nka The Royal Bank of Scotland N.V.), 10-CR-00124 (CKK) (D.D.C. 2010) (IEEPA violation resolved with a DPA with the following terms: 12-month period of deferred prosecution and no monitor imposed); United States v. Wachovia Bank, N.A., 10-CR-20165 (Lenard) (S.D.F.L. 2010) (money laundering violation resolved with DPA with the following terms: 12-month period of deferred prosecution and no monitor imposed); and United States v. KOS Pharmaceuticals, Inc., 10-CR-00158-RET (M.D.La. 2010) (Anti-kickback statute violation resolved with a DPA with the following terms: 6-month period of deferred prosecution and no monitor imposed).

Although it is not a specific term of the DPA, the government has exercised its prosecutorial discretion and has decided not to charge individuals for the conduct set forth in the DPA's attached Statement of Offense.   The government reached this conclusion separate and apart from its decision resolving the investigation with the Company.   Because the Court noted the government's decision to refrain from prosecuting individuals for Fokker Service's

18

violations, the government will address the topic.   We took seriously the need to hold accountable those most responsible for Fokker Service's illegal conduct. At the same time, we had to be confident that we could prove every element of an IEEPA violation beyond a reasonable doubt as to any member of the Fokker Services team the government charged.   The corporate knowledge doctrine made Fokker Service's criminal liability readily provable.   See, e.g., United States v. Science Application Intern. Corp., 555 F.Supp.2d 40 (D.D.C. 2008); Gutter v. E.I. Dupont De Nemours, 124 F.Supp.2d 1291 (S.D.Fla. 2000); and United States v. T.I.M.E.-D.C., Inc., 381 F.Supp. 730 (W.D.Va. 1974).   Over the course of this offense, there were several changes in Fokker Services' upper management.   Although at various times senior management was made aware of the breadth of U.S. sanctions, particularly as they pertained to Iran, there was little evidence that senior management was knowledgeable of the "work arounds" various people in the field had developed.   At the same time, there was a similar lack of evidence that the lower level employees who created and/or implemented the "work arounds" had full knowledge of the application of U.S. sanctions to their conduct.   In the end, the government lacked sufficient proof to demonstrate that a person with adequate responsibility over the company's affairs had both the necessary knowledge of the corporation's legal responsibility to abide by U.S. sanctions and knowledge of the manner in which Fokker Services was evading those sanctions.[17]   The exercise of prosecutorial discretion here in refraining from charging individuals is not unique.   See, e.g., ING Bank, N.V., 12-CR-00136 (PLF) (D.D.C. 2012) (no individuals prosecuted in IEEPA case);

---

[17]   The U.S. Attorney's Office for the District of Columbia has been aggressive in prosecuting (and convicting) both corporations and responsible officers when the evidence warrants.   See   United States v. Ozturk and Total Aviation, No. 1:12-cr-00265-RC (D.D.C.) (illegal export to Iran of parts for military and civilian aircraft); United States v. China Nuclear Indus. Huaxing Constr. Co., No. 1:12-cr-00251-EGS (D.D.C.) (state-owned Chinese corporation convicted for diverting specialized U.S.-origin paint controlled for nuclear non-proliferation purposes to a Pakistani reactor) and United States v. Wang, No. 1:11-cr-00187-EGS (D.D.C.) ] (Chinese executive most responsible for diversion scheme pled guilty); United States v. Motamedian Habibion, and Online Micro, No. 1:11-cr-00118-ESH (D.D.C.) (corporate officers and corporation convicted for sending computers to Iran)   United States v. Shi and Sunrise Technologies & Trading Corp., No. 1:11-cr-00119-JEB (D.D.C.) (same as Motamedian, Habibion, and Online Micro)

<u>United States v. Weatherford Int'l Ltd., et al.</u>, No. 4:13-cr-00737 (S.D. Tex.) (corporate guilty plea for subsidiary and DPA for parent for FCPA and IEEPA violations by oil services firms; no individuals prosecuted); <u>United States v. United Techs. Corp., et al.</u>, No. 3:12-cr-00146-WWE (D. Conn) (corporate guilty plea for subsidiary and DPAs for parent and another subsidiary for violating the Arms Export Control Act by sending military software China used in the development of an advanced attack helicopter; no individuals prosecuted); <u>Falconstor Software, Inc.</u>, 12-MJ-00615 (E.D.N.Y. 2012) (Foreign Corrupt Practices Act violation resolved without prosecution of individuals); <u>ABN Amro Bank N.V. (nka The Royal Bank of Scotland N.V.)</u>, 10-CR-00124 (CKK) (D.D.C. 2010) (no individuals prosecuted in an IEEPA case); <u>and Wachovia Bank, N.A., 10-CR-20165</u> (Lenard) (S.D.F.L. 2010) (money laundering violation resolved without individual prosecutions).

The terms of the DPA with Fokker Services are appropriate.  Nothing about this agreement is extraordinary.  The length of the DPA, the forfeiture amount totaling one-half of the Company's ill-gotten revenue (combined with payment of the remaining half of the revenue to the civil regulators), and the decision not to include an independent monitor are all in line with the Department's goals, policies, and objectives.

Respectfully submitted,

Ronald C. Machen Jr.
United States Attorney
DC Bar No. 447889

By:     _____/s/_____
Maia Luckner Miller, VA Bar: #73221
Assistant United States Attorney
National Security Section
555 Fourth Street, N.W., Room 11-445
Washington, DC  20530
(202) 252-6737
Maia.Miller@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2014, a copy of the foregoing pleading was sent via ECF

court filing system and electronic mail to parties of record.

_____/s/_____
Maia L. Miller
Assistant U.S. Attorney