# EXHIBIT A

UNITED STATES DEPARTMENT OF COMMERCE
BUREAU OF INDUSTRY AND SECURITY
WASHINGTON, D.C.  20230

In the Matter of:

Fokker Services B.V.
Hoeksteen 40
2132 MS Hoofddorp
The Netherlands

             Respondent

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made by and between Fokker

Services B.V., of The Netherlands ("FSBV"), and the Bureau of Industry and Security,

U.S. Department of Commerce ("BIS") (collectively, the "Parties"), pursuant to Section

766.18(a) of the Export Administration Regulations (the "Regulations"),[1] issued pursuant

to the Export Administration Act of 1979, as amended (the "Act").[2]

WHEREAS, BIS has notified FSBV of its intentions to initiate an administrative

proceeding against it, pursuant to the Act and the Regulations;

WHEREAS, BIS has issued a Proposed Charging Letter to FSBV that alleges that

FSBV committed 253 violations of the Regulations, specifically:

---

[1] The Regulations are currently codified in the Code of Federal Regulations at 15 C.F.R.
Parts 730-774 (2013).  The charged violations occurred in 2005-2010.  The Regulations
governing the violations at issue are found in the 2005-2010 versions of the Code of
Federal Regulations (15 C.F.R. Parts 730-774).  The 2013 Regulations set forth the
procedures that apply to this matter.

[2] 50 U.S.C. app. §§ 2401-2420 (2000).  Since August 21, 2001, the Act has been in lapse
and the President, through Executive Order 13222 of August 17, 2001 (3 C.F.R., 2001
Comp. 783 (2002)), which has been extended by successive Presidential Notices, the
most recent being that of August 8, 2013 (78 Fed. Reg. 49107 (Aug. 12, 2013)), has
continued the Regulations in effect under the International Emergency Economic Powers
Act (50 U.S.C. § 1701, *et seq.*) (2006 & Supp. IV 2010).

| | |
|---|---|
| **Charges 1 – 88:** | **Acting with Knowledge of a Violation of the Regulations in Connection with Exports or Reexports to Iran of Items Controlled on National Security and Missile Technology Grounds, in Violation of 15 C.F.R. § 764.2(e)** |

1. On 88 occasions between on or about July 19, 2005, and on or about April 16, 2010, FSBV sold, transferred, transported and/or forwarded to, and/or serviced for, end-users in Iran items subject to the Regulations, classified under Export Control Classification Number ("ECCN") 1A001 or 7A103, controlled, respectively, on National Security ("NS") or Missile Technology ("MT") grounds, and exported or to be exported from the United States, with knowledge that a violation of the Regulations had occurred, was about to occur, or was intended to occur.[3] These NS- and MT-controlled items consisted of parts and components used in aircraft avionics and navigation systems, as well as parts and components for other aircraft systems, including engine and communications systems, and were valued in total at approximately $4,422,089.

2. At all times pertinent hereto, Section 746.7 of the Regulations imposed a BIS license requirement for the export or reexport to Iran, including exports or reexports transshipped through a third country, of the items described in Paragraph 1 above.

3. The Regulations also prohibited the export or reexport to Iran, whether directly or transshipped through a third country, of any item subject to both the Regulations and the Iranian Transactions Regulations ("ITR"), if the transaction was not authorized by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which administered the ITR.[4]

4. In order to avoid duplication, exporters and reexporters were not required under the Regulations to seek authorization from both BIS and OFAC for exports or reexports subject to both the EAR and the ITR, and accordingly an authorization granted by OFAC was considered authorization for purposes of the EAR as well.

5. However, FSBV did not seek or obtain authorization from BIS, or from OFAC, in connection with any of the activities or transactions at issue.

6. At all pertinent times hereto, Section 764.2(e) of the Regulations prohibited any person from, inter alia, selling, transferring, transporting, forwarding, and servicing, in whole or in part, any item exported or to be exported from the United States and subject to the Regulations with knowledge that a violation of the Regulations had occurred, was about to occur, or was intended to occur. FSBV not only engaged in the alleged activities and transactions with such knowledge, but employed or took numerous schemes and

---

[3] These items also were controlled on Anti-Terrorism grounds.

[4] 31 C.F.R. Part 560 (2005-2010). On October 22, 2012, OFAC renamed the ITR as the Iranian Transactions and Sanctions Regulations ("ITSR"), and reissued them in relevant part. *See* 77 Fed. Reg. 64,664 (Oct. 22, 2012).

Fokker Services B.V.
Settlement Agreement
Page 3 of 11

actions to evade the U.S. embargo against Iran and related license requirements and to avoid detection by the U.S. Government.

7.   FSBV concealed information about the origin of the items from its vendors and suppliers in the U.S. (and the U.K.),[5] and by otherwise concealing its business dealings with Iran, in order to induce these vendors and suppliers to unwittingly repair or supply items that FSBV then exported or reexported to Iranian end-users. FSBV's practice of withholding information from such vendors and suppliers was described in numerous email messages and in a memorandum to FSBV's Component and Material Services management team as the "what they don't know won't hurt them" principle. Under this scheme, FSBV developed and maintained lists of repair shops and parts suppliers that were categorized based upon the likelihood that the firms would ask FSBV for end-user information about the items. Those vendors and suppliers that did not seek end-user statements or ask questions about the origin of parts sent to them were chosen by FSBV to service or supply the items for FSBV's Iranian customers. Vendors and suppliers that required end-user information were "blacklisted" by FSBV from working on parts destined for Iranian end-users.

8.   FSBV also took additional steps to conceal connections to Iranian customers prior to sending parts to U.S. (and U.K.) companies for repair or servicing. FSBV employees in the Netherlands would receive parts that needed repair or servicing from its Iranian customers, and would then strip identifying information associated with Iranian aircraft from items and packaging before sending those parts on to firms in the U.S. (and U.K.). When such repair shops specifically requested aircraft tail numbers associated with the parts FSBV sent them for repair, FSBV not only routinely withheld the tail numbers of Iranian-registered aircraft, but also provided the repair shops with false tail numbers belonging to non-Iranian aircraft or provided fabricated tail numbers for aircraft that did not actually exist, or asserted that the part was from FSBV stock when in fact it was associated with an Iranian aircraft.

9.   In 2007, numerous internal email messages were sent to employees reprimanding them on occasions when authentic identifying information, such as an aircraft's tail number, was included with items that were connected to Iran and then sent to the United States for repair. Ultimately, in February 2008, FSBV inserted an automatic electronic alert notice into its centralized enterprise resource management system that reminded employees to withhold information about Iranian end users from repair shops and suppliers. In contrast, such information was routinely provided to FSBV's outside vendors and suppliers in connection with non-Iranian end-users. The alert notice stated "Supply TAIL-[NUMBERS] except for customers like Iran and other countries that are boycotted." The alert notice also listed "boycotted" countries, including Iran, and listed FSBV's customers associated with each boycotted country.

---

[5] U.K. vendors and suppliers are referenced herein in connection with transactions involving U.S.-origin parts.

10. At all pertinent times hereto, FSBV, including its senior management, knew of the long-standing and widely-known U.S. trade embargo against Iran and was aware of the restrictions under U.S. law on exporting and reexporting U.S.-origin items to Iran without U.S. Government authorization.

11. FSBV knew of the need under the Iran embargo for U.S. Government authorization no later than February 2002, when it sought an OFAC license to export U.S.-origin aircraft parts to Iran. FSBV's application also made reference to a prior Commerce Department license that the company indicated had issued in 1990. In January 2004, OFAC denied FSBV's license application, specifically citing the prohibitions on exporting and reexporting to Iran.

12. Moreover, FSBV's knowledge of the U.S. embargo on Iran and on U.S. export licensing requirements is evident in numerous meetings and discussions among senior FSBV management, and among FSBV employees and FSBV management, beginning in at least 2005 and continuing through at least June 2010. These discussions included repeated warnings from FSBV's legal director to FSBV's chief executive officers and other senior executives at the time that U.S. export laws prohibited FSBV from exporting and reexporting U.S.-origin items to Iran. For example, in a February 28, 2008 memorandum prepared for the FSBV management team, the legal director stated that "parties in the US may not do business with Iran and may not provide services to third parties (like [FSBV]) which eventually are meant for Iran. ... The American laws and policies relating to the subject at hand have a so-called extra-territorial function. If, in the eyes of the US, a Dutch company is in breach of American export laws and policies, then the US will prosecute this Dutch party."

13. Notwithstanding FSBV's specific knowledge of the U.S. embargo on Iran and U.S. license requirements, no U.S. Government authorization was sought or obtained for any of these 88 transactions involving the NS- and MT-controlled items described above. Instead, as set forth above, FSBV engaged in numerous activities to evade U.S. law and avoid detection.

14. In so doing, FSBV committed 88 violations of Section 764.2(e) of the Regulations.

**Charges 89 - 98**   **Acting with Knowledge of a Violation of the Regulations in Connection with Exports to Iranian Military End Users, in Violation of 15 C.F.R. § 764.2(e)**

15. On at least 10 occasions between on or about November 17, 2006, and on or about February 12, 2008, FSBV sold, transferred, transported and/or forwarded to, and/or serviced for, Iranian military end users items subject to the Regulations, classified under ECCN 7A994 or 9A991.d, controlled for Anti-Terrorism reasons, and exported or to be exported from the United States, with knowledge that a violation of the Regulations had occurred, was about to occur, or was intended to occur in connection with the items.

Fokker Services B.V.
Settlement Agreement
Page 5 of 11

These items consisted of aircraft parts and components were valued in total at approximately $405,435.

16. At all times pertinent hereto, Sections 742.8 and 746.7 of the Regulations imposed a BIS license requirement for the export to Iran, whether directly or transshipped through a third country, of each of the items described in Paragraph 14 above.

17. Paragraphs 6 through 12 above are realleged and incorporated by reference.

18. Notwithstanding FSBV's specific knowledge of the U.S. embargo on Iran and U.S. license requirements, no U.S. Government authorization was sought or obtained for any of these 10 transactions involving military end users in Iran. Instead, as set forth in Paragraphs 6 through 12 and realleged in Paragraph 17 above, FSBV engaged in numerous activities to evade the U.S. embargo against Iran and related license requirements and to avoid detection by the U. S. Government.

19. In so doing, FSBV committed 10 violations of Section 764.2(e) of the Regulations.

**Charges 99-144**      **Acting with Knowledge of a Violation of the Regulations in Connection with Exports or Reexports to Iran of Items Controlled on Anti-Terrorism Grounds, in Violation of 15 C.F.R. § 764.2(e)**

20. On at least 46 occasions between on or about January 23, 2009, and on or about March 3, 2010, FSBV sold, transferred, transported and/or forwarded or serviced for, Iranian end-users items subject to the Regulations, classified under ECCN 6A998, 7A994, or 9A991.d, controlled for Anti-Terrorism reasons, and exported or to be exported from the United States, with knowledge that a violation of the Regulations had occurred, was about to occur, or was intended to occur in connection with the items. These items consisted of parts and components used in aircraft avionics and navigation systems, as well as parts and components for other aircraft systems, including engine and communications systems, and were valued in total at approximately $4,746,059.

21. At all times pertinent hereto, Sections 742.8 and 746.7 of the Regulations imposed a BIS license requirement for the export or reexport to Iran, whether directly or transshipped through a third country, of each of the items described in Paragraph 18 above.

22. Paragraphs 6 through 12 above are realleged and incorporated by reference.

23. Notwithstanding FSBV's specific knowledge of the U.S. embargo on Iran and U.S. license requirements, no U.S. Government authorization was sought or obtained for any of these 46 transactions. Instead, as set forth in Paragraphs 6 through 12 and realleged in Paragraph 22 above, FSBV engaged in numerous activities to evade the U.S.

Fokker Services B.V.
Settlement Agreement
Page 6 of 11

embargo against Iran and related license requirements and to avoid detection by the U. S. Government.

24. In so doing, FSBV committed 46 violations of Section 764.2(e) of the Regulations.

**Charges 145-240      Acting Contrary to the Terms of a Denial Order, In Violation of 15 C.F.R. § 764.2(k)**

25. On at least 96 occasions between on or about June 18, 2008, and on or about May 29, 2009, FSBV took actions prohibited by a BIS temporary denial order. Iran Air, a FSBV customer, was named as a Denied Person in a temporary denial order ("the TDO") issued by BIS on June 6, 2008, and renewed by BIS for 180 days on December 3, 2008.[6] Under the TDO, all persons, including FSBV, were prohibited from exporting or reexporting to or on behalf of Iran Air any item subject to the Regulations, and were further prohibited from, *inter alia*, engaging in any transaction to service any item subject to the Regulations that had been or would be exported from the United States and was owned, possessed, or controlled by Iran Air. FSBV violated the TDO by engaging in 96 transactions in which it exported or reexported items subject to the EAR to Iran Air and/or serviced items subject to the Regulations and owned or controlled by Iran Air. The items consisted of parts and components used in aircraft avionics and navigation systems and other aircraft systems, were classified under ECCN 1A001.c, 7A103.a, 6A998, 7A994, 9A991.d, or 9A991.e, and were controlled for National Security, Missile Technology, and/or Anti-Terrorism reasons. The items were valued in total at $999,141.

26. In acting contrary to the terms of the TDO, FSBV committed 96 violations of Section 764.2(k) of the Regulations.

**Charges 241-253      Exporting and Reexporting Items Controlled on National Security and Anti-Terrorism Grounds to Sudan Without the Required Licenses, in Violation of 15 C.F.R. § 764.2(a)**

27. On 13 occasions between on or about July 24, 2006, and on or about September 1, 2010, FSBV engaged in conduct prohibited by the Regulations by exporting or reexporting aircraft parts and components, items subject to the Regulations, classified under Export Control Classification Numbers (ECCN) 1A001.c, 7A994, or 9A991.d, and controlled for National Security and/or Anti-Terrorism reasons, to Sudan without the required licenses. The items were valued in total at approximately $152,381.

---

[6] The TDO was effective upon its issuance on June 6, 2008, and was published in the *Federal Register* on June 17, 2008. 73 Fed. Reg. 34,249. The TDO renewal order was effective upon issuance on December 3, 2008, was published on December 11, 2008 (73 Fed. Reg. 75,386), and remained in force until June 1, 2009.

Fokker Services B.V.
Settlement Agreement
Page 7 of 11

28.   At all pertinent times hereto, a license was required for the export or reexport of these items to Sections under Section 742.4 and/or 742.10 of the Regulations.[7]  By exporting or reexporting the items to Sudan without the required licenses, FSBV committed 13 violations of Section 764.2(a) of the Regulations.

WHEREAS, FSBV has reviewed the Proposed Charging Letter and is aware of the allegations made against it and the administrative sanctions that could be imposed against it if the allegations are found to be true;

WHEREAS, FSBV fully understands the terms of this Agreement and the Order ("Order") that the Assistant Secretary of Commerce for Export Enforcement will issue if he approves this Agreement as the final resolution of this matter;

WHEREAS, FSBV enters into this Agreement voluntarily and with full knowledge of its rights, after having consulted with counsel;

WHEREAS, the Parties enter into this Agreement having taken into consideration the deferred prosecution agreement ("DPA") that FSBV has entered into with the U.S. Attorney's Office for the District of Columbia ("USAO"), and the settlement agreement that FSBV has entered into with the Department of the Treasury's Office of Foreign Assets Control ("OFAC Settlement Agreement");

WHEREAS, FSBV accepts and acknowledges responsibility for its conduct and that of its employees as set forth in the Factual Statement attached to the DPA as Exhibit A thereto;

WHEREAS, FSBV states that no promises or representations have been made to it other than the agreements and considerations herein expressed;

WHEREAS, FSBV agrees to be bound by the Order, if issued;

---

[7] The transactions involving items classified under ECCN 7A994 or 9A991.d were exports.

Fokker Services B.V.
Settlement Agreement
Page 8 of 11

NOW THEREFORE, the Parties hereby agree, for purposes of this Settlement

Agreement, as follows:

A.     BIS has jurisdiction over FSBV, under the Regulations, in connection with

the matters alleged in the Proposed Charging Letter.

B.     The following sanctions shall be imposed against FSBV in complete

settlement of the alleged violations of the Regulations relating to the transactions

specifically detailed in the Proposed Charging Letter:

i.     FSBV shall be assessed a civil penalty in the amount of

$10,500,000, to be paid pursuant to the respective terms of this Agreement and

the OFAC Settlement Agreement. FSBV shall pay the U.S. Treasury in three

equal installments of $3,500,000 due, respectively, on November 25, 2014, May

25, 2015, and November 25, 2015. Payment shall be made pursuant to the

payment instructions to be supplied by the Department of the Treasury. If any of

the three installment payments is not fully and timely made, any remaining

scheduled installment payments become due and owing immediately under this

Agreement.

ii.     The full and timely payment of the civil penalty agreed to in

Paragraph B.i above and compliance with the DPA and the OFAC Settlement

Agreement are hereby made conditions to the granting, restoration, or continuing

validity of any export license, license exception, permission, or privilege granted,

or to be granted, to FSBV. The failure to make full and timely payment of the

civil penalty may result in the denial of all of FSBV's export privileges under the

Regulations for one year from the date of the failure to make such payment. The

failure by FSBV to comply in full with the DPA or the OFAC Settlement

Agreement may result in the denial of FSBV's export privileges for a period of

one year from the date on which it is determined that a violation of the DPA or

the OFAC Settlement Agreement, as applicable, has occurred.

C.      Subject to the approval of this Agreement pursuant to Paragraph H. below,

FSBV hereby waives any claims, whether asserted or unasserted, against BIS, the U.S.

Department of Commerce and/or its officials and employees arising out of the facts and

circumstances giving rise to the matters that resulted in this Agreement, including, but

not limited to, BIS's investigation of the facts and circumstances giving rise to the BIS

allegations and BIS's issuance of the Proposed Charging Letter.  FSBV also hereby

waives any possible legal objections to this Agreement at any future date and all rights to

further procedural steps in this matter (except with respect to any alleged violations of

this Agreement or the BIS Order, if issued), including, without limitation, any right to:

(a) an administrative hearing regarding the allegations in any proposed charging letter;

(b) request a refund of any civil penalty paid pursuant to this Agreement and the Order, if

issued; and (c) seek judicial review or otherwise contest the validity of this Agreement or

the BIS Order, if issued.  FSBV waives and will not assert any Statute of Limitations

defense, and the Statute of Limitations will be tolled, in connection with any violation of

the Act or the Regulations arising out of the transactions identified in the Proposed

Charging Letter or in connection with collection of the civil penalty or enforcement of

this Agreement and the Order, if issued, from the date of the Order until the latest of the

date FSBV pays in full the civil penalty agreed to in Paragraph B.i of this Agreement,

complies with the DPA, or complies with the OFAC Settlement Agreement.

Fokker Services B.V.
Settlement Agreement
Page 10 of 11

D.     FSBV shall not take any action or make or permit to be made any public

statement, directly or indirectly, denying the allegations in the Proposed Charging Letter

or the Order. The foregoing does not affect FSBV testimonial obligations in any

proceeding, nor does it affect its right to take legal or factual positions in civil litigation

or other civil proceedings in which the U.S. Department of Commerce is not a party.

E.     BIS agrees that upon full and timely payment of the civil penalty as set

forth in Paragraph B.i above, and compliance with the DPA and the OFAC Settlement

Agreement, BIS will not initiate any further administrative proceeding against FSBV in

connection with any violation of the Act or the Regulations arising out of the transactions

specifically detailed in the Proposed Charging Letter.

F.     This Agreement is for settlement purposes only. Therefore, if this

Agreement is not accepted and the Order is not issued by the Assistant Secretary of

Commerce for Export Enforcement pursuant to Section 766.18(a) of the Regulations, no

Party may use this Agreement in any administrative or judicial proceeding and the Parties

shall not be bound by the terms contained in this Agreement in any subsequent

administrative or judicial proceeding.

G.     No agreement, understanding, representation or interpretation not

contained in this Agreement may be used to vary or otherwise affect the terms of this

Agreement or the Order, if issued; nor shall this Agreement serve to bind, constrain, or

otherwise limit any action by any other agency or department of the U.S. Government

with respect to the facts and circumstances addressed herein.

H.     This Agreement shall become binding on the Parties only if the Assistant

Secretary of Commerce for Export Enforcement approves it by issuing the Order, which

Fokker Services B.V.
Settlement Agreement
Page 11 of 11

will have the same force and effect as a decision and order issued after a full

administrative hearing on the record.

      I.      BIS will make the Proposed Charging Letter, this Agreement, and the

Order, if issued, available to the public.

      J.      Each signatory affirms that he has authority to enter into this Settlement

Agreement and to bind his respective party to the terms and conditions set forth herein.


BUREAU OF INDUSTRY AND
SECURITY
U.S. DEPARTMENT OF COMMERCE

_____
Douglas R. Hassebrock
Director of Export Enforcement


Date: _____


FOKKER SERVICES B.V.

_____
Peter Somers
President
Fokker Services B.V.


Date: 30 May 2014


Reviewed and approved by:

_____
Edward O'Callaghan, Esq.
David DiBari, Esq.
Michelle Williams, Esq.
Clifford Chance US LLP
Counsel for Fokker Services B.V.


Date: 3 June 2014

## SETTLEMENT AGREEMENT

This settlement agreement (the "Agreement") is made by and between the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and Fokker Services B.V. ("FSBV" or "Respondent").

OFAC participated in a joint investigation of Respondent with other U.S. law enforcement agencies, including the U.S. Attorney's Office for the District of Columbia ("USAO") and the Department of Commerce's Bureau of Industry and Security ("BIS"). Contemporaneous with this Agreement, Respondent has entered into a Deferred Prosecution Agreement ("DPA") with the USAO, attached hereto as Attachment 1, and a separate settlement agreement with BIS ("BIS Settlement Agreement"), attached hereto as Attachment 2.

On January 30, 2014, OFAC issued Respondent a Prepenalty Notice, attached hereto as Attachment 3, identified as ENF No. 22792 (the "Prepenalty Notice"), containing allegations that Respondent violated the Iranian Transactions and Sanctions Regulations, 31 C.F.R. part 560 (the "ITSR"),[1] and the Sudanese Sanctions Regulations, 31 C.F.R. part 538 (the "SSR").

Specifically, OFAC alleges that:

1. From on or about November 16, 2005, to on or about May 12, 2010, Respondent appears to have violated § 560.204 of the ITSR on 625 occasions when it indirectly exported aircraft spare, exchanged, or repaired parts, or a combination thereof, procured from a U.S. supplier (including Fokker Services, Inc.'s warehouse in the United States) or repaired by a U.S. repairer, to customers located in Iran ("Iranian customers"), specifically to fill an Iranian customer's order;

2. From on or about November 19, 2005, to on or about August 25, 2010, Respondent appears to have violated § 560.205 of the ITSR on 487 occasions when it reexported U.S.-origin aircraft spare, exchanged, or repaired parts, or a combination thereof, which were subject to export license application requirements under U.S. law, independent of the ITSR, at the time of shipment to Iranian customers; and

3. From on or about July 1, 2006, to on or about September 1, 2010, Respondent appears to have violated § 538.205 of the SSR on 41 occasions when it indirectly exported or reexported aircraft spare or repaired parts, or a combination thereof, to customers or end users in Sudan, that either (i) Respondent procured from a U.S. supplier, or had repaired by a U.S. repairer, specifically to fill a Sudanese

---

[1] On October 22, 2012, OFAC changed the heading of 31 C.F.R. part 560 from the Iranian Transactions Regulations to the Iranian Transactions and Sanctions Regulations ("ITSR"), amended the renamed ITSR, and reissued them in their entirety. *See* 77 Fed. Reg. 64,664 (Oct. 22, 2012). For the sake of clarity, all references herein to the ITSR shall mean the regulations in 31 C.F.R. part 560 in effect at the time of the activity, regardless of whether such activity occurred before or after the regulations were renamed.

customer's or end user's order, or (ii) were U.S-origin and required the issuance of a license by a Federal agency at the time of shipment.

The foregoing allegations are referred to herein as the "Alleged Violations."

OFAC and Respondent agree as follows:

1. In consideration of the undertakings of Respondent in paragraph 2 below, OFAC agrees to release and forever discharge Respondent, without any finding of fault, from any and all civil liability in connection with the Alleged Violations arising under the legal authorities that OFAC administers.

2. In consideration of the undertakings of OFAC in paragraph 1 above, Respondent agrees:

   A. To settle with OFAC its potential civil liability of $50,922,208 for the Alleged Violations.  Respondent's settlement obligation will be satisfied by the following:

      (i) Respondent's payment to U.S. Treasury of $10,500,000, according to the respective terms of this Agreement and the BIS Settlement Agreement, in three equal installments payable on November 25, 2014, May 25, 2015 and November 25, 2015;

      (ii) Respondent's payment to the USAO of a separate forfeiture amount of $10,500,000, pursuant to the terms of the DPA;

      (iii) Respondent's acceptance of responsibility, as evidenced by the execution of this Agreement, the DPA, and the BIS Settlement Agreement, for the conduct giving rise to the Alleged Violations; and

      (iv) Respondent's acceptance of, and adherence to, all other terms specified in this Agreement, the DPA, and the BIS Settlement Agreement.

   B. To sign, date, and mail an original signed copy of this Agreement to: Attn: Office of Enforcement, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, NW, Washington, DC 20220;

   C. To arrange with the U.S. Bureau of the Fiscal Service, in accordance with the enclosed "Electronic Funds Transfer (EFT) Instructions" and referencing "ENF No. 22792," for the payment to the U.S. Treasury the amount of $10,500,000, referenced above in section 2(A)(i),

   D. To waive (i) any claim by or on behalf of Respondent, whether asserted or unasserted, against OFAC, the U.S. Department of the Treasury, and/or its officials and employees arising out of the facts giving rise to the enforcement matter that resulted in this Agreement, including but not

6666

666

limited to OFAC's investigation of the Alleged Violations, and (ii) any possible legal objection to this Agreement at any future date.

FSBV accepts and acknowledges responsibility for its conduct and that of its employees as set forth in the Factual Statement attached to the DPA as Exhibit A.

This Agreement has no bearing on any past, present, or future OFAC actions, including the imposition of civil monetary penalties, with respect to any activities by Respondent other than those set forth in the Alleged Violations.

OFAC may, in its sole discretion, issue a public statement about the facts of this Agreement, on its Web site or otherwise, including the identity of any entity involved, the settlement amount, and a brief description of the Alleged Violations.

This Agreement consists of three pages and three attachments, and expresses the complete understanding of OFAC and Respondent regarding resolution of OFAC's enforcement matter involving the Alleged Violations. No other agreements, oral or written, exist between OFAC and Respondent regarding resolution of this matter.

This Agreement shall inure to the benefit of and be binding on each party, as well as its respective successors or assigns.

Respondent accepts the terms of this Settlement Agreement this 30th day of May, 2014.

Signature

Respondent's Printed Name (or in the case of an entity, the name of Respondent's Duly Authorized Representative)

Peter Somas / President

Printed Title of Respondent's Duly Authorized Representative and Name of Entity (if applicable)

☒ Please check this box if you have not enclosed payment with this Agreement and will instead be paying or have paid by electronic funds transfer (see paragraph 2(C) and the Electronic Funds Transfer Instructions enclosed with this Agreement).

Date: 6/3/14

Adam Szubin
Director
Office of Foreign Assets Control