**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No.  14-CR-121 (RJL)** |
| | : | |
| **v.** | : | |
| | : | |
| **FOKKER SERVICES B.V.,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFERRED**</u>
<u>**PROSECUTION AGREEMENT REACHED WITH FOKKER SERVICES B.V.**</u>

<u>**INTRODUCTION**</u>

In its Memorandum in Support of Deferred Prosecution Agreement Reached with Fokker Services B.V., filed on July 7, 2014 ("Initial DPA Memo"), the government demonstrated why the proposed resolution of this matter is both fair and an appropriate exercise of the government's discretion.  The Court has now asked that the parties brief two matters: (1) "some of the issues" raised in a news article related to "whether or not this was truly a voluntary disclosure situation at all," and (2) the "standard of review when the Court is reviewing a Deferred Prosecution Agreement ("DPA")."  July 9, 2014, Hearing Tr. 4, 5.

Contrary to any suggestions in the press, the criminal conduct underlying the Information filed against Fokker Services was revealed to the government by Fokker Services itself following its own extensive internal investigation.  The limited information about Fokker Services that the government learned in an earlier inquiry did not lead the government to take any investigate step focused on Fokker Services.  Instead, Fokker Services became the subject of the government investigations that led to this criminal charge when it chose to come forward and confess its wrongdoing.

As set forth below, beginning in late 2007 and early 2008, two cooperating defendants in another matter provided limited information about Fokker Services' activities related to Iran. Those defendants provided this information in the context of debriefings during which they identified approximately 11 entities engaged in business with Iran.  Because the government had prioritized other targets to investigate based on the information provided by the cooperating defendants, when Fokker Services disclosed its conduct to the United States government in June 2010, no agency within the United States government had an open investigation focused on Fokker Services or had even taken an investigative step focused on Fokker Services.  In addition, to date, no agency within the United States government has found evidence demonstrating that Fokker Services believed it was under investigation for violating U.S. export control laws at the time the company disclosed its conduct.  For these reasons, after a searching inquiry, under the Department of Justice's Principles of Federal Prosecution of Business Organizations, set forth in the United States Attorneys' Manual ("USAM") § 9-28.000 *et seq.,* the Department of Justice, through the U.S. Attorney's Office for the District of Columbia and the National Security Division, deemed Fokker Services' disclosures to be objectively voluntary.[1]

With respect to the Court's inquiry concerning the scope of its authority to approve the DPA, courts have long given great deference to the Executive Branch in its exercise of prosecutorial discretion.  This is both a matter of separation of powers and a recognition of the respective fields of expertise of the two co-equal branches of government.  In the context of a DPA, the Court's authority is limited to reviewing the proposed exclusion of time pursuant to the Speedy Trial Act, 18 U.S.C. § 3162(h)(2) (exclusion of time for purposes of permitting

---

[1]     Below we discuss how the two regulatory agencies involved in the global resolution with Fokker Services applied their regulations to the same set of facts.

defendant to demonstrate compliance with the law while prosecution is deferred per written agreement).

Here, the government, in its prosecutorial discretion, entered into a DPA with Fokker Services as one component of a global resolution that requires the company to, among other things, pay the United States government $21 million, or 100% of its ill-gotten revenue, which is also an amount greater than three times the profit from the illegal business. Such a recovery from a company in dire financial straits is significant and in the public interest. The DPA also requires Fokker Services to continue its exemplary export compliance program. These requirements follow extensive cooperation from the company through which it provided the regulatory agencies and prosecutors a fulsome and verifiable narrative of its illegal conduct. It made thousands of pages of unredacted and translated documents available and facilitated the interviews of key employees. It also sanctioned those current employees who had a role in the illegal conduct. After a thorough review of the fruits of the investigation, the government agreed to let Fokker Services enter into a DPA. The government's decision to enter into a DPA with Fokker Services is appropriate, and none of the specific terms of the DPA are novel. The Court should exercise the authority it has to approve the exclusion of time under the Speedy Trial Act. Alternatively, should the Court conclude that it has inherent supervisory authority to review and approve (or disapprove) the DPA, the Court should exercise that authority and approve the DPA.

## I.  PROCEDURAL BACKGROUND

On June 23, 2010, Fokker Services disclosed to the United States government, through the Department of Commerce's Bureau of Industry and Security ("BIS") and the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), that the company had violated U.S. export control laws by engaging in transactions with U.S.-sanctioned countries, specifically Iran,

Sudan, and Burma, dating back to 2005.  Subsequently, with the assistance of outside counsel, Fokker Services submitted to BIS and OFAC a supplemental disclosure in December 2010 that articulated the results of an extensive internal investigation that cost the company more than $8 million in 2010.  Upon receipt of the company's disclosures, various agencies of the United States government opened investigations focused on Fokker Services' conduct in violation of U.S. export control laws and regulations.

After extensive negotiations between the parties, including counsel from BIS and OFAC, in early June 2014, Fokker Services and the government reached a global resolution of the criminal and administrative investigations.  To that end, on June 5, 2014, the government filed an Information, a DPA with an accompanying Statement of Offense, and a Joint Consent Motion for Exclusion of Time Under the Speedy Trial Act.  The parties subsequently provided the Court a proposed consent Forfeiture Order to effectuate the agreed-upon monetary penalty being received into the appropriate government coffers.

At the June 25, 2014, status conference, the Court requested that the government submit a pleading setting forth why the DPA reached in this case adequately reflects the seriousness of the company's conduct and why this resolution serves the interests of justice.  On July 7, 2014, the government submitted a memorandum in response to the Court's request.  At the July 9, 2014, status conference, the Court directed that the parties submit a pleading addressing the "standard of review when the Court is reviewing a Deferred Prosecution Agreement," as well as "some of the issues that [were] raised in [a] newspaper article" submitted to the Court by a member of the press, paying particular attention to the issue of "whether or not this was truly a voluntary disclosure situation at all."  July 9, 2014, Hearing Tr. at 4, 5.

II.    **FOKKER SERVICES' 2010 SELF-DISCLOSURES ARE WORTHY OF
       <u>SUBSTANTIAL BENEFIT UNDER JUSTICE DEPARTMENT GUIDELINES</u>**

### A. Background Related to Fokker Services' Disclosures

On June 23, 2010, Fokker Services disclosed to the government that the company had violated U.S. export control laws by engaging in transactions with U.S.-sanctioned countries dating back to 2005. Subsequently, with the assistance of outside counsel whom Fokker Services retained to investigate the extent of its violations of U.S. export control laws and provide guidance on developing a new corporate export compliance program, Fokker Services submitted to BIS and OFAC a supplemental and lengthy disclosure in December 2010 that articulated the results of the extensive internal investigation. The investigation concluded that from 2005 until 2010, Fokker Services engaged in 1,147 transactions in violation of U.S. export control laws, which conduct earned Fokker Services $21 million in gross revenue and $5.9 million in gross pretax profit.

### B. The United States Government Had Limited Information About Fokker Services' Activities When the Company Came Forward to Disclose the Full Extent of Its Criminal Conduct

Robert Niels Kraaipoel and his father Robert Kraaipoel were Dutch citizens who resided in The Netherlands. They owned and operated the business Aviation Services International B.V. ("ASI"), also located in The Netherlands. ASI's business was to illegally procure U.S.-origin aviation parts for customers located in Iran. In this capacity, the Kraaipoels ordered U.S.-origin aviation parts from suppliers located in the United States, and then had the parts shipped to The Netherlands. Once the parts arrived in The Netherlands, the Kraaipoels re-packaged the parts and shipped them to their customers in Iran. When their U.S. suppliers inquired about the end users of the aircraft parts, the Kraaipoels provided the U.S. suppliers false information as to the

destination and end-users of the parts, i.e., the Kraaipoels lied to U.S. suppliers to hide the fact that the parts were intended for ASI's customers in Iran.

In 2007, U.S. law enforcement began looking into ASI's conduct. Shortly thereafter, in late 2007, the Kraaipoels began cooperating with U.S. law enforcement.[2] In January 2008, both Robert and Niels Kraaipoel began debriefing with numerous representatives from United States law enforcement, including special agents from BIS, the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement ("ICE"), the Defense Criminal Investigative Service ("DCIS"), and Department of Justice prosecutors. As part of their cooperation, the Kraaipoels made available to law enforcement all of their business contacts and transaction documents. In addition, they provided detailed information about their Iranian customers, the Iranian end-users, ASI's freight forwarders in The Netherlands, and ASI's U.S. suppliers. In September 2009, the Kraaipoels flew to the United States to participate in more voluntary debriefings with law enforcement. During these debriefings, law enforcement gained substantial information about the Iranian civilian and military end-users whom the Kraaipoels and ASI serviced. Finally, in January 2010, the Kraaipoels provided voluminous documents and records at the request of law enforcement.

For over two years, the Kraaipoels were productive sources of information for U.S. law enforcement. The information provided by these cooperating defendants led to many indictments and convictions of other target companies and individuals. The information provided by the Kraaipoels related to a number of U.S. and foreign companies—the Kraaipoels identified at least 11 other companies and individuals during their cooperation. However, when identifying these other companies and individuals, the Kraaipoels did not always have direct,

---

[2] As a result of the investigation into ASI and the Kraaipoels, on September 24, 2009, the Kraaipoels pled guilty in the U.S. District Court for the District of Columbia to conspiring to commit an offense against the United States in violation of 18 U.S.C. § 371, in 2009-CR-219 (PLF).

firsthand knowledge that the other companies and individuals were engaged in conduct in violation of U.S. sanctions.

While the Kraaipoels identified Fokker Services in debriefings with U.S. law enforcement in late 2007 and 2008, the information they provided about Fokker Services' potential involvement in criminal activity was limited.  The Kraaipoels informed law enforcement that Fokker Services had Iranian customers—this conduct was permissible under U.S. law in certain circumstances.  The Kraaipoels knew firsthand that Fokker Services dealt with Iranian customers because, before Fokker Aircraft N.V.'s bankruptcy,[3] ASI was the company's European sales agent.  The Kraaipoels also gave secondhand information that they had heard from some of their Iranian customers that Fokker Services was acquiring U.S. parts, stripping off the parts' labels, and then sending the parts to Iran.  The Kraaipoels never provided information that Fokker Services was willfully violating U.S. sanctions.  Moreover, the Kraaipoels stated that at one point during their business operations, they lied to Fokker Services to hide the fact that ASI was servicing Iranian customers, just as they had hidden the same type of information from their U.S. suppliers.

### C.  No United States Government Agency Had Opened An Investigation Focused on Fokker Services Prior to the Company's 2010 Disclosures

Notwithstanding the few references the Kraaipoels made to U.S. law enforcement concerning Fokker Services, no agency within the United States government opened an investigation focused on Fokker Services until June 2010, when Fokker Services submitted its first disclosure to BIS and OFAC.  This reality reflects the quality and weight of the information about Fokker Services obtained from the Kraaipoels.  When receiving information about potential criminal conduct, U.S. law enforcement prioritized investigatory steps based on the

---

[3]     Fokker Aircraft N.V. manufactured Fokker airplanes until it went bankrupt in 1996.

quality and strength of the information provided in addition to other national security interests. Simply put, the limited information about Fokker Services provided by the Kraaipoels did not cause the government to open or pursue an investigation of Fokker Services before the company itself came forward to admit its wrongdoing.

### D. The Government Has Found No Evidence to Suggest That Fokker Services Was Aware of United States Law Enforcement's Possible Interest in the Company When Fokker Services Self-Disclosed in 2010

Finally, of equal significance to the Justice Department's determination under the USAM that Fokker Services should receive consideration for making a voluntary disclosure in 2010 is the fact that we have found no evidence to suggest that Fokker Services believed it was being investigated before it submitted its disclosures to BIS and OFAC.  When Fokker Services came forward to disclose its criminal conduct, given the information earlier provided by the Kraaipoels, the government carefully combed the record for any evidence suggesting that Fokker Services may have believed that it was under investigation by the United States government. After numerous interviews conducted by the government and a comprehensive review of the voluminous email and other documentary evidence, the government found no such evidence.

### E. USAM § 9-28.100 and Prevailing Department of Justice Policy Directs That Fokker Services Should Receive Meaningful Credit for Its 2010 Disclosures

The Department of Justice "has and will continue to provide meaningful credit for companies that provide voluntary disclosures."  Remarks by Charles Duross, Deputy Chief of the Department of Justice's Criminal Division's Fraud Section, at the World Bribery & Corruption Compliance Forum in September 2010.  The Department of Justice's determination that Fokker Services' 2010 disclosures were voluntary was based on three primary factors: (1) no agency within the United States government had an open investigation into Fokker Services when the company disclosed its illegal conduct; (2) no agency within the United States government had

taken an investigative step focused on Fokker Services at the time that the company submitted its disclosures; and (3) there is no evidence to demonstrate that Fokker Services believed it was under investigation at the time that it disclosed its conduct.

OFAC looked at the same undisputed facts as the Department of Justice and, applying its own regulatory standards, also concluded that Fokker Services' 2010 disclosures were voluntary.

In response to the Court's inquiry, the Department of Justice asked BIS to articulate in writing its position regarding Fokker Services' 2010 disclosures.   Applying BIS's Export Administration Regulations, BIS determined "that although the case might be a close one, on balance the company did not meet BIS's standard … for receiving voluntary self-disclosure credit," but that "the high degree of cooperation on the part of the company effectively rendered the voluntary self-disclosure issue moot from BIS's standpoint."[4]   BIS reached this conclusion on the basis of the fact that, as noted in the Initial DPA Memo (at 8-9) and the Statement of Offense (at ¶¶ 19-31), Fokker Services' upper management was aware of the extraterritorial application of U.S. export control laws to the company at least two years before the company disclosed its conduct to the United States government.   This was a fact that weighed heavily in the Department of Justice's determination that Fokker Services' conduct was egregious.   See Initial DPA Memo, at 8-9.   However, this fact does not minimize that (1) no agency within the United States government had an open investigation into Fokker Services when the company disclosed its illegal conduct; (2) no agency within the United States government had taken an investigative step focused on Fokker Services at the time that the company submitted its disclosures; and (3) there is no evidence to demonstrate that Fokker Services believed it was under investigation at the time that it disclosed its conduct.   For these reasons, the Department of

---

[4]      See Exhibit A (July 18, 2014, correspondence from Special Agent in Charge, Boston Field Office, John J. McKenna, BIS).

Justice concluded that Fokker Services' 2010 self-disclosures were worthy of meaningful credit under the USAM's Principles of Federal Prosecution of Business Organizations.

In any event, the combination of the company's fulsome disclosures, extensive cooperation, robust remediation efforts, and precarious financial condition led each Executive Branch agency to the conclusion that the global resolution reached with the company is manifestly in the public interest.

### III.   THE COURT'S AUTHORITY IS LIMITED TO APPROVING THE PENDING EXCLUSION OF TIME UNDER THE SPEEDY TRIAL ACT

#### A.  Background

The Court has asked that the parties provide their position on the scope of the Court's authority to approve the DPA.  The Court's scope of review and authority is derived from 18 U.S.C. § 3161(h)(2) and therefore is limited to determining whether to grant the pending consent motion to exclude time under the Speedy Trial Act.  18 U.S.C. § 3161(h)(2) does not, however, authorize the Court to approve or deny the DPA itself; rather, 18 U.S.C. § 3161(h)(2) only permits a court to approve the parties' agreement to exclude time from the computation of the speedy trial clock.  DPAs are contractual in nature and are not created or governed by statute.

This is the approach adopted by the District Court for the District of Connecticut in United States v. The Royal Bank of Scotland PLC, 13-CR-0074 (MPS) (D. Conn. 2013) ("RBS").  In RBS, the district court approved the parties' agreement to exclude time under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161(h)(2), and also engaged in a colloquy to assess whether the defendant corporation was executing its DPA knowingly, intelligently, and voluntarily.  The district court did not assess the merits of the DPA itself.

The approach of the district court judge in RBS is an appropriate exercise of judicial authority.  This approach duly recognizes the strong deference due the Executive Branch in

exercises of prosecutorial discretion because the "task of supervising prosecutorial decisions would place reviewing courts in the undesirable and injudicious posture of becoming superprosecutors."  Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 380 (2d Cir. 1973).  As the Supreme Court has explained,

> A prosecutor's broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review.  Such factors as the strength of the case, the prosecution's general deterrence value, the government's enforcement priorities, and the case's relationship to the government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.  Judicial supervision in this area, moreover, entails systemic costs of particular concern.

Wayte v. United States, 470 U.S. 598, 607 (1985).  See also United States v. Armstrong, 517 U.S. 456, 464 (1996) (stating that "the Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws"); In re Sealed Case, 131 F.3d 208, 214 (D.C. Cir. 1997) (finding that "in the ordinary case, the exercise of prosecutorial discretion, at the very core of the executive function, has long been held presumptively unreviewable"); Shoshone Bannock Tribes v. Reno, 56 F.3d 1476, 1480 (D.C. Cir. 1995) (holding that in "both civil and criminal cases, courts have long acknowledged that the Attorney General's authority to control the course of the federal government's litigation is presumptively immune from judicial review" and that "this court has declined to review a federal prosecutor's decision regarding a plea agreement") (internal citations omitted); United States v. Microsoft Corp., 56 F.3d 1448, 1459 (D.C. Cir. 1995) ("[T]he district court is not empowered to review the actions or behavior of the Department of Justice; the court is only authorized to review the decree [or pending order] itself.").

### B.  The Court's Authority to Approve the Parties' Agreement to Exclude Time Under 18 U.S.C. § 3161(h)(2)

The Speedy Trial Act requires that a trial begin within 70 days of the filing of an indictment or information.  18 U.S.C. § 3161(c)(1).  However, the Act contemplates certain periods of delay that must be excluded in computing the time within which the trial must commence.  For example, under 18 U.S.C. § 3161(h)(2), "any period of delay during which prosecution is deferred by the attorney for the Government pursuant to a written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct, [] shall be excluded [] in computing the time within which the trial of any such offense must commence."  Thus, in connection with a DPA, once a defendant has made an appearance and the Speedy Trial Act clock begins to run, as it has here, the Court has the responsibility to determine whether to grant or deny a speedy trial exclusion pursuant to 18 U.S.C. § 3161(h)(2) to allow the defendant to demonstrate good conduct.  See, e.g., United States v. Wright Medical, 2010 WL 6606785, *1 (D.N.J. Sept. 30, 2010); United States v. Credit Suisse AG, 2009 WL 4894467, *1 (D.D.C. Dec. 16, 2009).

Absent from the Act is a definition of the standard for the exclusion of time in the deferred prosecution context; however, the statute makes clear that time shall be excluded in the deferred prosecution context "with the approval of the court."  "Caselaw on this point is barren;" but, the Act appears to "instruct courts to consider whether a deferred prosecution agreement is truly about diversion and not simply a vehicle for fending off a looming trial date."  United States v. HSBC Bank USA, N.A., and HSBC Holdings PLC, 12-CR-00763-JG ("HSBC"), Document 23, at 6.

Here, the clear goals and objectives of this DPA are to defer prosecution of Fokker Services for its U.S. sanctions violations while allowing the company to continue to prove its

commitment to cooperation and compliance and requiring it to disgorge its illegal revenues.  The company is required to continue to cooperate with the government throughout the period of deferred prosecution—which it has been doing since the company disclosed its illegal conduct in June 2010 by providing the government information relating to possible U.S. sanctions violations by other individuals and entities.  The company is also required to continue to apply and implement its current Export Compliance Program, which is based on U.S. export control laws and regulations, the United States Sentencing Guidelines, and U.N. and E.U. export control laws. Finally, under the terms of the DPA, the government's ability to prosecute the company in the event of breach is preserved.  Thus, the Court can be satisfied that the parties' agreement to defer prosecution for a period of 18 is months for the purpose of allowing the company to demonstrate good conduct rather than simply putting off a looming trial date.  Consequently, the Court should grant the parties' motion to exclude time from the speedy trial clock under 18 U.S.C. § 3161(h)(2).

### C.      The Court's Supervisory Power

In HSBC, in which the government resolved sanctions and anti-money laundering violations with the bank through a DPA, the district court found that the court had the "authority to approve or reject the DPA pursuant to its supervisory power."  HSBC, 12-CR-00763-JG, Document 23, at 6.  Supervisory power "permit[s] federal courts to supervise the administration of criminal justice."  Id. at 6-7.  See also Bank of Nova Scotia v. United States, 487 U.S. 250, 264 (1988) (Scalia, J. concurring) ("every United States court has an inherent supervisory authority over the proceedings conducted before it").  The district court in HSBC further explained that "[b]y placing a criminal matter on the docket of a federal court, the parties have

subjected their DPA to the legitimate exercise of that court's authority." <u>HSBC</u>, 12-CR-00763-JG, Document 23, at 10.

Judicial powers rooted in a court's supervisory authority are not unlimited.  <u>See</u> <u>United States v. Gatto</u>, 763 F.2d 1040, 1046 (9th Cir. 1985) (noting that consideration of separation-of-powers principles imposes significant limitations on a court's use of supervisory powers); <u>United States v. Lau</u>, 714 F.2d 209, 210 (2d Cir. 1983) ("the federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all"); <u>United States v. Myers</u>, 692 F.2d 823, 847 (2d Cir. 1982) (finding that the supervisory authority is certainly not, in any case, a warrant for courts "to fashion their own sub-constitutional limitations on the conduct of law enforcement agents"); <u>United States v. Artuso</u>, 618 F.2d 192, 196-97 (2d Cir. 1980) (limiting the proper exercise of supervisory power to truly exceptional cases).  The standard for the court's supervisory authority is to "ensure that the courts do not lend a judicial imprimatur to any aspect of a criminal proceeding that smacks of lawlessness or impropriety."  <u>HSBC</u>, 12-CR-00763-JG, Document 23, at 10.  <u>See</u> <u>also</u> <u>S.E.C. v. Citigroup Global Markets, Inc.</u>, 752 F.3d 285, 296-98 (2d Cir. 2014) (recognizing the limitations of a district court's inquiry of a pending consent decree and noting that a district court may not withhold approval of a consent decree "on the ground that it believed the S.E.C. failed to bring the proper charges");  <u>Gatto</u>, 763 F.2d at 1046 ("our supervisory authority is not unbounded, and we may not exercise any supervisory power absent a clear basis in fact and law for doing so"); <u>United States v. Chanen</u>, 549 F.2d 1306, 1313 (9th Cir. 1977) (holding that as a threshold matter, a court may not exercise any supervisory power absent "a clear basis in fact and law for doing so"), <u>cert. denied</u>, 434 U.S. 825 (1977).  To the extent that the Court finds that it has the authority to review the Department of Justice's conclusion that under the USAM and Department

of Justice policy Fokker Services' disclosures were voluntary, we believe this is outside the Court's authority under any rubric of judicial authority.  See Citigroup Global Markets, Inc., 752 F.3d at 297 ("[w]hat the district court may not do is find the public interest disserved based on its disagreement with the S.E.C.'s decisions on discretionary matters of policy").

However, in the event that the Court disagrees with the government's position that the Court's authority is limited to the approval of the pending Speedy Trial Act motion, and the Court finds that 18 U.S.C. § 3161(h)(2) or the Court's supervisory power allows it to approve or reject the DPA, akin to the approach taken in HSBC, the Court should still approve the DPA because it is in the interests of justice.  There are no "impropriet[ies] that implicate[] the integrity of the Court and therefore warrant[] the rejection" of this DPA.  HSBC, 12-CR-00763-JG, Document 23, at 13.

When reaching the decision whether or not to prosecute Fokker Services, the government carefully and conscientiously considered a number of mitigating factors derived from USAM § 9-28.000 *et seq.*, many of which support significant mitigation in this case.  First, Fokker Services disclosed its violations of U.S. laws at a time when the United States government was not actively investigating it and had not even taken any investigatory steps.  In addition, there is no evidence to conclude that Fokker Services believed it was under investigation when it disclosed its violations in 2010.  The company's voluntary self-disclosure heavily weighs in favor of mitigation under the USAM.

However, this is not the only factor favoring mitigation.  The company's remediation efforts have been exemplary and similarly carry significant weight.  Simply put, the company's dedication to compliance with U.S. export control laws and regulations not only demonstrates its status as a model to be followed by other corporations, but also underscores the company's

continued commitment to become and remain compliant going forward.  Such remediation efforts include the following: (1) Fokker Services' decision to stop all shipments to all U.S.-sanctioned countries; (2) the company's decision to sanction or reprimand all employees involved in the illegal conduct; (3) the adoption of a new Export Compliance Program and the appointment of a new compliance director; (4) incorporation of safeguards into the company's electronic data management system; (5) exhaustive efforts to scrutinize all of its vendor relationships; and (6) including explicit provisions in its purchase contracts and requiring all customers sign end-user statements certifying that parts will not be supplied, either directly or indirectly, to U.S.-sanctioned countries.

In addition to remediation, the company has <u>extensively</u> cooperated with the government for the past four years—a factor for which the company should receive substantial credit.  In addition to disclosing its conduct to a government that was not actively investigating it, Fokker Services conducted an internal investigation, responded to all of the government's requests for information throughout the duration of the government's subsequent investigation, facilitated the government's receipt of responses to its Mutual Legal Assistance Treaty ("MLAT") responses, provided translations of MLAT documents, facilitated government interviews of 12 witnesses, provided translators for government interviews of witnesses, executed multiple tolling agreements, and provided the government information related to other companies' and individuals' suspicious conduct that may have been in violation of U.S. export control laws and regulations.

Finally, the company's financial situation is extremely unstable—a consideration that the government independently verified and which the government did not take lightly given the government's obligation to consider collateral consequences facing the company, per USAM §

9-28.1000.   Requiring a company to pay out 100% of illegally obtained revenue is noteworthy; here, this monetary penalty is even more significant given Fokker Services' present dire financial condition.  Fokker Services' precarious financial condition required its parent company, Fokker Technologies, to provide financial assistance to meet the company's obligations under the DPA.[5] The DPA also avoids the potentially devastating collateral consequence of putting Fokker Services out of business, which would cause the loss of hundreds of jobs, including many in the United States.

The DPA and its terms appropriately balance the Department's policy that "if [companies] come forward and [] fully cooperate with our investigation, [the company] will receive meaningful credit for having done so," with the Department of Justice's ability to preserve the option to prosecute the "recalcitrant company that materially breaches the agreement."   USAM § 9-28.1000B.   The DPA and its terms appropriately punish the wrongdoing, act as a deterrent to Fokker Services and similarly situated companies, and appropriately promote rehabilitation for a company that has implemented a noteworthy compliance program dedicated to ensuring compliance with U.S. export laws and regulations. Requiring a company to forfeit a multiple of its ill-gotten profits, in addition to requiring the company to continue cooperating with the United States government and also maintain its exemplary export compliance program, represents a resolution that is both fair and serves the public interest.  Finally, neither the decision to enter into the DPA with Fokker Services nor the

---

[5]   Fokker Services was at the time of the disclosure (and during the course of the illegal conduct) owned by Stork B.V., a large Dutch manufacturing and services firm.  In a corporate restructuring, the aerospace activities of the group were separated from the other activities of Stork, and Fokker Services is now owned by Fokker Technologies Holding B.V.  Neither the management of Stork nor Fokker Technologies was involved in the illegal activities, and the government has no criminal recourse against the former or current parent.  Fokker Technologies Holding B.V. is nevertheless providing financial support to Fokker Services to meet the costs associated with both its current restructuring program and the global settlement with U.S. authorities.

specific terms of the DPA are novel.  Simply put, the proposed DPA with Fokker Services is not only fair, but in the interests of justice.

## IV.    **<u>CONCLUSION</u>**

In light of the company's two self-disclosures which, taken together, were accurate, complete, and fulsome, and the fruits of its cooperation and remediation efforts, the appropriate resolution of Fokker Services' criminal liability is the pending DPA, which requires the company to forfeit $10.5 million (or half) of its revenue earned as a result of the conduct in violation of U.S. export control law, in addition to paying another $10.5 million to settle the civil investigations led by BIS and OFAC.  It is undisputed that the company's decision to disclose its violations came at a time when the United States government not only did not have an open case focused on Fokker Services, but no agency within the United States government had taken a single investigatory step focused on Fokker Services.  The company fully cooperated throughout the government's investigation.  The company's remediation efforts have been comprehensive.  The company's compliance program is robust.  Finally, the company has agreed to disgorge to the United States government all of the ill-gotten revenue earned as a result of the sanctions violations.  These factors not only support the government's decision to enter into a DPA with Fokker Services, but they also unequivocally support the conclusion that this resolution achieves

the ends of justice and meets the objectives of deterrence, punishment, and rehabilitation.

Respectfully submitted,

Ronald C. Machen Jr.
United States Attorney
DC Bar No. 447889

By:      _____/s/_____
Gregg A. Maisel, DC Bar: #447902
Jay I. Bratt, IL Bar: #6187361
Maia Luckner Miller, VA Bar: #73221
Assistant United States Attorneys
National Security Section
555 Fourth Street, N.W.,
Washington, DC  20530
Miller: (202) 252-6737
Maia.Miller@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 18, 2014, a copy of the foregoing pleading was sent via ECF court filing system and electronic mail to parties of record.

_____/s/_____
Maia L. Miller
Assistant U.S. Attorney