UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

FOKKER SERVICES B.V.

        Defendant.

Case No. 14 Cr. 121 (RJL)

# FOKKER SERVICES B.V.'S MEMORANDUM IN SUPPORT OF THE DEFERRED PROSECUTION AGREEMENT WITH THE GOVERNMENT

CLIFFORD CHANCE US LLP

Edward C. O'Callaghan
David D. DiBari (D.C. Bar No. 426152)
Michelle Williams (D.C. Bar No. 980209)

31 West 52nd Street
New York, NY 10019
(212) 878-8000

*Counsel for Defendant Fokker Services B.V.*

Dated: July 18, 2014

Fokker Services B.V. ("FSBV") respectfully submits this memorandum at the Court's invitation to address: (1) the applicable standard of review for consideration of the deferred prosecution agreement between FSBV and the U.S. Attorney's Office for the District of Columbia ("USAO-DC"), filed on June 5, 2014 (the "DPA"),[1] (2) the impact of *United States v. HSBC Bank USA, N.A.* on the standard of review, and (3) FSBV's voluntary self-disclosure of its sanctions violations to the U.S. agencies in June 2010.

## 1. The Standard of Review

Courts' authority to consider deferred prosecution agreements is grounded in the Speedy Trial Act, 18 U.S.C. § 3161 (the "STA"). The STA mandates that a trial commence within 70 days of the filing of an indictment or information. *See id.* § 3161(c)(1). Certain periods of delay, however, must be excluded in computing the time within which the trial must commence, such as "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." *Id.* § 3161(h)(2). This exclusion is mandatory, so long as the requirements of the subsection are satisfied — namely, a written agreement, approved by the court, for the stated purpose — but, the statute is silent on how discretion to approve the agreement should be exercised. *Cf. id.* § 3161(h)(7)(A) (excluding period of delay resulting from court-ordered continuance if ends of justice would outweigh the best interests of the public and the defendant in a speedy trial).

---

[1] Pursuant to the DPA, FSBV has agreed to the filing of a one-count criminal information against it, and has accepted and acknowledged responsibility for the conduct set forth in the DPA's factual statement. FSBV has also agreed under the DPA to forfeit the sum of $10.5 million to the United States, (and an additional sum of $10.5 million to the U.S. Department of Treasury Office of Foreign Assets Control and the U.S. Department of Commerce Bureau of Industry and Security), to continue to enforce and implement the remedial measures and compliance programs it has developed since its voluntary self-disclosure, and to a deferral period of 18 months during which it will demonstrate its capacity to continue to enforce its compliance measures to the satisfaction of USAO-DC, as it has done for last four years.  During this 18-month deferral period, FSBV has agreed to waive its rights to speedy trial under the Sixth Amendment and the Speedy Trial Act.

The Senate Judiciary Committee Report accompanying the STA suggests, however, that the court's reviewing authority is quite limited. The Report explains, by way of background, that subsection (h)(2) was designed to support a trend among prosecutors in the early 1970s to hold criminal charges in abeyance for the purpose of pretrial diversion or intervention programs, which permitted defendants to participate in social rehabilitation efforts. S. Rep. No. 93-1021, at 36-37 (1974). Court approval was required to "assure[] that the court will be involved in the decision to divert and that the procedure will not be used by prosecutors and defense counsel to avoid speedy trial time limits." *Id*. at 37. There is nothing else in the legislative history to suggest that authority to review deferred prosecution agreements involves more than confirming that the parties have not entered into the agreement to circumvent the requirements of the STA.

Courts' uniformly deferential stance to deferred prosecution agreements also stems from the "broad discretion" accorded to the Attorney General and United States Attorneys to enforce the Nation's criminal laws, and "the presumption of regularity" that supports their prosecutorial decisions. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("in the absence of clear evidence to the contrary, courts presume that [Executive Branch officials] have properly discharged their official duties") (internal citations and quotations omitted); *see also ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 283 (1987) ("[I]t is entirely clear that the refusal to prosecute cannot be the subject of judicial review"); *Swift v. United States*, 318 F.3d 250, 252 (D.C. Cir. 2003) (noting "the presumption that decisions not to prosecute . . . are unreviewable"); *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967) ("Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding

when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.").[2]

Against this backdrop, courts routinely exclude time under the STA without evaluating the substance of the deferred prosecution agreements before them.  For example, in *United States v. The Royal Bank of Scotland, plc*, Judge Shea of the District of Connecticut initially asked the parties to address the scope of the court's authority to consider the deferred prosecution agreement, but subsequently recognized how limited that authority was: "I think you guys have convinced me that with regard to the DPA it's not my role and, frankly, it's not within my purview to approve the substantive provisions of the DPA."  No. 13 Cr. 74, Tr. of Conf., 16 (D. Conn. Feb. 15, 2013) (attached hereto as Ex. A). Adhering to that approach as the case progressed, Judge Shea subsequently excluded time under Section 3161(h)(2) to allow the defendant to demonstrate its good conduct, but did not evaluate the merits of the agreement. *See* No. 13 Cr. 74, Tr. of Plea, 45 (D. Conn. Apr. 12, 2013) (attached hereto as Ex. B); *see also, e.g.*, *United States v. Credit Suisse AG*, No. 09 Cr. 352, 2009 WL 4894467, *1 (D.D.C. Dec. 16, 2009) (order excluding time pursuant to deferred prosecution agreement for IEEPA violation because the period is for the purpose of the defendant to demonstrate its good conduct).

---

[2]  Similar principles appear to animate judicial approval of civil consent decrees between the government and private parties.  *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.")  At least two appellate courts have reversed a district court's refusal to approve a civil consent decree.  *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995) (reversing and remanding for district court to enter proposed antitrust consent decree, because "the district court is not empowered to review the actions or behavior of the Department of Justice; the court is only authorized to review the decree itself"); *United States SEC v. Citigroup Global Mkts.*, 2014 U.S. App. LEXIS 10516, 28 (2d Cir. N.Y. 2014) (holding it was abuse of discretion "[t]o the extent the district court withheld approval of the consent decree on the ground that it believed the S.E.C. failed to bring the proper charges against Citigroup").  In *United States v. Microsoft Corp.*, the D.C. Circuit ordered that the case be reassigned to a different judge on remand, because not only was it error "to inquire into allegations outside the complaint," the district judge's reliance on unsworn allegations in a book about Microsoft had "contaminated" his entire review of the consent decree.  56 F.3d at 1463.  The case was subsequently reassigned from Judge Sporkin to Judge Jackson, and the consent decree entered.  *See United States v. Microsoft Corp.*, 1995 U.S. Dist. LEXIS 20533 (D.D.C. Aug. 21, 1995).

**2.      The *HSBC* Case**

The Court directed the parties to address *United States v. HSBC Bank USA, N.A.* In that case, Judge Gleeson of the U.S. District Court for the Eastern District of New York recognized that the legislative history for Section 3161(h)(2) "appear[ed] to instruct courts to consider whether a deferred prosecution agreement is truly about diversion and not simply a vehicle for fending off a looming trial date." 2013 U.S. Dist. LEXIS 92438, *10 (E.D.N.Y. July 1, 2013). But ultimately, finding the statute to be unclear and the case law to be "barren both in the Second Circuit and in other Circuits," *id.* *10–11, Judge Gleeson chose to approve HSBC's deferred prosecution agreement under the court's supervisory power, granting the parties' application to place the case in abeyance for five years pursuant to the STA, *id.* *3.

Resort to supervisory power is neither necessary nor appropriate in this case. The power is typically invoked in extraordinary circumstances that are not present here. As Judge Gleeson noted, the power has been used to provide a remedy for "the violation of a recognized right of a criminal defendant," 2013 U.S. Dist. LEXIS 92438, *11 (citing *McNabb v. United* States, 318 U.S. 332, 345 (1943)), to "fashion 'civilized standards of procedure and evidence,'" *id.* *12 (quoting 318 U.S. at 340), to "protect the integrity of judicial proceedings," *id.* (citing *United States v. Hastings*, 461 U.S. 499, 526 (1983)), to abstain from "redress[ing] a wrong when he who invokes [the court's] aid has unclean hands," *id.* *13 (quoting *Olmstead v. United States*, 277 U.S. 438, 483-85 (1928) (Brandeis, J., dissenting), and when a court is "faced with intentional illegal conduct [by the government]," *id.* *27 (quoting *United States v. Payner*, 447 U.S. 727, 746 (1980) (Marshall, J., dissenting)).

Given the compelling circumstances that typically justify its invocation, Judge Gleeson recognized that exercise of the supervisory power must be necessarily restrained. *See id.* ("I am

as mindful of the limits of the supervisory power as I am of its existence.") In *United States v. Payner*, for example, the Supreme Court reversed a district court's use of the supervisory power to exclude otherwise admissible evidence seized unlawfully from third parties not before the court. 447 U.S. at 735. The Court observed that "[t]he supervisory power is applied with some caution even when the defendant asserts a violation of his own rights," and that because the exclusion did not comport with Fourth Amendment jurisprudence, permitting such use of the supervisory power "would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing." *Id.* at 737.

When considered in this context, using the supervisory power to review a deferred prosecution agreement involving a corporate defendant is indeed, to use Judge Gleeson's own characterization, a "novel" approach. 2013 U.S. Dist. LEXIS 92438, *19. Even so, Judge Gleeson found "no impropriety that implicates the integrity of the Court" and nothing that warranted "rejection of the agreement." *Id.* *27. Judge Gleeson approved the parties' agreement, although he did direct the parties to file quarterly reports "to ensure [the implementation] remains within the bounds of lawfulness and respects the integrity of [the] Court." *Id.* *38.

In the end, Judge Gleeson recognized that "[s]ignificant deference is owed the Executive Branch in matters pertaining to prosecutorial discretion." *Id.* at 28–29 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). He also emphasized that the judiciary was not well placed to question the proper balancing of competing interests that underpinned prosecutorial decisions:

> With respect to cases of corporate misconduct, prosecutors must consider such factors as the nature and seriousness of the conduct, the pervasiveness of the conduct within the company, and the company's reaction to its own misconduct. . . . the ripple effects a conviction might have on innocent parties .

> . . resource allocation concerns within the Department of Justice ("DOJ") play a legitimate role as well. Judges (even, and perhaps especially, judges who themselves once exercised prosecutorial discretion) need to be mindful that they have no business exercising that discretion and, as an institutional matter, are not equipped to do so.
>
> I observed many years ago that although the Supreme Court's language in *Wayte* addressed 'the decision of *whether* to prosecute, it is equally applicable to the decision of how aggressively to prosecute, and specifically to whether an arguably reasonable sentence bargain is appropriate.' . . . I add here that this language is just as applicable to the decision to enter into a deferred prosecution agreement.

*Id.* at 29–30 (emphasis in original) (internal citation omitted).

There is no basis to depart from these bedrock principles here. Judge Gleeson gave examples of instances when the supervisory power might be implicated, including concerns about governmental conduct that might undermine the attorney-client privilege or work product protections, infringe constitutional rights, or raise the specter of official corruption in the implementation of the deferred prosecution agreement. *See id.* at 19–20. None of the circumstances that would justify invocation of the court's supervisory powers are present in this case.[3]

\*   \*   \*

The supervisory power is not needed in this case: the DPA is the product of extensive, good-faith negotiations between the parties and projects none of the circumstances the supervisory power is designed to redress. Nor does the DPA leave any suggestion that the parties

---

[3] Nor should public opinion be a factor. Judge Gleeson acknowledged receiving heavy public criticism of the HSBC agreement, but observed courts' limited ability to appease such hostility. *See id.* ("[E]ven if I were to reject the DPA, I would have no power to compel the government to prosecute the pending charges against HSBC to adjudication" and, moreover, "if the government moved under Fed. R. Crim. P. 48(a) to dismiss the Information, it would be an abuse of discretion not to grant that motion.").

have used it to sidestep the requirements of the Speedy Trial Act. Accordingly, and respectfully, the Court should effectuate the DPA by excluding time under 18 U.S.C. § 3161(h)(2).

### 3. Voluntary Self-Disclosure

Finally, this case involves an additional factor not present in *HSBC Bank*, which supports the conclusion that the exclusion of time under Section 3161(h)(2) is to allow FSBV to continue demonstrating its good conduct. Here, as confirmed by the government pleading submitted to the Court, FSBV made a voluntary self-disclosure of its sanctions violations to U.S. agencies in June 2010.

FSBV did not know that the company was under investigation by any U.S. agency prior to its June 2010 initial disclosure. FSBV came forward on its own accord and within six months of the initial notification, conducted an extremely thorough, internal investigation that consisted of a five-year look-back exercise (covering the period from May 1, 2005, through June 1, 2010) to determine the scope of potential violations, all of which it voluntarily disclosed to the United States. FSBV's internal investigation resulted in a detailed conduct report resulting from an electronic review of millions of pages of documents, dozens of interviews, as well as a detailed analysis of over 20,000 export transactions. These results were fully disclosed to the U.S. agencies in a comprehensive Disclosure Report in December 2010. None of the results of the internal investigation uncovered evidence that would suggest that FSBV knew that the company was under investigation prior to its voluntary self-disclosure in June 2010. While there certainly was knowledge among several FSBV management and employees surrounding a U.S. government investigation of Aviation Services International B.V. ("ASI"), a wholly different Dutch aviation company, due primarily to numerous reports on ASI in the Dutch press beginning in approximately 2008, there was no knowledge that FSBV was under a similar investigation.

Significantly, prior to its voluntary self-disclosure in June 2010, to its knowledge, FSBV did not receive any subpoenas, document requests or other inquiries from any U.S. agency that would evidence the existence of an ongoing investigation into FSBV by BIS or any other U.S. agency. In fact, it was FSBV, not any U.S. agency, which chose to go beyond what would be required for compliance with the applicable U.S. sanctions regulations when it decided in September 2010 to cease doing business with civilian entities from U.S. embargoed countries.

Additional support for the voluntariness of FSBV's self-disclosure comes from the fact that subsequent to June 2010, on two separate occasions, BIS agents involved in FSBV's post-voluntary self-disclosure investigation stated to Clifford Chance attorneys that BIS had no open investigation into FSBV prior to June 2010. This point was made by Clifford Chance to BIS in three written submissions during the course of exchanges with BIS from 2010 though the settlement of the matter in June 2014. Specifically, in both a written submission to BIS dated January 5, 2012, and a written submission to USAO-DC dated December 22, 2011 (that was shared with BIS on January 5, 2012), Clifford Chance recounted two separate September 2010 conversations with BIS Special Agent David Poole and confirmed in writing that during those conversations with the BIS agent, "FSBV was told that no investigation had been opened on it . . . ."

Subsequently, an April 2, 2013 written submission by FSBV to BIS stated, in support of its arguments that its disclosure to all U.S. agencies and specifically to BIS was voluntary, that "on September 17, 2010, David Poole (then Senior Special Agent assigned to this case) told [Clifford Chance] that BIS did not have an investigation open into FSBV and that FSBV's disclosure was a voluntary disclosure." BIS has never disputed nor contradicted these written statements that it did not have an open investigation of FSBV prior to June 2010.

Given that FSBV made a voluntary self-disclosure in June 2010, which is confirmed by the government's pleading, the USAO-DC operated well within the bounds of its prosecutorial discretion in applying DOJ's principles and guidelines to recognize the critical value of FSBV's voluntary self-disclosure in its consideration of the applicable mitigation factors in this case.

Dated: July 18, 2014

Respectfully Submitted,

CLIFFORD CHANCE US LLP

 */s/ Edward C. O'Callaghan*
Edward C. O'Callaghan
David D. DiBari (D.C. Bar No. 426152)
Michelle Williams (D.C. Bar No. 980209)

31 West 52nd Street
New York, NY 10019
(212) 878-8000

*Counsel for Defendant Fokker Services B.V.*