UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 14-CR-121 (RJL) |
| | : | |
| v. | : | |
| | : | |
| FOKKER SERVICES B.V., | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S STATUS REPORT

### Introduction

In response to the Court's June 25, 2014, directive that the government file a pleading demonstrating why the deferred prosecution agreement ("DPA") the government reached with Fokker Services B.V. ("Fokker Services") was appropriate and in the interests of justice, we submitted a memorandum on July 7, 2014, showing why the DPA was consistent with the Department of Justice's ("DOJ") guidelines for corporate prosecutions. In particular, we explained why DOJ considered Fokker Services' initial disclosure of its criminal conduct to the United States government in June 2010[1] to be voluntary, a factor, among many others,[2] that weighs heavily in the determination to permit a corporation to resolve its liability through a DPA. As set forth in the government's July 7, 2014, memorandum, three factors support the conclusion that Fokker Services' June 2010 disclosure was voluntarily submitted. First, no agency within the United States government had opened a case or investigation focused on Fokker Services before the June 2010 disclosure. Second, no agency within the United States

[1] Fokker Services supplemented that disclosure in December 2010.

[2] Under current DOJ policy and the United States Attorney's Office Manual ("USAM") §9-28.000 setting forth DOJ's principles governing corporate liability, the following additional factors militate towards mitigation in this case: (1) Fokker Services' extensive remediation efforts, (2) Fokker Services' vast and continued cooperation, and (3) adverse collateral consequences facing Fokker Services as a result of the instant criminal investigation and the company's poor and unstable financial status.

government had pursued substantive investigatory steps[3] specifically focused on Fokker Services before the June 2010 disclosure. Finally, none of the law enforcement agencies involved in the investigation and prosecution of this company, has obtained evidence demonstrating that Fokker Services believed it was under investigation when the company submitted its June 2010 disclosure.

In the wake of a press article quoting three anonymous sources who claimed there was an investigation pre-dating Fokker Services' June 2010 disclosure and the emergence of a March 2013 affidavit from former Department of Commerce ("DOC") Bureau of Industry and Security ("BIS") Special Agent David Poole ("Poole Affidavit") in which there is a similar claim (as well as other criticisms), we have sought to ensure that our representations concerning the voluntariness of Fokker Services' June 2010 disclosure are correct. Toward that end, we now have interviewed eleven agents and seven prosecutors who have worked on this case and an earlier investigation of Aviation Services International B.V. ("ASI"). We have also either reviewed the relevant files from each of the agencies participating in this investigation or have received written confirmation from each of the agencies participating in this investigation concerning the contents of their files. We have confirmed that, notwithstanding that federal investigators and prosecutors received lead information about Fokker Services in 2007 and 2008 from cooperating defendant ASI and its principals, Robert and Niels Kraaipoel, to include documents and statements related to many entities, including Fokker Services, possibly engaged in violations of U.S. sanctions against Iran, the following remains true:

---

[3] References to an absence of "affirmative substantive investigatory steps" are used here to describe the lack of any affirmative action taken by investigators or prosecutors even after those entities learned of Fokker Services' involvement in Iranian transactions. This is not intended to state or imply that agents of the United States government were unaware of, or had not received documents related to, Fokker Services' potential violations of U.S. sanctions against Iran, prior to the June 2010 disclosure. Rather, it is intended to convey that no steps were taken to target Fokker Services until after June 2010.

(1) there is no record of any agency opening an investigation of Fokker Services in any case management system (as normally occurs when an investigation begins) before the June 2010 disclosure;

(2) there is no record of any agent having taken any affirmative substantive investigative steps after receipt of the lead information with respect to Fokker Services before the June 2010 disclosure;

(3) there is no record of any prosecutor tasking an agent to take any affirmative investigative steps with respect to Fokker Services after receipt of the lead information before the June 2010 disclosure;

(4) there is no record of any subpoena being issued as part of any investigation of Fokker Services before the June 2010 disclosure;

(5) Fokker Services does not appear on any list of potential targets drafted and circulated by agents or prosecutors after ASI and the Kraaipoels provided a wealth of information about other individuals and firms during the course of their cooperation (and at least three such lists were generated during this time) before the June 2010 disclosure;

(6) Fokker Services is not mentioned in any agent "running résumés" or other recordkeeping of the spinoff ASI investigations before the June 2010 disclosure; and

(7) there is no record or other evidence demonstrating that Fokker Services believed it was under investigation before it made its disclosure in June 2010.

As set forth below, former Special Agent Poole's articulated belief that he had begun an investigation of Fokker Services in 2007 or 2008 based on the leads from ASI and the Kraaipoels is unsupported, even after a review of his former agency's own records. Regardless of what former Special Agent Poole intended to do, there is no record showing that he took any

affirmative substantive investigative step focused on Fokker Services before the company came forward to admit its wrongdoing in June 2010.

Over the seven years from the time the government began investigating ASI until the present, agents from five federal agencies have participated in the investigations of ASI and Fokker Services. During the same period, at least ten prosecutors—approximately six from the United States Attorney's Office for the District of Columbia ("USAO-DC") and approximately four from DOJ's National Security Division ("NSD")—have been involved in the prosecution of ASI and Fokker Services.

In the course of our review, two of the prosecutors, who worked on the ASI case from 2007 until approximately 2009, before Fokker Services disclosed its wrongdoing, stated that they believed an investigation of Fokker Services had begun before the June 2010 disclosure. They base their conclusion on a trip prosecutors took to The Netherlands in 2008 to review ASI's records, during the course of which one or two boxes of documents relating to Fokker Services were examined. However, there is nothing to indicate that *any* further steps were taken after discovery of these boxes or to alter the conclusion that there were no affirmative substantive investigative steps taken related to Fokker Services until after the June 2010 disclosure.

Finally, these same two prosecutors and a third prosecutor formerly assigned to the case believe that Fokker Services likely considered itself the subject of an investigation in light of the notoriety surrounding the U.S. government's prosecution of ASI and the Kraaipoels. But these beliefs, however sincere, rest on speculation and are to date unsupported by any actual evidence of Fokker Services' knowledge of a purported pending investigation.

In short, after a thorough review, we do not believe there is any reason to question our prior representations to the Court about the factors demonstrating the voluntariness of Fokker

Services' disclosure for purposes of DOJ's policy determination. DOJ, through USAO-DC and NSD, deemed and continue to deem Fokker Services' disclosure of its criminal conduct to be objectively voluntary.

## PROCEDURAL HISTORY

On June 5, 2014, the government filed: (1) an Information charging Fokker Services, (2) a DPA reached with Fokker Services with an accompanying Statement of Offense, and (3) a Joint Consent Motion for Exclusion of Time Under the Speedy Trial Act. The parties subsequently provided the Court a proposed consent Forfeiture Order to effectuate the agreed-upon monetary penalty being received into the appropriate government coffers. At the June 25, 2014, status conference, the Court requested that the government submit a pleading setting forth why the DPA reached in this case adequately reflects the seriousness of the company's conduct and why this resolution serves the interests of justice. On July 7, 2014, the government submitted a memorandum in response to the Court's request ("Initial DPA Memorandum"). At the July 9, 2014, status conference, the Court directed that the parties submit a pleading addressing the "standard of review when the Court is reviewing a Deferred Prosecution Agreement," as well as "some of the issues that [were] raised in [a] newspaper article" submitted to the Court by a member of the press, paying particular attention to the issue of "whether or not this was truly a voluntary disclosure situation at all." July 9, 2014, Hearing Tr. at 4, 5. At the request of the Court, on July 18, 2014, the government submitted its Supplemental Memorandum in Support of the Deferred Prosecution Agreement Reached with Fokker Services ("Supplemental Memorandum in Support of DPA"). On the same day, Fokker Services submitted its Memorandum in Support of the Deferred Prosecution Agreement with the Government ("Fokker DPA Memorandum").

 After the July 9, 2014, status conference, the USAO-DC sought to confirm its understanding that no United States government agency had opened a case or investigation or pursued an affirmative substantive investigative step focused on Fokker Services anytime before the company disclosed its violations to law enforcement beginning in June 2010. To that end, the government contacted all of the law enforcement and regulatory agencies involved in the Fokker Services investigation: BIS, the United States Department of the Treasury's Office of Foreign Asset Control ("OFAC"), the Federal Bureau of Investigation's Washington Field Office ("FBI-WFO"), the United States Department of Homeland Security ("DHS"), and the Defense Criminal Investigative Service ("DCIS"). Collectively, these agencies confirmed the government's understanding that they had neither opened a case or investigation nor pursued an affirmative substantive investigative step focused on Fokker Services before to the company's June 2010 disclosure.

In addition, DOJ also met personally with DOC senior officials on July 11, 2014, to discuss the Court's inquiry and the government's anticipated filing in response to it (i.e., the government's Supplemental Memorandum).[4] In response to the Court's inquiry and at DOJ's request, BIS articulated in writing its position regarding Fokker Services' 2010 disclosures—"although the case might be a close one, on balance, the company did not meet BIS's standard as set forth in the [Export Administration Regulations] for receiving voluntary self-disclosure credit[,] [because] a significant factor in [BIS's Office of Export Enforcement's] determination was that Fokker [Services'] June 2010 submission occurred more than two years after company management indisputably was aware [] that Fokker [Services] had engaged and was engaging in conduct that violated U.S. export control regulations." See Exhibit A (July 18, 2014,

---

[4] The government requested this meeting to ensure the factual accuracy of the representations in its anticipated filing and because BIS was the lead law enforcement agency responsible for the Fokker Services investigation.
correspondence from Special Agent in Charge, John J. McKenna, BIS Boston Field Office). In other words, DOC's conclusion about the non-voluntary nature of Fokker Services' disclosure was based on the timeliness of that disclosure, not on a finding that Fokker Services had knowledge of a pending investigation at the time of its disclosure.

On July 22, 2014, DOC provided DOJ for the first time with a copy of former Special Agent Poole's May 2013 Affidavit. See Exhibit B (Former Special Agent Poole's Affidavit). In light of the possible inconsistencies between some of the opinions expressed in the Poole Affidavit and the oral and written representations made by DOC officials to DOJ, in addition to DOJ's understanding of the facts, the government moved to continue the July 24, 2014, status hearing to allow it time to conduct further inquiry into this matter. Subsequently, the Court granted the government's unopposed motion to continue and continued the July 24, 2014, status hearing until August 21, 2014. The Court also ordered that the government submit a status report regarding its factual investigation by August 18, 2014. On August 15, 2014, the Court granted the government's unopposed motion to extend the August 18, 2014, filing deadline. At an August 21, 2014, status conference, the Court directed that the government submit a status report concerning its inquiry by September 30, 2014.

## RESULTS OF GOVERNMENT'S INQUIRY SUPPORT GOVERNMENT'S PREVIOUS REPRESENTATIONS CONCERNING FOKKER SERVICES' DISCLOSURES

### A. *Summary of Government's Inquiry*

After receiving the Poole Affidavit, we began efforts focused on evaluating the information previously provided by BIS officials, upon which we relied to represent to the Court that Fokker Services' 2010 disclosures were voluntary, complete, and accurate. To that end, the government conducted a review of documents and also spoke with 18 individuals. The government's document review entailed the following efforts: reviewing internal USAO-DC

databases, records, and electronic communications ("emails"); reviewing internal DOJ NSD databases, records, and emails; and reviewing internal BIS databases, records, and emails.  In addition to reviewing internal USAO-DC, NSD, and BIS documents, the government also contacted former and current BIS agents and officials who worked on the Fokker Services and ASI investigations, former USAO-DC prosecutors who worked on the Fokker Services and ASI investigations, former NSD prosecutors who worked on the Fokker Services and ASI investigations, a former DCIS agent who worked on the Fokker Services and ASI investigations, former DHS special agents who worked on the Fokker Services and ASI investigations, and a Supervisory Special Agent from the FBI-WFO who worked on the Fokker Services investigation.

After completing its review of documents and conferring with these individuals, we have not found any evidence to undermine our conclusion that Fokker Services' June 2010 disclosure was voluntary—a conclusion that again was based on the following: (1) no case or investigation was opened against Fokker Services until *after* the company submitted its June 2010 disclosure; (2) all of the substantive investigative steps focused on Fokker Services were pursued *after* the June 2010 disclosure; and (3) no one has found any evidence that Fokker Services believed it was under investigation at the time it disclosed in June 2010.

B. *Evidence Shows No Case or Investigation Was Focused on Fokker Services before the June 2010 Disclosure and No Substantive Investigative Steps Were Taken*

In October 2007, members of law enforcement, including former Special Agent Poole, interviewed Robert Kraaipoel as part of the ASI investigation ("Kraaipoel October 2007 interview").  During this interview, Robert Kraaipoel mentioned Fokker Services, along with at least twelve other entities or individuals.  Subsequently, in January 2008, members of law enforcement interviewed Robert Kraaipoel a second time.  At this time, law enforcement also

interviewed Robert Kraaipoel's son, Niels Kraaipoel (collectively "Kraaipoels' January 2008 interviews"). Again, Fokker Services, along with at least twelve other entities or individuals, was mentioned during the Kraaipoels' January 2008 interviews. The information provided concerning Fokker Services was limited: Fokker Services had Iranian customers (which could be legal for a Dutch company) and some of ASI's Iranian customers had informed ASI that they were getting U.S. parts from Fokker Services.[5]

Former Special Agent Poole claims that around the time of the Kraaipoels' January 2008 interviews, he *may* have called freight forwarding companies and if he did, *he would have* asked them to alert him if Fokker Services came across their paths.[6] But Poole does not specifically remember making these phone calls and stated that if he documented making the calls he would have written a note in the ASI file about the calls. We and BIS reviewed BIS' ASI file, and there is no evidence supporting Poole's contention that he may have made telephone calls to freight forwarding companies about Fokker Services. He did not document making any such calls and he did not tell anyone that he made any such calls. Poole also took no steps to document the opening of either a lead or an investigation into Fokker Services in the internal BIS tracking system for case management ("IMS-R"). IMS-R records show that BIS's Fokker Services case was opened on June 25, 2010. Within the IMS-R records for ASI, which were created by Poole

---

[5] One of the former prosecutors we interviewed, who worked on the ASI matter between 2007 and 2009, suggested that we speak with the Kraaipoels' former attorney, who was present for these interviews. We do not believe such a step is necessary given that law enforcement documented these earlier interviews on this subject. In preparation for this filing, we reviewed all of those materials. Moreover, the extent of the information provided by the Kraaipoels is not relevant to the instant inquiry—what is relevant is whether law enforcement pursued affirmative substantive investigatory steps after it received the information through the ASI investigation or whether law enforcement opened a case or investigation on Fokker Services prior to the June 2010 disclosure.

[6] Even assuming *arguendo* that former Special Agent Poole actually called freight forwarders and mentioned Fokker Services to them, he has confirmed with us that none of the freight forwarders called him back and alerted him to information related to Fokker Services. Thus, even if Poole actually called freight forwarders and mentioned Fokker Services, an event which Poole cannot corroborate and does not specifically recall doing, he has confirmed that nothing came about from any such calls that he may have made to freight forwarders.

on May 25, 2006, there is no reference to Fokker Services. Fokker Services is not listed as a lead under the ASI case file and Fokker Services is not included in the substantial comments updating the status of the ASI investigation. Poole did, however, include other leads obtained through the ASI investigation in the IMS-R ASI case records, as either linked cases or as a reference in the comments. Within the linked cases in the IMS-R case records that were generated from the ASI investigation, in at least four instances, a case was opened in the IMS-R system. Moreover, to date, IMS-R records indicate that the BIS Fokker Services case has never been linked to the BIS ASI case in any way whatsoever.

In August 2008, members of law enforcement reviewed documents at the ASI warehouse in The Netherlands ("August 2008 ASI document review"). The August 2008 ASI document review was a fact-finding mission. The purpose was to obtain evidence that supported the charges against ASI and the Kraaipoels but also to obtain evidence that could be used to pursue investigations of other individuals or companies. When the August 2008 ASI document review occurred, however, specific entities had not been identified as priorities to investigate. Practically all of the individuals involved in the August 2008 ASI document review have indicated that, although documents referencing Fokker Services were reviewed during this trip, the intent behind this effort was akin to casting a fishing net around ASI for the purpose of obtaining evidence related to ASI's transactions that had a nexus to the United States or to Iran. Evidence referencing Fokker Services was caught in law enforcement's net, but the net was not cast over Fokker Services itself.

Two prosecutors formerly involved with the ASI investigation from 2007 through 2009, however, have informed us that they view the August 2008 ASI document review as an affirmative substantive investigatory step taken towards investigating Fokker Services. One of

the prosecutors believes that Fokker Services was one of four specific entities that had been deemed an investigative priority at that time. Our inquiry did not reveal any evidence to support the position that Fokker Services was an investigative priority and that one of the objectives of the August 2008 ASI document review was specifically to obtain evidence against Fokker Services. Moreover, a third prosecutor who also participated in the August 2008 ASI document review and the agents who participated in the August 2008 ASI document review do not agree with the view that the purpose of the August 2008 ASI document review was to gather evidence against Fokker Services. In fact, the third prosecutor, who participated in the August 2008 ASI document review, recalls that this prosecutor had not really heard of Fokker Services before reviewing documents at the ASI warehouse in August 2008.

Approximately four to five months later, in response to a request pursuant to the Mutual Legal Assistance Treaty (MLAT") between the United States and The Netherlands, law enforcement obtained copies of the documents that were deemed of interest during the August 2008 ASI document review. Upon receipt of these materials, law enforcement began the process of reviewing the evidence and pursuing affirmative substantive investigative steps towards entities and individuals who were referenced in the materials. Law enforcement did not pursue an affirmative substantive investigative step specifically directed towards Fokker Services at that time; law enforcement did, however, begin to investigate other leads obtained through the ASI materials and the interviews of the Kraaipoels.

For example, in April 2009, members of law enforcement, including representatives from BIS-BFO, NSD, and USAO-DC met for the purposes of discussing the "ASI Spin-Off Cases." Either shortly before or shortly after this meeting, BIS-BFO created a list, "ASI Targets to be Indicted"; Fokker Services was not included on BIS-BFO's list. Similarly, BIS-BFO created

another list, "ASI Targets to be Listed on the TDO (Temporary Denial Order)"; again, Fokker Services was not on BIS-BFO's list.  Similarly, the USAO-DC developed its own list ("USAO-DC ASI Spin-Off Cases Memorandum"), which prioritized leads obtained through the ASI investigation and materials.  The USAO-DC ASI Spin-Off Cases Memorandum was shared with all of the prosecutors participating in the ASI investigation; including the prosecutors who participated in the August 2008 ASI document review.  Fokker Services was not mentioned in the USAO-DC ASI Spin-Off Cases Memorandum.

The same agencies involved in the April 2009 multi-agency meeting discussing the ASI-Spin Off cases also participated in weekly teleconferences.  During these weekly phone calls, law enforcement efforts focused on pursuing leads generated through the ASI investigation were discussed—no one we spoke with who participated in these calls recalled Fokker Services being mentioned during the weekly teleconferences.

Thus, while it is true that as early as October 2007, members of the United States government received limited information through the ASI investigation that identified Fokker Services as possibly violating U.S. export control laws, we uncovered no evidence to rebut the conclusion that no United States government agency had opened a case or an investigation on Fokker Services until *after* the company submitted its initial disclosure in June 2010, and no affirmative substantive investigative steps targeting Fokker Services had occurred before then.

C. *There Is No Evidence To Demonstrate that Fokker Services Believed It Was Under Investigation when It Disclosed Its Criminal Conduct in June 2010*

Although there has been much speculation, the government has not located any evidence to demonstrate that Fokker Services believed it was under investigation when it submitted its June 2010 disclosure.  All of the law enforcement agencies who participated in the ASI and Fokker Services investigations agree that no one has located evidence demonstrating that Fokker

Services believed it was under investigation when it submitted its June 2010 disclosure.  In addition, Fokker Services' counsel has adamantly maintained to the government and to this Court, after a comprehensive inquiry, that the company did not believe it was under investigation before it came forward to admit its wrongdoing.

Even former Special Agent Poole and two of the former prosecutors who believe that Fokker Services' disclosures were not "self-initiated" have recognized that their opinions are based on speculation alone.  When asked why they characterized the disclosures as not "self-initiated," Poole and these prosecutors explained that, because the ASI case was public and Fokker Services was aware of the ASI investigation through its publicity, Fokker Services *must have known* that the United States government was intending to investigate it at some point in the future.  However, sincerely and deeply felt, these views ignore the fact that there is no evidence that anyone has located that supports the inference that Fokker Services' knowledge of another Dutch company's prosecution led to a belief within Fokker Services that it, too, was being investigated.[7]

D. *There Is No Evidence to Suggest Fokker Services' Disclosures Were Either Inaccurate or Incomplete*

Former Special Agent Poole and two of the former prosecutors also believe that the 2010 disclosures were neither truthful nor complete because Fokker Services redacted the names of its

---

[7]   One of the former prosecutors suggested that the government pursue the following in order to learn whether Fokker Services was aware of an investigation into the company and that this awareness existed before the June 2010 disclosure: (1) the government should review information potentially generated by the Intelligence Community that may be useful in demonstrating that Fokker Services was aware of an investigation into the company before the company submitted its June 2010 disclosure, (2) the government should confer with the DOJ Office of International Affairs attorney who was involved in DOJ's efforts to collect evidence from the Kraaipoels and ASI through Mutual Legal Assistance Treaty requests, and (3) the government should request that Fokker Services, in light of the DPA's cooperation requirement, provide the government with its internal communications, including privileged communications with its attorneys, which led to the company's decision to submit the June 2010 disclosure. We do not believe that these steps would be fruitful. Moreover, per DOJ policy, the government is prohibited from requesting that a component of Fokker Services' cooperation include the disclosure of attorney-client privileged materials.  In any event, there is no reason to believe that these further steps would yield information that would alter the conclusion that the proposed agreement with Fokker Services is an appropriate exercise of prosecutorial discretion and in the best interests of justice.

employees from the submissions and chose to characterize Fokker Services' unlawful conduct as a "work around," rather than describing the conduct as deliberate efforts taken to evade U.S. export control laws.[8] Another of the three former attorneys similarly cited the redactions in Fokker Services' disclosures as support for the position that the disclosures were not fulsome or accurate.

First, it should be noted that each of these individuals had stopped working on or having direct contact with the Fokker Services investigation by mid-2012 or earlier; the investigation did not conclude until approximately two years later. Therefore, these individuals were not privy to the information and materials provided by Fokker Services after to their disassociation from the Fokker Services investigation. This cooperation included subsequently providing the government the information that was originally redacted from the 2010 disclosures and facilitating the government's interview of Fokker Services' current and former employees. Consequently, the opinion that the disclosures were incomplete and inaccurate is misinformed.

The government also notes that the Statement of Offense agreed to by Fokker Services and included as Exhibit A to the DPA, defines the company's conduct as "steps taken by [Fokker Services] to avoid detection of violations of U.S. Export laws," and explains that "from on or about 2005 through 2010, [Fokker Services] used a number of schemes to evade U.S. sanctions and export laws while continuing its business with customers located in U.S.-sanctioned countries. [Fokker Services] described these schemes to continue its business in U.S.-sanctioned

[8] The former DCIS agent involved in the Fokker Services and ASI investigation informed us that Fokker Services included in its 2010 disclosures transactions that involved United States Munitions List items that likely formed the basis for an International Trafficking in Arms Regulations ("ITAR") violation. Thus, Fokker Services mischaracterized a small number of ITAR violations, which should have been disclosed to the United States Department of State, as sanctions violations which should have been disclosed to BIS and OFAC. Fokker Services' mischaracterizations of ITAR violations as sanctions violations did not lead the DCIS agent to opine that the company's 2010 disclosures were incomplete or inaccurate, however.

countries by evading U.S. laws and detection by U.S. authorities as 'work-arounds.'" Fokker Services has publicly admitted to an accurate description of its unlawful conduct.

CONCLUSION

In short, the belief that Fokker Services was under investigation when the company submitted its June 2010 disclosure is based on the tautology that, because the United States government obtained some information through the ASI investigation that indicated that Fokker Services may have been involved in conduct in violation of U.S. export control laws, Fokker Services was thereby "under investigation." However, there is nothing in the record to support the conclusion that Fokker Services was under investigation when it submitted its June 2010 disclosure. In fact, the record evidence is directly to the contrary. There is no documented investigation of Fokker Services before June 2010, which stands in contrast to how the prosecutors and agencies tracked the actual investigations that grew out of the ASI and Kraaipoel cooperation. There are no documented affirmative substantive investigative steps directed towards Fokker Services before the June 2010 disclosure. And there is nothing that even suggests that Fokker Services was motivated to make its disclosures out of fear about a nonexistent U.S. government investigation.

We believe that we have done a thorough vetting of the facts supporting the representations in our prior submissions to the Court about the voluntariness of Fokker Services' June 2010 disclosure of its criminal conduct. Although one former prosecutor has suggested other (speculative) sources of information we might explore, we do not believe it would be fruitful to spend additional time and resources on such searches. We have taken our responsibilities to the Court seriously, and, in fairness to the parties, we would request that the

Court proceed to hold the hearing on the DPA and make the rulings it believes it must make concerning the DPA.

Finally, the government maintains that the global settlement with Fokker Services, which requires that the company pay $21 million dollars, an amount that reflects 100% of the company's ill-gotten revenue, that the company enter into a DPA with the government for a period of 18 months, and that the company continue to cooperate with the government, is an appropriate exercise of prosecutorial discretion and is in the best interests of justice.

Respectfully submitted,

Ronald C. Machen Jr.
United States Attorney
DC Bar No. 447889

By: _______/s/___________________________
Gregg A. Maisel, DC Bar: #447902
Jay I. Bratt, IL Bar: #6187361
Maia Luckner Miller, VA Bar: #73221
Assistant United States Attorneys
National Security Section
555 Fourth Street, N.W.,
Washington, DC 20530
Miller: (202) 252-6737
Maia.Miller@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2014, a copy of the foregoing pleading was sent via ECF court filing system and electronic mail to parties of record.

________/s/____________________
Maia L. Miller
Assistant U.S. Attorney