```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
------------------------------X

UNITED STATES OF AMERICA

            v.                        Criminal No. 14-121

FOKKER SERVICES B.V,

       Defendant

------------------------------X


                    Washington, D.C.
                         Wednesday, October 29, 2014
                              12:00 noon

                  TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE RICHARD J. LEON
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: Maia Luckner Miller, AUSA
                    Zia Faruqui, AUSA
                    U.S. ATTORNEY'S OFFICE
                    Fraud and Public Corruption
                    555 Fourth Street, NW
                    Washington, DC 20530
                    (202) 252-6737

For the Defendant:  Edward C. O'Callaghan, Esq.
                    David D. DiBari, Esq.
                    Michelle Williams, Esq.
                    CLIFFORD CHANCE US LLP
                    31 West 52nd Street
                    New York, NY 10019
                    (212) 878-3439



Court Reporter:     Lisa Walker Griffith, RPR
                    U.S. District Courthouse
                    Room 6507
                    Washington, D.C.  20001
                    (202) 354-3247
```

1                    **P R O C E E D I N G S**

2          THE DEPUTY CLERK:  This is criminal case 14–121.

3    United States of America versus Fokker Services B. V.

4          Would counsel please approach the lecturn and

5    identify yourselves for the record and the party that you

6    represent.

7          MS. MILLER:  Good afternoon, Your Honor.  Maia

8    Miller on behalf of the United States.  With me, I have my

9    colleague, Zia Faruqui.

10          THE COURT:  Welcome back.

11          MR. O'CALLAGHAN:  Good afternoon, Your Honor.

12    Edward O'Callaghan, David DiBari and Michelle Williams for

13    Fokker Services B.V.   There is a company representative in

14    the courtroom as well, Your Honor.  Good afternoon.

15          THE COURT:  As you know, I informed you it was not

16    necessary to have that.  I know there are costs and expenses

17    associated with there being here.  It is certainly

18    unnecessary.

19          So, I received your report.  And that is very

20    detailed.  And it seems to me anyway from -- I've only read

21    it once but it seems to me that you've run this issue to the

22    ground.  And it appears that you've reached a conclusion that

23    is consistent with the facts.  So I don't really at this

24    point, I don't have any quarrel with the conclusion that you

25    have reached.  That's a separate, of course, consideration

1    from whether it is an agreement the Court is prepared to

2    bless.

3           Now that we've resolved this particular issue, I

4    have to focus now on the bottom line basically and whether or

5    not this is an agreement that the Court is comfortable with

6    and thinks is appropriate under the circumstances.

7           I've previously stated on the record on more than

8    one occasion my concerns about this arrangement.  And they

9    haven't gone away as of now.  So, if I am going to reject it,

10   I am going to write an opinion.  And writing opinions takes

11   time, especially when they're novel.

12          I've been on the court 13 years in March.  I've

13   never had an occasion to reject a deferred prosecution

14   agreement.  It is not something that happens every day in

15   this courthouse.  Indeed, I could not, off the top of my

16   head, tell you of a case in the last 13 years or any of my

17   colleagues if they did it, I'm not aware of it.  That's the

18   kind of thing that gets out.  The other judges in the judge's

19   dining room share those kinds of experiences with one

20   another.

21          So, I'll make a final decision soon.  And then if I

22   end up deciding to reject it then I'll write an opinion.  I

23   have every, absolutely every expectation you will appeal it

24   if I reject it.  You may not.  But that's your choice.  I'm

25   certainly not encouraging you to.

1          I think you've probably made too good a deal for the

2     defendant, way too good, and to the point where there is a

3     question as to whether your prosecutorial discretion has been

4     abused.  That's what I have to decide in the end.  And I have

5     not reached a final decision yet.  But if I reach that

6     decision, I will lay it out in writing.  And you will have an

7     opinion and you can do with it as you see fit.

8          So unless you have any questions, you will get an

9     opinion from me or, if I'm not going to reject it, then I'll

10    set a date to inform you otherwise.  But I'm not going to set

11    that today.

12          MR. O'CALLAGHAN:  May I be heard briefly?

13          THE COURT:  Of course you may.

14          MR. O'CALLAGHAN:  Thank you, Judge.

15          THE COURT:  You've come a long way.

16          MR. O'CALLAGHAN:  Not so long for me but the client

17    of course, Judge.  Thank you, Your Honor.

18          We understand Your Honor's scrutiny of the

19    agreement.  And I just did feel compelled to state on the

20    record the urgency with which this decision is being

21    considered by the client.

22          THE COURT:  What is so urgent about it?

23          MR. O'CALLAGHAN:  It is an impact on this particular

24    client and this particular company as has been set forth in

25    the papers, and was certainly considered by every government

1   agency that considered the propriety of the agreement that

2   was reached.  This company is in serious financial distress.

3   They are in a mode of restructuring.

4           THE COURT:  Isn't the defendant a subsidiary of a

5   much larger corporation that is indeed a healthy corporation?

6           MR. O'CALLAGHAN:  I'm not going to speak to the

7   healthiness of the corporation.  The defendant before Your

8   Honor is a company that certainly relies on the financial

9   support of a parent company to make sure that it can even be

10  operational.  So certainly with respect to the significant

11  fines that are being paid to the DOJ under the agreement and

12  to BIS and OFAC--

13          THE COURT:  Pause.  Pause.

14          MR. O'CALLAGHAN:  Sure.

15          THE COURT:  They aren't.  They are repaying the

16  misbegotten profits that they got.  They're not paying

17  anything above and beyond that.  Now you know that.

18          MR. O'CALLAGHAN:  Your Honor, the record is actually

19  very clear that they're paying every single penny of revenue

20  that they have earned, which is an extraordinary penalty in

21  comparison to all the other cases frankly that have been

22  settled under a deferred prosecution agreement.  It is

23  revenue, Your Honor, not profit.

24          THE COURT:  They have earned from these ill-gotten

25  transactions.

1            MR. O'CALLAGHAN:  All of the revenue earned from the

2       admitted violative conduct, absolutely.

3            THE COURT:  So that is my point.

4            MR. O'CALLAGHAN:  Understood, Judge.

5            THE COURT:  That is, obviously in this case, a

6       significant amount of money.  $20 million I think it is

7       roughly.  But there is no fine above that, which is what you

8       would normally have in a criminal prosecution.  You would not

9       only have to give up your ill-gotten gains, but there would

10      be a penalty over and above it to not only deter your company

11      but other companies from engaging in this kind of conduct and

12      I might add, with one of the most -- "feared" might not be

13      the right word, but certainly one of the most, one of the

14      worst enemies of the United States.  We'll just leave it at

15      that.

16           MR. O'CALLAGHAN:  Yes, Judge.  No question the

17      company has accepted responsibility in the factual statement

18      that was filed with the DPA.  But if Your Honor actually does

19      look at the calculation of the penalty here in comparison to

20      the statutes and the sentencing guidelines for this conduct,

21      the $21 million penalty is a penalty.  It is not just a

22      return of ill-gotten gains.  It is revenue which is

23      significant.

24           They didn't make $21 million off these sales.  In

25      comparison to some of the bank cases where deferred

1    prosecution agreements have been entered into, of course you

2    see the fairly eye-popping figures that result in the

3    repayment of penalties there.  It is actually proportionately

4    lower of what those banks have paid in the course of settling

5    on a deferred prosecution agreement that Fokker Services has

6    agreed to pay to the DOJ, BIS and OFAC to settle this

7    violative conduct.  So proportionality actually weighs in

8    favor of the significance of this penalty to Fokker Services.

9          So the end, getting back to the point of why it is

10   very urgent, the company does need to rely on the support,

11   financial support of its parent to make the penalty payment,

12   which it is prepared to do, the parent is prepared to fund

13   that within five days of the entry of the forfeiture order.

14         And that, of course from a business perspective,

15   would remove uncertainty with respect to this proceeding.

16   And frankly, in consideration of all the other things that

17   Fokker Services is doing right now to remain an operating

18   entity, which is restructuring its employment force,

19   principally in the Netherlands, but in other places as well.

20   That has significant cost as well in the Netherlands.

21         THE COURT:  Why would any of that be deterred or

22   delayed pending the Court's resolution of this issue?

23         MR. O'CALLAGHAN:  It is all about whether or not, at

24   some point, it will come to the point as to whether or not --

25   the parent needs to make the decision as to whether or not

1    the continued support, financial support of this company

2    matches the prospective return on that investment.  At some

3    point it very well may be the decision that they have to

4    conclude that -- they're not there yet, Judge.  I'm not

5    representing at all that that is where they are.  But it is

6    certainly something that they're going to have to take into

7    consideration.

8                THE COURT:  Sure.

9                MR. O'CALLAGHAN:  Your Honor, on one other --

10               THE COURT:  But keep in mind of course, too, as I

11   know you are well aware, at this situation, I mean, at this

12   time, with regard to this situation, it was not until the

13   very end of September, which is only a matter of weeks ago,

14   that the government satisfied itself that this had been a

15   voluntary disclosure.  So until that issue is run to ground

16   and presented to the Court and its conclusion and its

17   briefing, this Court wasn't even in a position to move

18   forward on this case.

19               MR. O'CALLAGHAN:  Yes, Your Honor.

20               THE COURT:  That's a matter of weeks.

21               MR. O'CALLAGHAN:  The issue of voluntariness I think

22   from DOJ's perspective was resolved and was certainly

23   something that, as Your Honor rightly identified, was

24   something that went deeply into their consideration of giving

25   a DPA.  From DOJ's perspective, the voluntariness issue was

1    not an issue; otherwise, we would have never been before Your

2    Honor.  It did come up in the course of proceedings, Your

3    Honor exercised authority to order the DOJ to do a very

4    thorough inquiry.

5         But the voluntariness I think from DOJ's perspective

6    was resolved when we entered into the agreement and filed it

7    before Your Honor.  But no matter, I just -- the

8    voluntariness was an agreement among the parties before we

9    entered the agreement before Your Honor.

10        I do want to just address Your Honor's issue on

11   whether there had been a Court in the circuit that actually

12   rejected an agreement and how the circuit responded to that.

13   It is not in the criminal context, Your Honor, but in an

14   antitrust case, in a Microsoft case --

15        THE COURT:  That is really of no value.

16        MR. O'CALLAGHAN:  Your Honor is aware of that case

17   then.  And obviously it went up and it was reversed on abuse

18   of discretion.

19        THE COURT:  I'm aware of that case, that is not a

20   deferred prosecution agreement.

21        MR. O'CALLAGHAN:  Certainly not, Your Honor.  It is

22   an agreement--

23        THE COURT:  She can't take us both down at once.

24   When I start, you stop.  That's how it works in this

25   courtroom.

1           MR. O'CALLAGHAN:  I apologize, Judge.

2           THE COURT:  The deferred prosecution agreements, as

3    you are well aware from your service in the government as

4    well as now in private practice, have in recent times become

5    a matter of great concern to many district judges around the

6    country, not just this Court, other courts as well.  Some in

7    your old alma mater, the Southern District of New York.

8           MR. O'CALLAGHAN:  Yes, Judge.

9           THE COURT:  So, and I might add, like SEC consent

10   decrees, those have become a matter of great concern to

11   courts around the country, the District of New York in

12   particular, this Court in particular.  I have had a number of

13   colleagues who have raised concerns about civil enforcement

14   of consent decrees in the SEC's context.  This is different

15   obviously.

16          I've blessed them before.  God knows I have on a

17   number of occasions.  Indeed, I've never rejected one.  But

18   this case is different in my judgment, in terms of the facts

19   and the circumstances and the way it has been structured.

20          Now, I'm not going to tell you what my ruling is

21   because I have not made a final decision.  I intend to make

22   one soon, within the next week or two.  If I decide against

23   you, I will write an opinion.  I will lay it out.

24          You will have to then make a decision.  You appeal

25   it, and they'll tell you how long that takes in the D.C.

1     Circuit if time of the essence.  Go back to the drawing board

2     and renegotiate.  And maybe come up with a deal that would be

3     acceptable to this Court.  That's your choice.  I'm not

4     getting into all that.  That's between you and the

5     government.

6           If you want to appeal it, you decide how important

7     is time, how important is precedent and what the risks are

8     and the odds are, I should say, of getting me reversed.  You

9     will have to assess that based on my opinion because that's

10    where I will lay it out if I end up doing that.  Of course if

11    I accept it, that's all moot.

12          But you probably would be wise to use your time in

13    the next few weeks to have some discussions as to, if he

14    rejects it, is there an alternative resolution we can come up

15    with that might be acceptable to the Court.  At least have

16    those discussions so that you are not starting anew in the

17    event I do reject it a few weeks from now.  Food for thought.

18          MR. O'CALLAGHAN:  Yes, Your Honor.

19          THE COURT:  You think it over.  I'm not telling you

20    how to handle your case.  But we're not in this situation

21    very often.  In fact, I don't know of any other situation

22    like it in my tenure on this Court, certainly not in my

23    courtroom.  And I don't know that I've had colleagues that

24    have come this close.  I've discussed this case with some of

25    my colleagues.  They were surprised, as I was, as to how it

1   was resolved.  Who knows what they would do.  Those are

2   informal chats.  But I can assure you, this is not a slam

3   dunk question.

4          So, I'm happy and satisfied as of now that the

5   government has run that issue to the ground.  It's a very

6   detailed discussion of what you did and the work you did.  It

7   was pretty extraordinary I think in a relatively short time

8   particularly.  So that is no longer on the table for me as a

9   concern, at least as of now.

10          If for whatever reason it should become one, then

11   I'll call you all immediately and we'll see if we can get it

12   resolved.  But as of now, it is no longer an issue that I'm

13   worried about.  I'm pretty satisfied that's in the report

14   that was submitted to the Court by the government.

15          MR. O'CALLAGHAN:  Understood, Your Honor.  Thank

16   you.

17          THE COURT:  Any other questions?

18          MR. O'CALLAGHAN:  Sounds like further argument on

19   civil consent orders is not a good use of the judge's time.

20          THE COURT:  That would be a waste.

21          MR. O'CALLAGHAN:  Thank you, Judge.

22          MS. MILLER:  Thank you, Your Honor.  If I could just

23   clarify with respect to Your Honor's determination.

24          THE COURT:  I haven't made a determination.

25          MS. MILLER:  Regarding the representations made by

1    the government in the status report with respect to the

2    voluntariness of Fokker Services' disclosure.  Just for

3    clarification, Your Honor had said that you are satisfied

4    with the representations in the status report.

5         Does that mean that Your Honor agrees that the

6    government's conclusion that this was a voluntary self

7    disclosure is well supported and was from the government's

8    perspective accurate?

9         THE COURT:  What do you think satisfied means?  Is

10   this like a Bill Clinton exercise?

11        MS. MILLER:  It wasn't clear to me that--

12        THE COURT:  This isn't a Bill Clinton exercise.

13   Trust me, if there is a problem, you will hear from me.

14        MS. MILLER:  Thank you, Your Honor.

15        The other thing I wanted some clarification on

16   relates to the judicial authority which Your Honor intends to

17   use with respect to deciding whether or not to approve or

18   reject the--

19        THE COURT:  There is no question in my mind that

20   district judges have authority to reject deferred prosecution

21   agreement, zero.  Now, I can't be clearer than that.  That is

22   as clear as I can be, zero question that a district judge has

23   the authority to reject a deferred prosecution agreement.

24   I'll leave it at that.  I won't say no more on the subject.

25   Let there be no doubt in your mind.

1          MS. MILLER:  Very well, Your Honor.  But--

2          THE COURT:  Until the D.C. Circuit or the Supreme

3    Court says otherwise, that is the absolute belief of this

4    Court.  And the D.C. Circuit has not said otherwise.

5          MS. MILLER:  Even under that approach though, which

6    was adopted by Judge Gleason in HSBC, and any other

7    additional district court judges who the government may not

8    be aware of who have also adopted the--

9          THE COURT:  Oh, you would be aware of it.  You have

10   a cast of thousands out there from the Criminal Division, two

11   rows filled with DOJ folks sitting out there right now, just

12   for the record.

13         MS. MILLER:  Yes, Your Honor.  I would call to the

14   Court's attention though, that even under the more broad view

15   of the judicial authority with respect to approving or

16   rejecting a DPA, which certainly as set forth in the

17   government's papers is not the position that the government

18   is taking and--

19         THE COURT:  Of course it isn't.

20         MS. MILLER:  But even under that approach, which

21   Judge Gleason adopted in HSBC, I would note though that there

22   are a number of limits to the scope of judicial authority.

23         THE COURT:  We're not here to argue that.

24         MS. MILLER:  Very well.

25         THE COURT:  You've put your arguments in writing.

1   What more can you do?  You've put them in writing.  If I

2   reject it, I'll put my reasons in writing.  And then you will

3   have to decide what you want to do.

4        And the defendant is going to have to decide how

5   much time, if time is of essence, which he says it is, how

6   much time they have to go through the appellate process or

7   whether they should go back to the drawing board and come up

8   with another solution and see if it works.  That's between

9   you and him, I'm not getting in the middle of that.

10       MS. MILLER:  I'm sorry, Your Honor.  I didn't mean

11  to --

12       THE COURT:  Do you have a question?  I'm not here

13  for argument.

14       MS. MILLER:  Very well.  The only other point of

15  clarification, though, I would ask from--

16       THE COURT:  Clarification?

17       MS. MILLER:  -- from Your Honor, you had mentioned

18  that you were going to take the opportunity to determine

19  whether or not this was an abuse of prosecutorial discretion,

20  this being the particular settlement reached between the

21  parties, or whether or not this is in the ends of justice.

22       And I would note that, and this is my request for

23  clarification, that even under HSBC, the standard with which

24  Judge Gleason used to ultimately approve the agreement in

25  HSBC was, quote, to determine whether there was a, quote,

1   two-fold purpose of deterring illegality and protecting

2   judicial integrity.

3          THE COURT:  Is there some reason why you think what

4   Judge Gleason said or did has any binding effect on this

5   Court?  Because I'm unaware of how anything that Judge

6   Gleason has said or done has any affect on this Court.  Zero.

7   Can I make that clearer?  Zero.

8          MS. MILLER:  Your point is well taken.  I only am

9   drawing on HSBC because Your Honor had brought it up in the

10  past in a previous hearing to--

11         THE COURT:  It is an example of a case where the

12  issue arose and he wrote an opinion.  And he is a well

13  regarded judge.  So to that extent, yeah, sure I would be

14  interested in reading whatever his opinion is but it has no

15  binding effect on this Court, as you well know.

16         MS. MILLER:  Very well.

17         THE COURT:  This Court has had on occasion cases

18  that were novel.  So I deal with each case on a case-by-case

19  basis.  And this is another one of those novel ones.

20         MS. MILLER:  The last issue that I would ask Your

21  Honor to consider is whether or not to toll the Speedy Trial

22  Act between now and whenever Your Honor either sets another

23  hearing or issues an opinion.

24         THE COURT:  I don't see how there could be any

25  objection to that from either side.

1    MR. O'CALLAGHAN:  There is no objection to that,

2   Judge.

3    THE COURT:  Fine with me.

4    MS. MILLER:  Thank you.

5    THE COURT:  Consider it tolled until we either have

6   a hearing or I issue an opinion.  That's fine with me.

7    MS. MILLER:  Thank you.  If I may, the other point

8   that I would like to make with respect to the pending matter

9   that is before Your Honor is, to recognize that, while I

10   appreciate that Your Honor has now clarified that you

11   appeared to agree that this was a voluntary self disclosure

12   based off of our representations, that in and of itself was

13   not the sole determining factor in the government's

14   calculation with respect to an appropriate resolution.  There

15   were a number of other mitigating factors.

16    THE COURT:  It was a critical factor.

17    MS. MILLER:  Yes, it was a critical factor, as set

18   forth in our pleadings, it is DOJ policy that that is

19   something that should be taken into consideration but it is

20   not the deal breaker.  And in this particular case, there are

21   also other very salient, mitigating factors as I mentioned

22   which were set forth in our pleadings, but which I would ask

23   the Court to take note of.  In particular--

24    THE COURT:  Was it a factor that the company is

25   apparently, based on Mr. O'Callaghan's description, in

1    economic distress?

2         MS. MILLER:  Yes, very much so.  That was a factor

3    that, not only the government took into consideration when

4    contemplating the collateral consequences facing Fokker

5    Services, but also when considering the very issue which Your

6    Honor had brought up, which is imposing a forfeiture in

7    addition to a criminal fine in this particular settlement as

8    a term of the--

9         THE COURT:  Is it a factor that the parent company

10   does contracts with the U. S. Government?

11        MS. MILLER:  Your Honor, in this particular case,

12   there is no evidence to link the parent company, either

13   Fokker Technologies or the previous parent company of Stork

14   Technologies or--

15        THE COURT:  I didn't say that.  I asked you a much

16   simpler question.  Was it a factor from the government's

17   point of view in favor of resolving it this way that the

18   parent company was a company that on a regular basis does

19   government contracts with the U.S. military.

20        MS. MILLER:  No, that was not a factor.

21        THE COURT:  Not a factor, didn't even enter into it.

22        MS. MILLER:  It was not one that was put into the

23   analysis of the principles of corporate--

24        THE COURT:  So I don't have to have any concerns

25   that the parent company wanted it resolved this way and the

1    U.S. Government, because of government contracts that are

2    engaged in between the parent company and the U.S.

3    Government, that may be classified or something like that,

4    was a factor.  I don't have to worry about that.

5            MS. MILLER:  No.  And I perhaps was getting there in

6    an inartful way but what I intended to say earlier is there

7    is no evidence to suggest that any of the conduct here went

8    above or was elevated to any type of parent company

9    involvement.  So, certainly that also is something that we

10   took into consideration.

11           Fokker Services was the entity that, not only

12   engaged in this conduct, but that is before Your Honor taking

13   responsibility for it, and that we have been negotiating

14   with.  So your concern with respect to whether there was any

15   external influence during the negotiations or during the

16   analysis of the principles of corporate liability here, there

17   shouldn't be one, that wasn't a factor.

18           THE COURT:  I'm happy to hear that.  I assumed it

19   but now you've confirmed it.

20           MS. MILLER:  In addition, Your Honor, to the serious

21   financial stress which this company is facing which the

22   government took into consideration, not only with respect to

23   determining an appropriate monetary penalty which, as counsel

24   has indicated, is a significant monetary penalty based off of

25   my review as well as you've noted, the other individuals I've

1    had the opportunity to work with on this matter, it is --

2    this is one of the largest settlements in an IEEPA case if

3    you were to take out of the equation the bank cases.

4         But not only the actual number, it is not only

5    significant because of the actual number, namely $21 million

6    is one of the largest IEEPA cases, not including the bank

7    cases, it is also very significant that in this particular

8    case we're requiring this company to be disgorged of all of

9    its gross revenue.

10        So its gross revenue with respect to its illegal

11   conduct was $21 million, which this company is being required

12   to give back to the government: 10.5 million in criminal

13   forfeiture and 10.5 million in a civil penalty.  But it is

14   also significant because the profit that the company made as

15   a result of this illegal conduct was significantly lower,

16   namely $5.9 million.

17        So I would ask that when Your Honor is considering

18   the number here of $21 million that you, one, consider it in

19   the context of the global resolution but then also consider

20   it in the context that it is $21 million that was the gross

21   but it was $5.9 million that was the profit.  So we certainly

22   have required this company to pay far beyond what it actually

23   earned as a result of its illegal conduct.

24        Another point of mitigation here, which is very

25   significant for the government, is the company's cooperation

1    and something I would bring to Your Honor's attention which

2    actually isn't before the Court.

3            THE COURT:  It is already in the pleadings, isn't

4    it?

5            MS. MILLER:  This actually is not before Your Honor.

6    But even as late as the last couple of weeks, so since the

7    matter has been pending before Your Honor in June of this

8    year, this company has provided a disclosure to the

9    government in which there are details related to possible

10   suspicious activity of another entity or another company.

11           So, the company has not only cooperated in the

12   instant investigation, it has not only been cooperating

13   historically since the matter has been pending before Your

14   Honor, but even as recent as in the last three weeks, Fokker

15   Services has been providing the government with disclosures

16   detailing possible suspicious activity which the government

17   could pursue investigatory leads.

18           THE COURT:  Are there any other cases with which you

19   have familiarity involving deferred prosecution agreements

20   where the company in question was engaged in transactions of

21   a similar kind as this, with an enemy of the United States,

22   that is considered one of its most serious enemies?

23           MS. MILLER:  If Your Honor is asking if there are

24   other cases in which I am familiar where the sanctioned

25   entity, or the sanction is Iran, yes, I am familiar with a

1    number of corporate investigations which have been resolved

2    with a deferred prosecution agreement where the defendant

3    company has been engaged in conduct with respect to

4    interfacing or violating the sanctions with Iran.

5             THE COURT:  With the Iranian military?

6             MS. MILLER:  Yes, Your Honor.  In addition to that,

7    I would--

8             THE COURT:  The Iranian military?

9             MS. MILLER:  I would note that in this particular

10   case--

11            THE COURT:  Was that a yes?

12            MS. MILLER:  Off the top of my head, I'm not as

13   familiar with the details of those other cases and whether

14   they particularly related to Iranian military end users or

15   Iranian civilians.

16            THE COURT:  How about North Korean military end

17   users?  Do you have any cases like that that you are familiar

18   with?

19            MS. MILLER:  Off the top of my head, I don't know

20   the particulars of whether or not those particular cases

21   involved North Korean military or just simply North Korean

22   civilian end users.  I would note that in this case, is there

23   is no evidence to suggest that or Fokker is not before Your

24   Honor for engaging in conduct with North Korea.

25            THE COURT:  I'm looking for analogies in other cases

1    where there are deferred prosecution agreements where the

2    company in question was engaged in providing parts to one of

3    the most serious enemies of the United States' military.

4    Now North Korea would qualify for that characterization just

5    like Iran would.  Right?  So I was just throwing it out to

6    see if you may have knowledge about a case where there was a

7    deep deferred prosecution agreement where the company in

8    question was providing military goods, equipment, to the

9    military of one of our most serious enemies.

10           MS. MILLER:  I will certainly review that issue and

11   provide supplemental materials to Your Honor.  But I would

12   note for the clarification, these were not military goods.

13   So this is an ITAR--

14           THE COURT:  Parts.

15           MS. MILLER:  These were aircraft components.

16           THE COURT:  Going to the Iranian military.

17           MS. MILLER:  Which were going to aircraft operators

18   within Iran.  Some of which, I believe five of the 11 had

19   connections to Iranian military use.

20           THE COURT:  Close enough.  Close enough.  If you

21   know of any, let me know.

22           MS. MILLER:  I will.  And thank you for the

23   opportunity.  In addition to the cooperation and the fact

24   that this was a voluntary disclosure--

25           THE COURT:  Your pleadings are voluminous,

1    voluminous.

2         MS. MILLER:  Thank you, Your Honor.  If there is

3    anything further, I would be happy to answer your questions

4    otherwise.

5         THE COURT:  If I need anything you'll hear from me.

6         MS. MILLER:  Thank you, Your Honor.

7         (Whereupon, at 12:40 P.M., the hearing concluded.)

8

9

10

11                    CERTIFICATE OF REPORTER

12         I, Lisa Walker Griffith, certify that the foregoing

13   is a correct transcript from the record of proceedings in the

14   above-entitled matter.

15

16

17

18

19   _____   _____

20   Lisa Walker Griffith, RPR                     Date

21

22

23

24

25